IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

    v.

HAOYANG YU, *et al.*

No. 19-cr-10195-WGY

## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS INDICTMENT DUE TO
## UNCONSTITUTIONAL SELECTIVE ENFORCEMENT AND PROSECUTION

William W. Fick (BBO # 650562)
Daniel N. Marx (BB0 #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## TABLE OF CONTENTS

Background ........................................................................................................................ 1

    A.    The FBI selectively targeted Mr. Yu, an American citizen of Chinese descent, for investigation, and the DOJ selectively identified him for prosecution. .................. 1

    B.    Similarly situated individuals who have alleged committed similar conduct but were not from China have received different treatment. ........................................ 3

        1.    The ADI-MACOM Case ................................................................................ 4

        2.    Massachusetts data ........................................................................................ 5

        3.    National data ................................................................................................. 6

Argument .......................................................................................................................... 7

I.     The government may not selectively apply criminal laws based on race or nationality. ... 7

II.    The federal government's enforcement policy concerning suspected trade-secret theft by people of Chinese ethnicity is discriminatory on its face. ............................................... 10

III.   Regardless, the federal government's actions against Mr. Yu have been motivated, at least in part, by discriminatory animus toward people of Chinese ethnicity. .......................... 12

IV.   The federal government's enforcement actions also have discriminatory effects on people of Chinese ethnicity, including U.S. citizens like Mr. Yu. .............................................. 14

V.    At a minimum, further discovery is warranted, because Mr. Yu has made a "colorable showing," based on available evidence, of selective enforcement and prosecution......... 17

    A.    Mr. Yu satisfies the threshold standard for discovery in support of his selective prosecution claim. ............................................................................................... 18

    B.    Mr. Yu easily satisfies the lower standard for discovery in support of his selective enforcement claim................................................................................................. 19

Conclusion ...................................................................................................................... 20

Certificate of Service ...................................................................................................... 21

<u>**BACKGROUND**</u>

**A.      The FBI selectively targeted Mr. Yu, an American citizen of Chinese descent, for investigation, and the DOJ selectively identified him for prosecution.**

On June 11, 2019, Mr. Yu, a naturalized U.S. citizen who has lived in this country for nearly 20 years, was charged in a 15-count indictment with various trade secret offenses:  stealing trade secrets in violation of 18 U.S.C. § 1832(a)(1) & (a)(4); copying, uploading, or downloading trade secrets in violation of § 1832(a)(2) & (a)(4); and possessing trade secrets in violation of § 1832(a)(3) & (a)(4). *See* DE #1 (Counts I-XIV). Mr. Yu allegedly misappropriated from his former employer, Analog Devices, Inc. ("ADI" or "Analog"), data about monolithic microwave integrated circuits ("MMICs"), a common type of semiconductor commercially available for over 30 years and found in many electronic devices. Mr. Yu was also charged with "smuggling" in violation of 18 U.S.C. § 554, because he allegedly shipped export-controlled MMIC products to a commercial customer in Spain. *See id.* (Count XV).

The Indictment, which reads like a civil complaint that ADI might have filed against Mr. Yu, alleges in part:

- While working for ADI, Mr. Yu improperly downloaded "hundreds of highly confidential schematic design files as well as design layouts and modeling files" and uploaded "certain portions of those files" to his Google drive. *Id.* ¶ 9. For example, he stole data about MMICs, such as HMC-994A, a wideband frequency amplifier that ADI claims to be worth "millions of dollars." *Id.*

- In violation of his separation agreement, Mr. Yu kept ADI's files, including confidential design, layout, and production information for MMICs, on his personal Google drive "for his own economic benefit." *Id.* ¶ 10.

- Since departing from ADI, Mr. Yu has operated Tricon MMIC, LLC ("Tricon"), his own start-up company to design, manufacture, and sell MMICs, and he has sold "parts that are identical, or substantially similar, to ADI products and which incorporate ADI's stolen trade secrets." *Id.* ¶ 12.

- Through Tricon, Mr. Yu has "marketed for sale approximately 20 ADI and HMC designs as his own." The specifications of Tricon's MMICs are

"identical or virtually identical to those sold by ADI," and Tricon uses the
same foundry in Taiwan to fabricate its products that ADI uses. *Id.* ¶ 8.

In short, the Indictment alleges Mr. Yu stole "trade secrets" about MMICs from ADI, a multi-

billion-dollar, multi-national microchip company, to jumpstart his one-man, start-up "competitor."

From the start, however, Mr. Yu has been unfairly targeted as a potential threat to "national

security," because he was "born in Harbin, China," entered the U.S. from China nearly 20 years

ago "through the student visa program," and is married to "a Chinese national." *Id.* ¶ 1. If Mr. Yu

were not Chinese American, he likely would have received a stern letter from ADI's outside

counsel, former U.S. Attorney William Weinreb, threatening a potential civil suit, demanding the

immediate return of all ADI's files, and requiring some proof of compliance (e.g., an independent

forensic examination). That would have been the end of it.

Instead, a few months before the government indicted Mr. Yu, it designated the Tricon

investigation as a "significant case" that involved a "national security threat," including potential

"counter-proliferation" concerns. *See* Ex. A (DOJ-YU-2899) ("Report concerning SCR

designation"). The SCR report emphasized Mr. Yu is "a naturalized United States citizen from

China" and his wife is "an LPR from China." *Id.* at 2. It falsely claimed Mr. Yu was "selling"

MMIC amplifiers to "international customers, *including those in China*, based on designs and

technical data that he stole from Analog while he was still working there." *Id.* (emphasis added).

In fact, the investigation found no sales or shipments to China, and the Indictment charges no

offenses related to China.[1]

---

[1] The SCR report was replete with additional misleading and inaccurate information. It stated
Tricon products were advertised by Chinese companies on Chinese websites, but it offered no
evidence (and there is none) that those sham companies had any legitimate connection to Mr. Yu
or had access to his products. *See id.* It also stated Mr. Yu was paid $50,000 to consult with a
Chinese MMIC manufacturer that is "seeking to use US techniques, innovations and know-how to
produce their own MMIC amplifiers." *Id.* Although the report does not suggest that consulting (if

Although some investigative steps were taken as early as December 2017, the targeting of Mr. Yu significantly intensified in March 2018, immediately after President Trump announced the trade war with China. At that point, HSI opened multiple cases concerning Tricon and Mr. Yu. *See, e.g.*, DOJ-YU-145 (noting case opened March 23, 2018). Then, in May 2018, the FBI installed a pole camera outside the Yu residence to surveil the entire family (Mr. Yu, his wife, and their two young sons) for almost a year. *See* Ex. B (Siegmann Discovery Ltr. (July 17, 2019)) at 2. In June 2019, shortly before Mr. Yu planned to visit his elderly parents in China, agents raided his home, seizing a significant volume of Mr. Yu's property, including his own confidential business information and trade secrets. Ex. C (DOJ-YU-000311).

**B.**     **Similarly situated individuals who have alleged committed similar conduct but were not from China have received different treatment.**

The government has neither investigated nor prosecuted similarly situated individuals who allegedly stole trade secrets from U.S. Companies but who were *not* ethnically Chinese. In addition, as detailed in his separate Motion for Franks Hearing [DE #__], investigators sought a Department of Commerce export classification for one of Mr. Yu's products but failed to ask about (or disclose) functionally identical products that other companies, including ADI, sell without export licenses. Although Mr. Yu has not yet had an opportunity to take discovery in support of this motion, the available evidence on the disparate treatment of suspected Chinese "spies" is extensive, drawn from a recent, comparable civil case in this District involving the alleged theft of the same technology from ADI by former employees who were not ethnically Chinese, as well as compelling statistics concerning trade secrets cases in state and federal courts in Massachusetts and elsewhere.

---

it occurred) would violate U.S. laws, the vague mention gave the misleading impression that Mr. Yu was a Chinese spy trying to steal U.S. technology and advancing Chinese interests.

### 1. The ADI-MACOM Case

Only a few years ago, four former employees of ADI allegedly stole the very same trade secrets about MMICs (and much more) to help their new employer, MACOM Technology Solutions, Inc. ("MACOM"), compete against ADI. None of those individuals were ethnically Chinese, and none faced prosecution. Rather ADI sued MACOM, alleging civil claims based on "MACOM's recent attempts to compete with [ADI] not by its own innovation, but instead by misappropriation of Analog's trade secrets, improperly acquired from former Analog employees, and by its infringement on Analog's patent-protected inventions." Ex. D (Complaint, *Analog Devices, Inc. v. Macom Tech. Solutions Holdings, Inc.*, No. 18-cv-11028-GAO (D. Mass.)) ¶ 2.

Mirroring the Indictment against Mr. Yu, the civil complaint against MACOM alleged "[a]t least three Analog employees," Frank Traut, Thomas Winslow, and George Papamitrou, "departed Analog for MACOM in 2015 and 2016, attempting to take with them valuable Analog trade secrets." *Id.* ¶¶ 4, 23. Although the defecting employees were "caught red-handed and returned or destroyed some of the stolen information, confidential Analog trade secrets nonetheless made their way to MACOM." *Id.* ADI further claimed MACOM's CEO, John Croteau, another former employee, conspired with Traut, Winslow, and Papamitrou. *Id.* ¶¶ 20, 24.

The similarities between the criminal charges against Mr. Yu and the civil allegations about Winslow, who worked closely with Mr. Yu at ADI, are uncanny. In its complaint, ADI alleged:

- Winslow worked for ADI from September 2011 until leaving for MACOM in February 2015, and while at ADI, he held various engineering positions, including the Principle Designer for certain MMICs. *Id.* ¶¶ 48-49.

- In the weeks before joining MACOM, and in violation of his confidentiality agreements with ADI, Winslow "secretly and without authorization downloaded approximately 500GB of data to at least 19 external devices (including 4 hard drives)," and those stolen trade secrets included ADI's "confidential and proprietary information, such as design and layout files, schematics and simulations related to various products, including but not limited to MMIC amplifier products." *Id.* ¶¶ 51-54.

- When ADI learned of these downloads, it contacted Croteau and Winslow, who later "signed a document certifying that he copied Analog's confidential information to portable hard drives, some of which he took with him after leaving employ of Analog" and "had, indeed, put certain of those Analog files into his MACOM-issued laptop." *Id.* ¶¶ 55-58.

- Even then, however, ADI asserted that "MACOM misused (and continues to misuse) confidential and proprietary . . . Analog trade secret information brought to it by Mr. Winslow." *Id.* ¶ 60.

Notably, both cases involved several of the exact same ADI products, HMC797, HMC994, HMC994A, and HMC998, *compare id.* ¶¶ 30, 63-64, *with* Indictment ¶ 18 & Count 10, and Winslow stole far more data from ADI ("500GB of data" on "at least 19 external devices") than the Indictment alleges Mr. Yu transferred to his Google drive (four relatively small files).

Based on ADI's civil suit against MACOM (which quickly settled to ADI's apparent satisfaction, this Court has a readily available "control group" for its equal protection analysis of the criminal case against Mr. Yu. The former employees who stole valuable trade secrets about MMICs from ADI—including Winslow, who confessed—suffered no legal consequences. ADI civilly sued MACOM but not its former employees. More importantly, none faced criminal charges for intentionally stealing technology from ADI to help MACOM. In sharp contrast, Mr. Yu who is alleged to have taken the same technology from the same company for a similar purpose (to help another, much smaller U.S. competitor) now faces decades in federal prison, based on ADI's grossly inflated valuation of its alleged trade secrets. A single, critical fact distinguishes the MACOM case from this prosecution: Mr. Yu is a U.S. citizen of Chinese descent.

### 2. Massachusetts data

Publicly available evidence confirms the discriminatory targeting of persons of Chinese descent who are alleged to have stolen trade secrets from U.S. companies. A search of press releases by the U.S. Attorney's Office, dating back to 2013, yields the following five reports:

- Harvard University Professor and Two Chinese Nationals Charged in Three Separate China Related Cases (Jan. 28, 2020);
- Dual Canadian/Chinese Citizen Arrested for Attempting to Steal Trade Secrets and Computer Information (Aug. 31, 2017);
- Extradited Chinese National Sentenced to Nine Years for Providing U.S. Goods to Iran to Support its Nuclear Program (Jan. 27, 2016);
- Woman Sentenced for Illegally Exporting Electronics Components Used in Military Radar, Electronic Warfare and Missile Systems to China (May 1, 2014); and
- Chinese National Sentenced for Illegal Exporting Military Electronics Components (Sept. 10, 2013).

With one exception, all seven defendants in all five cases were either Chinese Americans or Chinese nationals. The lone exception is Prof. Charles Lieber, of Harvard University, who has been charged with making false statements about China's Ten Thousand Talents Program.

Despite the intense focus on ethnically Chinese defendants, there has been no shortage of other non-Chinese suspects who warranted scrutiny. A Lexis search of civil trade secrets cases in this District, over the past three years, yields numerous claims by corporations against employees who allegedly stole confidential information. *See* Appx. A. Similar searches of Massachusetts courts yields an even longer list of civil cases. *See id.* All these cases follow the MACOM pattern: they involve non-Chinese defendants who faced only civil claims, not criminal charges.

### 3. National data

Nationwide statistics further establish that, when it comes to suspected theft of trade secrets, persons from China are subjected to disparate treatment. A first-of-its-kind empirical analysis of criminal prosecutions under the Economic Espionage Act ("EEA") was recently conducted, and based on a review of 136 federal cases involving 187 defendants from 1997 to 2015, the study "reveal[ed] significant disparities in the rates at which people of Asian descent"—Chinese Americans and nationals, in particular—"are prosecuted for espionage and the outcomes of those prosecutions." Andrew C. Kim, "Prosecuting Chinese 'Spies': An Empirical Analysis of

the Economic Espionage Act," 40 CARDOZO L. REV. 751, 753 (2018) (finding that, "[a]fter 2009, the percentage of Chinese defendants tripled to 52%" of all federal prosecutions concerning alleged corporate espionage). The study bluntly concluded that these disparities are "consistent with concerns of racial profiling and racial bias." *Id.* at 754.

Such racial discrimination concerns are impossible to ignore when one compares nationwide statistics for civil trade secret cases. During the first year after Congress enacted the Defend Trade Secret Act ("DTSA") in 2017, federal civil claims were brought against Chinese defendants in less than 2% of cases. *See* David S. Levine & Christopher B. Seaman, "The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act," 53 WAKE FOREST L. REV. 105, 146-47 (2018) ("[F]ew foreigners were named as defendants in DTSA claims. Out of 486 cases in our dataset, only 29 (6%) alleged a foreign citizen or national had committed trade secret misappropriation. China is the most represented country, but only in 7 cases—in other words, less than 2% of all DTSA claims."). Thus, the high rate of criminal cases against Chinese defendants cannot be justified on the grounds that only Chinese people steal trade secrets from U.S. companies. Trade secret theft is an equal opportunity offense, and the selective investigation and prosecution of people of Chinese descent is an equal protection violation.

## ARGUMENT

## I. The government may not selectively apply criminal laws based on race or nationality.

The decision to investigate or prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 488, 456 (1962). When "the administration of a criminal law is 'directed so exclusively against a particular class of persons,'" such a "system of prosecution amounts to 'a practical denial' of the equal protection." *Armstrong v. United States*, 517 U.S. 456, 464-65 (1996) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)). Because selective enforcement and prosecution claims "draw on 'ordinary equal

protection standards,'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)), a defendant must make "a binary showing" of "discriminatory effect" and "discriminatory intent." *United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008).

"To establish a discriminatory effect" based on race or nationality, the defendant "must show that similarly situated individuals" of different races or nationalities have not faced investigation or prosecution. *Armstrong*, 417 U.S. at 465 (citing *Ah Sin v. Wittman*, 198 U.S. 500 (1905)). For these purposes, "[a] similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *Lewis*, 517 F.3d at 27; *see United States v. Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999) (comparing statistics on black and white defendants in crack cases, without regard to several factors that the government cited as distinguishing, including whether defendants were career offenders or offenses occurred in school zones).

To show "[d]iscriminatory purpose," the defendant must offer evidence that government actors, whether investigators or prosecutors, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (quoting *Personnel Admin. of Mass. v. Feeney*, 422 U.S. 256, 279 (1979)). For these purposes, "contemporary statements" by decision-makers, "the historical background" to the challenged action, and "the specific sequence of events leading up to [it]" are all relevant considerations. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977); *cf. Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (considering reasonable inferences from President Trump's statements and tweets about "the Muslim ban").

Importantly, a defendant is "not required to produce direct evidence" of discriminatory intent, which is "rarely available." *Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17

(D.D.C. 1997); *see Tuitt*, 68 F. Supp. 2d at 10 (recognizing "[i]t is exceedingly rare for a prosecutor to admit that the decision to prosecute was based on ethnicity or nationality"). "As in any equal protection case, evidence concerning the unequal application of the law, statistical disparities and other indirect evidence may be used to show bias or discriminatory motive." *Branch Ministries, Inc.*, 970 F. Supp. at 17. Further, when the discriminatory effect is "severe enough," that fact alone provides "sufficient evidence of discriminatory purpose." *Tuitt*, 68 F. Supp. 2d at 10.

Since *Yick Wo v. Hopkins*, 118 U.S. 265 (1886), the Supreme Court has implicitly recognized that dismissal is the appropriate remedy for selective prosecution. Several circuits have expressly held, "[i]f the Executive selectively prosecutes based on impermissible considerations, the equal protection remedy is to dismiss the prosecution." *In re Aiken County*, 725 F.3d 255, 264 n.7 (D.C. Cir. 2013); *see United States v. Vazquez*, 145 F.3d 74, 82 n.6 (2d Cir. 1998); *Feder v. Village of Shiloh*, No. 97-1101, 1997 U.S. App. LEXIS 19190, at *5 n.3 (7th Cir. July 22, 1997); *see also United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1055 n.9 (N.D. Cal. 2016) (noting government neither disputed that dismissal is appropriate remedy nor cited any contrary authority).

The same is true for selective enforcement, because "discrimination in enforcement of criminal laws is constitutionally as injurious as . . . discrimination in prosecution." *Mumphrey*, 193 F. Supp. 3d at 1055 (ruling dismissal is appropriate remedy for selective enforcement).

> Racially selective action by law enforcement inflicts harm whether it is perpetrated by law enforcement in the streets or by a prosecutor in an office—both inflict substantial injury on the victim and society: in addition to violating the victim's rights to equality and liberty, such discriminatory conduct impugns the integrity of the criminal justice system and compromises public confidence therein.

*Id.* At least two circuits have held that selective enforcement warrants dismissal of criminal proceedings. *See United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (*en banc*); *United States v.*

*Alcaraz-Arellano*, 441 F.3d 1252 (10th Cir. 2006); *see also United States v. Mackey*, No. 5:16-CR-772, 2016 U.S. Dist. LEXIS 188671, at *8 (S.D. Tex. Oct. 24, 2016).

## II. The federal government's enforcement policy concerning suspected trade-secret theft by people of Chinese ethnicity is discriminatory on its face.

When an equal protection claim is based on "overtly discriminatory classification," a defendant need not prove "discriminatory intent." *Wayte*, 470 U.S. at 608 n.10 (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)). That is the case, here: as a matter of federal policy, the DOJ's "China Initiative" intentionally targets people of Chinese ethnicity, including U.S. citizens like Mr. Yu, for aggressive enforcement and criminal prosecution.

At a recent conference, Attorney General William Barr stated that China poses "the greatest threat" to the U.S. because "China wants to own the world," and "[f]or China, success is a zero-sum game." Keynote Address, "China Initiative Conference," Ctr for Strategic & Int'l Studies (Feb. 6, 2020).[2] Attorney General Barr referred to "[t]he Chinese" as "a commercial people" who view "economic success" as "a means to wider political and strategic objectives." *Id.* He also asserted, "the Chinese leadership . . . has mobilized all elements of Chinese society," including "all of its industrious people," in China, the United States, and elsewhere, to engage in "industrial espionage and theft of technology and intellectual property," all as part of "an ambitious plan" by China "to dominate the core technologies of the future." *Id.*

Consistent with that jingoistic rhetoric, the prosecution of alleged trade secret theft by ethnically Chinese defendants is a core element of the DOJ's China Initiative. *See id.* Correspondingly, the investigation of such suspected activities, which FBI Director Christopher Wray has called "the most significant counterintelligence threat that we face," is a major part of

---

[2] For ease of reference, the press releases, press articles, and other materials cited in this memorandum, and available online, are included in Appendix B.

the FBI's current enforcement efforts. U.S. Senate Select Comm. on Intelligence, "Worldwide Threat Assessment of the U.S. Intelligence Community," S. Hrg. 116-75 (Jan. 29, 2019) at 80.

The U.S. Attorney for the District of Massachusetts is one of five members of the China Initiative's Steering Committee, which "provide[s] guidance to US attorneys nationwide on prioritizing aggressive, innovative prosecutorial strategies for countering th[e] threat" that Chinese Americans and nationals will steal trade secrets from U.S. companies. Andrew Lelling & Joseph Bonavolonta, "The intel on China's counterintelligence threat to America," THE BOSTON GLOBE (Feb. 11, 2020). Recently, U.S. Attorney Lelling predicted "a 'spike' in prosecutions" in 2020, a "response" that is "needed" to counter "a massive nationwide effort [by China] to pilfer technology and know-how and transfer it to China for its own uses." Catherine Matacic, "U.S. attorneys warn of upcoming 'spike' in prosecutions related to China ties," SCIENCE (Feb. 7, 2020).

As a matter of federal law enforcement policy, this explicit focus on, and highly publicized targeting of, people of Chinese ethnicity developed over many years, but it accelerated after President Trump was elected. In June 2018, the White House issued a report, titled "How China's Economic Aggression Threatens the Technologies and Intellectual Property of the United States and the World" (June 2018). The Report stated, "Physical theft through economic espionage by company insiders or others who have trusted access to trade secrets and confidential business information provides China with a significant means to acquire U.S. technologies and intellectual property." *Id.* at 2 (noting the Office of the Director of National Intelligence described "Chinese actors" as "the world's most active and persistent perpetrators of economic espionage").

By stereotyping "Chinese actors" in this way, "the argument for greater protection" of U.S. companies "derive[s] at least some of its power from xenophobia." Rachel Cooper Dreyfuss & Orly Lobel, "Economic Espionage as Reality or Rhetoric: Equating Trade Secrecy with National

Security," 20 LEWIS & CLARK L. REV. 419, 426 (2016). It "represents racial profiling at its most pernicious" and leads to "spectacular prosecutorial errors, including investigations and indictments that fall apart, but nonetheless do significant damage to the people involved." *Id.* at 471.

**III. Regardless, the federal government's actions against Mr. Yu have been motivated, at least in part, by discriminatory animus toward people of Chinese ethnicity.**

In announcing his National Counterintelligence Strategy, President Trump recently stated, "A more powerful and emboldened China is increasingly asserting itself by stealing our technology and intellectual property in an effort to erode United States economic and military superiority." National Counterintelligence Strategy of the United States of America 2020-2022 (Jan. 7, 2020).

In a less-scripted moment, President Trump expressed similar bias against China in cruder terms: "We can't continue to allow China to rape our country and that's what they're doing. It's the greatest theft in the history of the world." Nick Gass, "Trump: We can't continue to allow China to rape our country," POLITICO (May 2, 2016). Beyond bashing the Chinese government, President Trump has made racist comments about Chinese people; for example, accusing Chinese participants of "cheating at the Olympics," he tweeted: "That's the *Chinese M.O. – Lie, Cheat, Steal* in all international dealings." @realDonaldTrump (Aug. 8, 2012). Endorsing unfounded claims that China "spawn[ed]" the COVID-19 pandemic, Peter Navarro, a senior trade official in the Trump administration, recently declared Chinese officials are "guilty until proven innocent." AP, "US trade adviser links virus to China government," THE BOSTON GLOBE (July 22, 2020).

FBI Director Wray has identified "the threat from China" as "the greatest long-term threat to our nation's information and intellectual property, and to our economic vitality." Christopher Wray, Remarks, China Initiative Conference, CSIS (Feb. 6, 2020) at 1. Generalizing about more than 1 billion Chinese people, Wray proclaimed: "[T]hey've made the long view an art form. They are calculating, they are persistent, they are patient," and "they've shown that they're willing to

steal their way up the economic ladder at our expense." *Id.* at 3.[3] Those discriminatory comments

are consistent with "ongoing complaints of bias against Chinese Americans" at the FBI. Mara

Hvistendahl, "The FBI's China Obsession," THE INTERCEPT (Feb. 2, 2020); *see id.* at 18 (reporting

that, according to former FBI supervisor of Chinese descent, "[t]he message from leadership . . .

is that 'Chinese Americans are being weaponized as a tool by foreign nationals'").

U.S. Attorney Lelling offered the following blunt explanation for the federal government's

discriminatory policy to target ethnically Chinese people:

> The bottom line is that this is an effort by a rival nation state to steal
> U.S. technology. . . that rival nation is made up almost exclusively
> of Han Chinese. And so, unfortunately, a lot of our targets are going
> to be Han Chinese. It if were the French government targeting U.S.
> technology, we'd be looking for Frenchmen.

Jeffrey Mervis, "U.S. prosecutor leading China probe explains effort that led to charges against

Harvard chemist," SCIENCE (Feb. 3, 2020). It is difficult to imagine a more explicit declaration that

the DOJ, FBI, and other law enforcement agencies are "looking for [Chinamen]," despite the

undisputed (and indisputable) fact that persons of all races, ethnicities, and nationalities—

including Caucasian Americans—steal trade secrets from U.S. companies or attempt to do so.

These anti-Chinese statements have—perhaps, intentionally—caused considerable fear

about a "new McCarthyism" that unfairly profiles and harshly scrutinizes all people of Chinese

descent, including U.S. citizens. *See* Nick Anderson, "Scrutiny of Chinese American scientists

raises fears of ethnic profiling," THE WASHINGTON POST (July 19, 2019). Congressman Ted Lieu,

of Los Angeles, California, criticized Director Wray for "feed[ing] into the false and harmful

---

[3] Although Director Wray claimed "this is not about the people of Chinese ethnicity as a whole and it sure as heck is not about Chinese Americans as a group," Wray, Remarks, *supra* at 3, his defensive comments ring hollow, and they cannot be squared with the FBI's targeting of Chinese Americans. More than once, President Trump has insisted, "I am the least racist persons you have ever met." Peter Baker, "Trump Fans the Flames of a Racial Fire," THE NEW YORK TIMES (July 14, 2019). Such comments cannot obscure the unfortunate reality of race-based state action.

narrative that somehow Chinese-Americans are more suspicious." Press Release, "Rep. Lieu Calls on FBI Director to Clarify Statements on Chinese Academics" (Feb. 18, 2015). Congresswoman Judy Chu, of Monterey Park, California, decried a new "Red Scare" after she attended intelligence briefings that gave "the impression that 'every Chinese person is evil and a spy.'" Teresa Watanabe, "Is it police work or racial profiling? U.S. crackdown puts Chinese scholars on edge," LOS ANGELES TIMES (July 22, 2019); *see* Kim, *supra*, at 752 (describing fear of "an irrational 'Red Scare'" in which "the American intelligence community is racially profiling Asian-Americans as 'perpetual foreigners' whose loyalty to their country will always be in doubt").

Reflecting widespread sentiments in the academic community, MIT President L. Rafael Reif, recently "shared [his] dismay" about government scrutiny of "our fellow MIT community members of Chinese descent." L. Rafael Reif, "Immigration is a kind of oxygen," MIT NEWS (June 25, 2019). President Reif criticized the "toxic atmosphere of unfounded suspicion and fear."

> Looking at cases across the nation, small numbers of researchers of Chinese background may indeed have acted in bad faith, but they are the exception and very far from the rule. Yet faculty members, post-docs, research staff and students tell me that, in their dealings with government agencies, they now feel unfairly scrutinized, stigmatized and on edge – *because of their Chinese ethnicity alone*.

*Id.* (emphasis added). The same caution is warranted concerning alleged corporate espionage.

## IV. The federal government's enforcement actions also have discriminatory effects on people of Chinese ethnicity, including U.S. citizens like Mr. Yu.

Over the past decade, the government's enforcement actions have had disparate effects and devasting consequences on people of Chinese ethnicity. *See* Jessica Nall & Janice Reicher, "3 Trends in Criminal Trade Secret Prosecutions," LAW360 (Jan. 23, 2019). From 1997 to 2009, only 17% of defendants charged under the EEA were of Chinese descent, but after 2009, the percentage tripled to 52%. *See* Kim, *supra*, at 753. Since then, this disparate treatment has only intensified. From 2011 to 2018, "[m]ore than 90 percent of the [DOJ's] cases alleging economic espionage . .

. involve[d] China," and "[m]ore than two-thirds of the cases involving thefts of trade secrets [we]re connected to China." DOJ Press Release, "Chinese National Charged with Committing Theft of Trade Secrets" (Dec. 21, 2018); *see* Cooper Dreyfuss & Lobel, *supra*, at 449 ("Over half of the economic espionage indictments since 2013 have had a China connection.").

In recent years, the DOJ "has brought trade secret theft cases in eight of the 10 technology sectors China is aspiring to dominate," Barr, *supra*, at 4, against more than 13 Chinese individuals and entities, *see* Jeremy S. Wu, "Federal Cases," *available at* < https://jeremy-wu.info/fed-cases/ >; *see also* U.S. Dep't of Justice PRO IP Act Annual Report (2018) at 15-16 (listing 10 DOJ cases concerning alleged trade secret theft, of which 8 cases targeted Chinese individuals or entities).

Not surprisingly, "the first systematic empirical analysis of racial disparities in DOJ prosecutions for espionage" has "reveal[ed] significant disparities in the rates at which people of Asian descent are prosecuted for espionage and the outcomes of those prosecutions." Kim, *supra*, at 753. The study found Chinese defendants are far more likely to be charged but "twice as likely to be innocent as those of other races." *Id.* at 753. More than 20% of Chinese defendants charged with espionage are never convicted. *See id.* at 754. Nevertheless, when convicted, Chinese defendants tend to receive harsher sentences than non-Chinese defendants. *See id.* at 753-54.

The wave of criminal cases against Chinese defendants is the inevitable result of aggressive scrutiny of Chinese suspects. As of last year, the FBI had more than 1,000 active investigations, spread across all 56 field offices, concerning Chinese persons and entities suspected of stealing intellectual property from U.S. companies. *See* S. Hrg. 116-75 at 80; *see* FBI News, "Confronting the China Threat" (Feb. 6, 2020). According to Director Wray, "the number of those [investigations] has probably doubled over the last three or four years," and "*almost all of them . . . lead back to China*." S. Hrg. 116-75 at 80-81 (emphasis added).

Unfortunately, many high-profile investigations of ethnically Chinese people have led to wrongful prosecutions that devastated innocent lives and failed to protect national security.

> A growing number of scientists have been targeted improperly as DOJ lawyers have stepped up prosecutions, advocates say. Since 2014, charges have been dropped against at least five Chinese-born scientists accused of crimes related to secrets, theft or economic spying. . . . critics say, the US government has charged scientists without understanding the science at the heart of its allegations.

Mara Hvistendhal, "Spying charges against Chinese-American scientists spark fears of a witch hunt," SOUTH CHINA MORNING POST (May 5, 2018) (noting "a startling number of cases [against Chinese Americans] have unraveled"). Many cases failed because they "clearly [went] overboard with their intense focus on Chinese nationals." Dreyfuss & Lobel, *supra*, at 450.

For example, Xiaoxing Xi, the former chair of Temple University's physics department, was charged with transferring superconductor technology to China. Only five months later, all charges were dropped, after it became clear the technology was old and publicly available. Dr. Xi's case "raise[d] questions about whether the Justice Department, in its rush to find Chinese spies, is ensnaring innocent American citizens of Chinese ancestry." Matt Apuzzo, "U.S. Drops Charges that Professor Shared Technology with China," THE NEW YORK TIMES (Sept. 11, 2015). Similarly, Sherry Chen, a hydrologist with the National Weather Service, was charged with giving data on U.S. dams to China. As with Dr. Xi, the case against Dr. Chen was dropped, because she had legitimate reasons to access the data and never passed it to China. After reviewing Dr. Chen's case, a former prosecutor cautioned, "If you're looking everywhere for spies, you will find spies everywhere, even where they don't exist." Nicole Perlroth, "Accused of Spying for China, Until She Wasn't," THE NEW YORK TIMES (May 9, 2015). Other cases that began with headline-grabbing accusations about Chinese "spies" have ended with modest convictions for rarely enforced crimes such as taking government laptops out of the U.S. without prior approval. *See* Kim, *supra*, at 165.

In the late 1990s, Wen Ho Lee, a scientist at Los Alamos, was charged with stealing U.S. nuclear secrets for the Chinese military. In the end, however, Dr. Lee pleaded guilty only to one count of mishandling classified data (1 of 59 charges) and was sentenced to time served. Based on the DOJ's trumped-up national security claims, Dr. Lee had been denied pre-trial release, held in solitary confinement, and subjected to "draconian" conditions for almost one year. *See* Matthew Purdy, "The Prosecution Unravels: The Case of Wen Ho Lee," THE NEW YORK TIMES (Feb. 5, 2001). Later apologizing to Dr. Lee, Judge James Parker said he was "led astray" by the DOJ and FBI, and he criticized "the top decision makers in the executive branch" for having "embarrassed" the judiciary and "our entire nation and each of us who is a citizen of it." "Statement by Judge in Los Alamos Case, With Apology for Abuse of Power," THE NEW YORK TIMES (Sept. 14, 2000).

The wrongful prosecution of Dr. Lee was an "18-month fiasco that exposed an American security apparatus as both too vulnerable to political influence and too unchecked in its investigative and prosecutorial abilities, all in the name of the national interest." Lowen Liu, "Just the Wrong Amount of American," SLATE (Sept. 11, 2016). Unfortunately, "despite the embarrassment the case brought to multiple branches of government, it was not the closing chapter in an ugly period of suspicion and prejudice, *id.*, and that unconstitutional story continues with the selective investigation and prosecution of Chinese Americans, like Mr. Yu.

## V.     At a minimum, further discovery is warranted, because Mr. Yu has made a "colorable showing," based on available evidence, of selective enforcement and prosecution.

"[A] facially less rigorous standard" applies when defendants "seek[] *discovery* on an anticipated selective prosecution claim." *United States v. Washington*, 869 F.3d 193, 215 (3d Cir. 2017) (emphasis in original); *see Tuitt*, 68 F. Supp. 2d at 6-7 (allowing in part defendant's motion for discovery on his selective prosecution claim). Thus, even if this Court is not inclined to find, on the present record, that the government's investigation and prosecution of Mr. Yu constitutes

the impermissibly selective application of the criminal law based on Mr. Yu's protected identity as a Chinese American, it should permit Mr. Yu to obtain further discovery in support of his claims. Mr. Yu has requested discovery concerning the initiation of this particular investigation and prosecution, as well as investigative and charging practices nationwide, *see* Ex. E ¶¶ 16-27, but the government has refused to provide any responsive materials or information, *see* Ex. F at 4-5.

### A. Mr. Yu satisfies the threshold standard for discovery in support of his selective prosecution claim.

To obtain discovery, a defendant "must offer 'at least a colorable claim' that (1) he or she was singled out for prosecution from among others similarly situated and (2) that his or her prosecution was improperly motivated." *Branch Ministries, Inc.*, 970 F. Supp. at 16. "The colorable basis standard is met by 'some evidence' tending to show the existence of the essential elements of the [claim]." *Id.* (quoting *Armstrong*, 517 U.S. at 470); *see Washington*, 869 F.3d at 214-15 ("Instead of 'clear evidence,' a successful discovery motion can rest on 'some evidence.'"); *see, e.g.*, *Branch Ministries, Inc.*, 970 F. Supp. at 11 (allowing discovery motion by church stripped of its tax-exempt status to compel IRS to produce evidence about investigations of, or sanctions on, other churches that engaged in similar political activity).

In *Tuitt*, the court allowed Tuitt's motion for discovery in support of his claim that prosecutors "unfairly, arbitrarily, and discriminatorily enforced" certain federal drug laws against black defendants. Tuitt's "proffer" was sufficient to satisfy the two-prong standard for a selective prosecution claim. First, his evidence of disparate impact went "well beyond that offered in *Armstrong*" and had "significant force." 68 F. Supp. 2d at *7. That evidence, which comprised data from 1998, was "not anecdotal or confined to statistics arising out of the federal district itself," rather it included "a comprehensive survey of the local state courts in order to provide an appropriate comparison." *Id.* at *9. It showed federal prosecutions involving cocaine, especially

crack, targeted a disproportionately high percentage of black and Latino defendants. Second, regarding discriminatory intent, although Tuitt had no "inside information" or other direct evidence of any impermissible intent to target black defendants, *id.*, his "prima facie evidence . . . reflect[ed] possible choices on the part of law enforcement personnel, if not the prosecutors themselves, which raise an eyebrow high enough as to require a further explanation." *Id.* at 18.

Here, the case for discovery concerning selective prosecution is far stronger than it was in *Tuitt*, where no evidence demonstrated "a deliberate choice on the part of the Government." *Id.* at 10. With respect to investigating and prosecuting Chinese Americans and nationals for allegedly stealing trade secrets, the federal government has made a deliberate choice—persons from China are "Public Enemy No. 1" and a grave threat to national security. Moreover, the MACOM case demonstrates that similarly situated defendants who are not ethnically Chinese have not faced prosecution, even when they have confessed to stealing trade secrets about the same products and technology (MMICs) from the same company (ADI). The statistics from Massachusetts and nationwide confirm that trade secret cases that involve alleged wrongdoing by people of Chinese ethnicity often result in criminal prosecution, but comparable cases with people of other ethnicities almost always result in civil litigation (if any court case is brought at all).

**B.** **Mr. Yu easily satisfies the lower standard for discovery in support of his selective enforcement claim.**

To obtain discovery for a selective enforcement claim, "a defendant need not, at the initial stage, provide 'some evidence' of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race . . . were not arrested or investigated by law enforcement." *Washington*, 869 F.3d at 221; *see United States v. Davis*, 793 F.3d 712, 721 (7th Cir. 2015); *United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018). A lower standard applies, because "the special solicitude shown to prosecutorial discretion" in *Armstrong*, "does not

inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity." *Washington*, 869 F.3d at 219. Further, the *Armstrong* standard is "too high a bar" because it "would functionally preclude discovery in selective enforcement cases." *United States v. Lopez*, No. 19-cr-323, 2019 U.S. Dist. LEXIS 196848, at *7-8 (S.D.N.Y. Nov. 13, 2019).

In *Lopez*, the court ruled "some initial discovery [wa]s warranted" to allow defendants to pursue their claims that the DEA selectively implemented "stash-house reverse sting operations" against black and Latino suspects. *Id.* at *8. The defendants, all black and Latino men, showed their respective racial groups "ha[d] been singled out for reverse sting operations to a statistically significant extent in comparison with other groups." *Id.* That initial proffer, based on "a combination of raw data and statistical analysis," was "sufficient to warrant further inquiry and discovery." *Id.* at 8-9. The court ordered the government to produce "all DEA manuals, circulars, protocols, and the like that provide guidelines for how and when reverse stings should be originated" and "all notes, memoranda, or other investigative materials showing how defendants were identified and evaluated as targets in this particular reverse sting operation." *Id.* at 10-11.

Because ethnically Chinese people have been "singled out" for suspicion of stealing trade secrets from U.S. companies, further inquiry is warranted. As in *Tuitt* and *Lopez*, this Court should order discovery concerning the federal government's policies regarding the investigation and prosecution of trade secret offenses and also its specific decision to pursue Mr. Yu and Tricon.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant Haoyang Yu respectfully requests this Court dismiss with prejudice the Indictment against him or, at a minimum, order the government to provide discovery relevant to its investigation and prosecution of alleged trade secret thefts in violation of 18 U.S.C. § 1831, including but not limited to Mr. Yu's own case.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

_____*/s/ William Fick*_____
William W. Fick (BBO # 650562)
Daniel N. Marx (BB0 #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: June 22, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 22, 2020.

*/s/ William Fick*_____