IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>HAOYANG YU, *et al*. | No. 19-cr-10195-WGY |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR *FRANKS* HEARING**

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: June 22, 2020

**TABLE OF CONTENTS**

Background ............................................................................................................................. 1

Argument ................................................................................................................................ 3

I.  False statements, misleading statements, reckless omissions, and failures to investigate relevant matters in a search warrant affidavit require a *Franks* hearing .............................. 3

II. The search warrant affidavits in this case are replete with false statements, misleading statements, and material omissions further tainted by failures to investigate .................... 5

    1.  False statement concerning Mr. Yu's nationality .................................................. 6

    2.  False and misleading statement concerning "suspicious" use of UPS store mailbox ............................................................................................................................. 7

    3.  False and misleading statements and omissions concerning Department of Commerce CCL export classification of TM-5054 ............................................... 7

    4.  False and misleading statements and omissions concerning products with "virtually the same or identical performance metrics ............................................. 9

    5.  False and misleading statements and omissions concerning Digital Guardian evidence and "legitimate access" to ADI information ......................................... 11

    6.  False and misleading statements and omissions concerning suspected exports to China ................................................................................................................... 12

III. Individually and together, the defects in the First Affidavit vitiate probable cause ......... 13

Conclusion ............................................................................................................................ 14

Certificate of Service ............................................................................................................ 14

This Court should hold a hearing pursuant *Franks v. Delaware*, 438 U.S. 154 (1978), to enable inquiry about multiple false and misleading statements and material omissions underlying a dozen search warrants issued in this case.

The search warrant applications purported to establish probable cause to believe that Mr. Yu stole trade secrets about certain integrated circuit devices from his prior employer, Analog Devices, Inc. ("Analog" or "ADI") and unlawfully exported those devices from the United States. The probable cause presentation was based on two essential pillars: purported "similarities" between ADI's products and Mr. Yu's own products, and a Department of Commerce "classification" of one of Mr. Yu's products as subject to export control. But neither pillar stands when stripped of the false and misleading statements and omissions on which it rests. The devices at issue are commodity products based on decades-old technology that can readily be replicated by physical observation, publicly accessible data, and computer modeling. Indeed, multiple manufacturers produce what amount to "generic" equivalents of the same devices. And the export "classification" was actually a secret review solicited by law enforcement investigating Mr. Yu that was not revealed to him until after he was charged. All the while, multiple manufacturers, including ADI, exported functionally identical products without a license.

## BACKGROUND

On June 11, 2019, Mr. Yu was charged in a 15-count indictment with various trade secret offenses: stealing trade secrets in violation of 18 U.S.C. § 1832(a)(1) & (a)(4); copying, uploading, or downloading trade secrets in violation of § 1832(a)(2) & (a)(4); and possessing trade secrets in violation of § 1832(a)(3) & (a)(4). *See* D.E. 1 (Counts I-XIV). Specifically, the government alleges that Mr. Yu misappropriated from his former employer, Analog Devices, Inc. ("ADI" or "Analog"), data about monolithic microwave integrated circuits ("MMICs"), a common type of semiconductor found in many electronic devices. Mr. Yu and his company, TRICON MMIC, were

also charged with "smuggling" in violation of 18 U.S.C. § 554, because they allegedly shipped certain MMIC products to a commercial customer in Spain without an export license. *See* D.E. 1 (Count XV).

The investigation of Mr. Yu and TRICON began in or around December 2017. As part of that investigation, from September 2018 through June 2019, the government obtained a dozen search warrants for a variety of electronic accounts and data as well as Mr. Yu's residence and other physical premises, summarized in the chart below.

| Affidavit Date | Affiant | Docket No. | Target |
| --- | --- | --- | --- |
| 9/27/18 | SA Thomas Brian Anderson | 19-mj-5143-JGD | triconmmic@yahoo.com |
| 12/4/18 | SA Benjamin Hickock | 18-mj-5181-JGD | Yhy51@yahoo.com |
| 12/4/18 | SA Benjamin Hickock | 18-mj-5182-JGD | Haoyang.yu@gmail.com |
| 12/4/18 | SA Benjamin Hickock | 18-mj-5183-JGD | Google Voice |
| 12/4/18 | SA Benjamin Hickock | 18-mj-5190-JGD | Pilgrimmmic@gmail.com |
| 12/4/18 | SA Benjamin Hickock | 18-mj-5191-JGD | Angie.yz.chen@gmail.com |
| 12/4/18 | SA Benjamin Hickock | 18-mj-5192-JGD | Yanzhi.chen@gmail.com |
| 6/13/19 | SA Thomas Brian Anderson | 19-mj-7182-JCB | Tricon Mailbox |
| 6/13/19 | SA Thomas Brian Anderson | 19-mj-7183-JCB | Yu Residence |
| 6/13/19 | SA Thomas Brian Anderson | 19-mj-7184-JCB | Cobin Residence |
| 6/13/19 | SA Thomas Brian Anderson | 19-mj-7185-JCB | Quantum Mailbox |
| 6/13/19 | SA Thomas Brian Anderson | 19-mj-7186-JCB | Pilgrimmmic@gmail.com |
| 6/13/19 | SA Thomas Brian Anderson | 19-mj-5267-JGD | www.triconmmic.com |

There were a total of three affidavits submitted in support of the various warrants, attached hereto as Exhibits 1 (9/27/18), 2 (12/4/18), and 3 (6/13/19).[1] The first search warrant affidavit was

---

[1] Even though the government did not designate the search warrant affidavits as "confidential" under the protective order entered in this case, it has requested that Mr. Yu file those documents under seal, because the underlying search warrant dockets, themselves, are still sealed. As

signed by HSI Special Agent Thomas Brian Anderson on September 27, 2018 (the "First Affidavit"). This memorandum addresses averments in the First Affidavit in the order in which they were made. Subsequent search warrant affidavits, in turn, incorporated the First Affidavit by reference, made similar allegations, and/or relied upon the fruits of prior searches. In other words, the subsequent affidavits and searches are tainted fruits of the First Affidavit and/or suffer the same defects as the First Affidavit. All of the evidence obtained from the searches should be excluded.

## ARGUMENT

**I.  False statements, misleading statements, reckless omissions, and failures to investigate relevant matters in a search warrant affidavit require a *Franks* hearing.**

In *Franks*, the Supreme Court described the circumstances in which a defendant may overcome the presumed validity of a duly issued search warrant:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155.

"Material *omissions* from a warrant affidavit also may furnish the basis for a successful *Franks* challenge." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (emphasis added).

---

discussed in Mr. Yu's separately-filed Motion to Temporarily Seal Specified Exhibits, Mr. Yu does not believe there is good cause to require that the affidavits remain under seal but has agreed to permit the government an opportunity to make its case to the Court and/or propose redactions. The government separately stated it had no objection to Mr. Yu quoting from the search warrant affidavits in this motion, requesting only that counsel exercise judgment to refrain from revealing confidential information about purported ADI trade secrets or confidential business practices.

"The required showing is two-fold: first, the omission must have been either intentional or reckless; and second, the omitted information if incorporated into the affidavit, must be sufficient to vitiate probable cause." *Id.*; *see also United States v. Vigeant*, 176 F.3d 565, 572 (1st Cir. 1999) (finding reckless disregard for truth based on material omissions); *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987) (holding police "were reckless in not including in the affidavit information which was known or easily accessible to them" and "simply did not take every step that reasonably could be expected of them").

Investigators cannot "insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks*, 438 U.S. at 163 n.6. The same principle has also been applied to deliberate omissions. *See United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992).

Finally, a reason to doubt the asserted facts underlying probable case may be "sufficient to create a duty of further inquiry." *Tanguay*, 787 F.3d at 53.

> All that is required to trigger an officer's duty of further inquiry is her knowledge of an obvious and unexplored reason to doubt the truthfulness of the allegations. When confronted with such a red flag, the officer should look into the matter even if she does not believe that what she will discover is likely to vitiate probable cause. After all, the officer is the only party who, in this context, has the tools to undertake any meaningful investigative work.
>
> The trigger for further investigation may function even when the officer's obvious reason only serves to diminish her confidence to some modest degree. Pieces of evidence should not be assessed in isolation: "the whole sometimes can exceed the sum of the parts, and the appropriate test focuses on the totality of circumstances."

*Id.* (internal citations omitted).

**II.     The search warrant affidavits in this case are replete with false statements, misleading statements, and material omissions further tainted by failures to investigate.**

In ¶ 2 of the First Affidavit, SA Anderson alleged "probable cause to believe that Yu did knowingly steal or appropriate without authorization a trade secret of Analog for his own economic benefit, intending or knowing such actions would injure Analog, in violation of 18 U.S.C. § 1832." Under federal law, information can qualify as a trade secret only if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

In addition, in ¶ 2 of the First Affidavit, SA Anderson alleged "probable cause to believe that Yu . . . did commit violations of the Export Administration Regulations, 15 C.F.R. §§ 730-744, by exporting, and causing, U.S. origin goods to be exported outside the United States without first obtaining export licenses in violation of 50 U.S.C. §§ 1702 and 1705, and 18 U.S.C. § 554." Under the plain statutory language, a section 554 offense requires that violation of export rules be committed "knowingly" while a section 1705 offense requires that the violation be committed "willfully."

SA Anderson represented that he had "received specialized training on how to conduct investigations involving the alleged exportation of weapons, technology, and other controlled commodities, including weapons, weapons systems, military equipment, and technology." First Affidavit ¶ 1. He explained that the First Affidavit was "based upon information and supplied to [him] by other law enforcement officers, including Special Agents employed by the U.S. Department of Commerce, Office of Export Enforcement ("DOC/OEE"), Naval Criminal Investigative Service ("NCIS"), and the Federal Bureau of Investigation ("FBI"), as well as [his]

personal involvement in this investigation and on my own training and experience." *Id*. ¶ 6. He also represented knowledge of and familiarity with the specific technology at issue in this case: "monolithic microwave integrated circuits 'MMICs')" which he correctly described as "integrated circuit devices that operate at microwave frequencies and [are] used in radio, cellular, and satellite communications." *Id*. ¶ 15.

In summarizing the purported basis of probable cause in ¶ 2 of the First Affidavit, SA Anderson misleadingly stated that "TRICON sells integrated circuit devices [MMICs] that are in many respects identical to those manufactured by Analog Devices, Inc. 'Analog'), Yu's former employer. Moreover, TRICON appears to be selling those integrated circuit devices to customers outside of the United States without first obtaining an export license." This summary ignored that MMICs, like those at issue in this case, are a mature technology which has been available since the 1980s. They are relatively simple circuits that can readily be reversed-engineered, and therefore, they are "commodity" products for which multiple manufacturers commonly sell items with very similar or identical designs and performance characteristics (which the manufacturers, themselves, typically make public in extensive detail). *See* Expert Declaration of Manfred J. Schindler ("Schindler Decl."), filed separately, ¶¶ 9-12. SA Anderson's summary also failed to mention that only *some* MMICs require an export license, and many companies, *including ADI*, export products functionally identical to TRICON's products without a license. *See id.* ¶¶ 16-18.

SA Anderson compounded his misleading framing of the issues by making the specific false and misleading statements and omissions described below.

### 1. False statement concerning Mr. Yu's nationality

In ¶ 2 of the First Affidavit, SA Anderson falsely described Mr. Yu as a "Chinese national[ ]" who is a "legal permanent resident[ ] in the United States." Mr. Yu is actually a

6

naturalized American citizen, who has lived in the United States for nearly 20 years, a fact surely known or readily ascertainable by SA Anderson or other agents.

### 2. False and misleading statement concerning "suspicious" use of UPS store mailbox

In ¶ 16 of the First Affidavit, SA Anderson stated: "I know that companies that design and manufacture MMICs typically have large facilities to design integrated circuits, operate machinery to manufacture these circuits, conduct business operations, and store products for sale." The statement that "large facilities" are "typical" is not accurate. It ignores the well-known phenomenon of "fabless" semiconductor companies, which design and sell MMICs (or other semiconductor products) but outsource the manufacturing to a third-party foundry. "Fabless" companies can be established by a handful of people (or even just one person) using computers, with no need for a "large facility." For example, Hittite Microwave Corporation (which was acquired by ADI) started this way in 1986, as have many others. *See* Schindler Decl. ¶ 15. The implication that use of UPS store mailbox is somehow suspicious or suggested that Mr. Yu's small company was a "front" for some other sovereign or large business entity was false and misleading.

### 3. False and misleading statements and omissions concerning Department of Commerce CCL export classification of TM-5054

In ¶ 23 of the First Affidavit, SA Anderson stated: "According to TRICON's website, one of the products it sells is an integrated circuit device called a TM-5054 . . . . Based on the specification sheet on TRICON's website, DOC [Department of Commerce] classifies the TM-5054 as ECCN 3A001b.2.d, and therefore, it is [export] controlled for National Security (NS1), Regional Stability (RS1) and Anti-terrorism (AT1) reasons." SA Anderson did not disclose, however, that this "classification" was contained in a conclusory one-paragraph document issued on January 22, 2018, *at the request of a law enforcement agent investigating Mr. Yu*, and it has never been published or released except to the prosecution team (and now the defense) in this case.

7

*See* Schindler Decl. ¶ 17 and appended exhibits. In other words, SA Anderson concealed that the DOC "classification" of Tricon's TM-5054 was a closely held secret, resulting from a selectively targeted solicitation by law enforcement, that was not revealed to Mr. Yu until *after* he was indicted on charges of knowingly and willfully violating export laws.

While some, but not all, MMICs may be subject to U.S. Government Export Administration Regulations ("EAR"), the DOC does not typically publish lists of specific products that require export licenses. Instead, the DOC Bureau of Industry and Security ("BIS") publishes a document called the Commerce Control List ("CCL") – Category 3 – Electronics ("ccl3").[2] Export Control Classification Numbers (ECCNs) are alphanumeric designations in the CCL associated with certain performance characteristics that trigger export controls. Items not covered by the CCL criteria are classified as "EAR99," which means they generally do not require an export license (unless to an embargoed country, to an end user of concern, or in support of a prohibited end-use).[3] *See* Schindler Decl. ¶ 16.

In ¶ 24 of the First Affidavit, SA Anderson stated that "Analog Devices representatives noted that the product specifications of the TM-5054 are nearly identical to the HMC-994A, one of the Analog Devices integrated circuit devices that it sells to customers." But SA Anderson failed to disclose that ADI and its resellers treat the "nearly identical" HMC-994A as "EAR99"—that is, *not* subject to export control. *See* Schindler Decl. ¶ 18.

Moreover, the DOC's secret "classification" of TRICON's TM-5054 is dubious because both TRICON's circuit and ADI's HMC-994A are *rated* as 30 GHz products, with the same

---

[2] *Available at* https://www.bis.doc.gov/index.php/documents/regulations-docs/2334-ccl3-8/file.

[3] *See* https://www.bis.doc.gov/index.php/regulations/commerce-control-list-ccl.

8

saturated power output at that frequency, which does *not* trigger export controls. *See* Schindler Decl. ¶ 19. And overall, both above and below 30 GHz, ADI's HMC-994A has *greater* performance capability than TRICON's TM-5054. *See* id. ¶¶ 22-23. All of this information was readily available to SA Anderson (and publicly accessible on ADI's website), but he failed to disclose it.

Finally, SA Anderson failed to disclose that many other companies also produce MMICs nearly identical to ADI's HMC-994A and TRICON's TM-5054. Among those MMICs for which the manufacturer's export self-classification is publicly available, all but one are classified by the manufacturer as "EAR99"—that is, not subject export control. The one exception has substantially greater performance capability than both the ADI and TRICON products. *See* Schindler Decl. ¶¶ 24-25.

### 4. False and misleading statements and omissions concerning products with "virtually the same or identical performance metrics"

In the First Affidavit, SA Anderson repeatedly noted close similarities between certain TRICON products and ADI products, implying that this fact, without more, provides probable cause for an allegation of trade secret theft. That suggestion is highly misleading because, as noted, the MMICs at issue are "commodity" products made by multiple manufacturers.

With regard to the specific similarities between TRICON's TM-5054 and ADI's HMC-994A, referenced in ¶ 24 of the First Affidavit, as noted above, SA Anderson failed to disclose that many other companies sell nearly identical products. *See* Schindler Decl. ¶ 26. A chart compiling publicly available information about a sample of such products, including performance data, manufacturer's export self-classification (where available), schematics, and layouts, is attached to the Schindler Declaration as Exhibit H. The chart illustrates the many similarities among the products. The schematics and layouts are functionally the same and the performance

9

data are very similar and sometimes indiscernible. *See* Schindler Decl. ¶ 26. The schematics and layouts of the Microsemi and Microwave Technology products may "look" different from the others to a lay-person but that is because they contain even more details than the other products' block diagrams. *See id.* Even with that level of detail, the products are still functionally very similar. *See Id*.

>Also, in ¶ 24 of the First Affidavit, SA Anderson stated:

>>Yu's former supervisor at Analog Devices stated that TRICON's TM-5021 device is identical to Analog Devices' HMC-462 device. The similarities extend not only to the product specifications but also the design of the integrated circuits. Yu's former supervisor said that his "jaw dropped when he saw TRICON's diagram of the TM-5021," because of how identical the two devices were. According to his former supervisor, YU could not have built TRICON's integrated circuit devices unless he had help from a current employee or took Analog Devices' proprietary modeling and file reviews.

But in fact, there is nothing remarkable about the similarities between the functional diagrams of the referenced products, precisely because the data sheets are publicly available and the products are straightforward to reverse engineer. *See* Schindler Decl. ¶ 27 The data sheet for the TRICON TM-5021 is attached to the Schindler Declaration as Exhibit I. The publicly available data sheet for the ADI HMC-462 is attached to the Schindler Declaration as Exhibit J. A chart showing other similar products from other manufacturers is attached to the Schindler Declaration as Exhibit K.

>In ¶ 25 of the First Affidavit, SA Anderson stated: "As shown in the table below, TRICON

markets devices with virtually the same or identical performance metrics as Analog Devices." In fact, SA Anderson's table shows that performance characteristics in the referenced table are not *identical* across the board. *See* Schindler Decl. ¶ 28. And again, there is nothing remarkable about the existence of competing MMIC products, from different manufacturers, "with virtually the same or identical performance metrics." *Id.* For each of the devices listed in SA Anderson's table, other manufacturers also sell devices with similar characteristics, as noted in the table at Exhibit L to

the Schindler Declaration, which adds publicly available data about other manufacturers' products to SA Anderson's table. *See id.*

### 5. False and misleading statements and omissions concerning Digital Guardian evidence and "legitimate access" to ADI information

In ¶¶ 26-27 of the First Affidavit, SA Anderson stated:

> Prior to his separation from Analog Devices in July 2017, YU's then-supervisor had concerns about YU, and believed he was acting suspiciously. As a result, the supervisor requested the company's information technology group install a program called Digital Guardian on Yu's computer. Digital Guardian is a software program designed to protect a company's intellectual property and trade secrets from insider threats, such as rogue employees accessing unauthorized company information.
>
> Digital Guardian monitored YU's computer activity during his last few months at the company, including what files were accessed, updated, downloaded, and printed. Following YU's departure from the company, YU's former supervisor reviewed the Digital Guardian program to see what files that Yu had accessed. I, along with other agents, interviewed the supervisor, who told us that YU had access design reviews for Analog Devices' integrated circuit device models, which the supervisor believed were necessary to produce TRICON's advertised products. According to the supervisor, as a design engineer, YU had access to this restricted information, but the information was not necessary for the work YU was doing at the company. Thus, there was no legitimate reason for YU to access this information and the timing of YU's accessing the files strongly suggests that YU intended to steal Analog's designs to use for his TRICON business.

Several aspects of this statement are false and misleading.

First, while it is true that ADI activated Digital Guardian to monitor Mr. Yu in or around October 2016, SA Anderson failed to disclose that contemporaneous reports revealed nothing amiss. *See* Exhibit 4 ("no sign of unusual activity" by Mr. Yu) (ADI-YU-0000439); *see also* Exhibit 5 ("there was no suspicious activity") (ADI-YU-0000446).

Second, SA Anderson failed to disclose that ADI emails obtained by the government in mid-2018 refuted the allegation by Bob Broughton, Mr. Yu's supervisor, that Mr. Yu had "no

11

legitimate reason" to access "design reviews for Analog integrated circuit device models." A few examples include:

- On November 11, 2015, ADI employee G---- W---- e-mailed a design review concerning the HMC-994A, one of the products at issue in this case, to a group of other employees including Mr. Yu and Broughton. *See* Exhibit 6 (ADI-YU-00005579-80).

- On June 20, 2016, Mr. Yu circulated a design review that he compiled concerning HMC-863 to a group of employees including Broughton. *See* Exhibit 7 (ADI-YU-00009491-92).

- On December 15, 2016, ADI employee W---- C---- emailed a design review concerning HMC-460 to Mr. Yu. *See* Exhibit 8 (ADI-YU-00013996-98).

Third, as explained in the Schindler Declaration, access to purportedly confidential "design reviews" was not necessary to create TRICON products, because it would be straightforward to "reverse engineer" ADI's MMIC products based on physical observation and publicly available information.

### 6. False and misleading statements and omissions concerning suspected exports to China

In ¶ 30 of the First Affidavit, SA Anderson stated: "I have learned that several TRICON parts are presently being advertised for sale by Chinese companies on websites in the People's Republic of China. Some of the Chinese companies identify themselves as 'sales representatives' for TRICON or as suppliers of integrated circuit devices."

SA Anderson did not state whether investigators made any efforts to determine whether these Chinese companies actually possessed or sold TRICON products. And in fact, in the nearly three years that the government has been investigating Mr. Yu, no evidence has emerged that he ever exported controlled items to China or sold products via the Chinese websites at issue, or any others.

SA Anderson also failed to disclose the fact, well-known in the industry, that on-line sellers in China sometimes falsely purport to sell various electronics products to which they do not, in fact, have access in order to substitute some other product that they do sell—what might commonly be called a "bait and switch" tactic. *See* Schindler Decl. ¶ 29. Alternatively, such vendors might try to obtain the desired product for resale once a potential customer has been identified. *See id.*

Finally, SA Anderson failed to disclose that the very same Chinese website where TRICON products were advertised for sale—1688.com—also advertises various ADI products for sale, including HMC-994A (the product "nearly identical" to Tricon's TM-5054, which ADI publicly classifies as EAR99) as well as, for example, HMC-1144 and ADL7003 (both of which ADI publicly acknowledges to be subject to export controls). *See* Exhibit 9 (screen shots showing ADI parts advertised for sale).

### III. Individually and together, the defects in the First Affidavit vitiate probable cause.

Absent the misimpressions that SA Anderson conjured with his false and misleading statements and omissions, probable cause evaporates. The mere similarities of TRICON products and ADI products fail to establish probable cause to believe that Mr. Yu stole "trade secrets," as federal law defines that term. In addition, because Mr. Yu could not have known about the secret (and dubious) DOC "classification" of the TM-5054 solicited by law enforcement, and because other companies treat functionally identical products as EAR99 (not requiring an export license), there was no basis to conclude that Mr. Yu knowingly or willfully violated export laws. Consequently, the warrants never should have issued.

## CONCLUSION

For the foregoing reasons, this Court should hold a *Franks* hearing and, thereafter, suppress all fruits of the search warrants because they were obtained based on false and misleading statements and/or intentional or reckless omissions and failures to investigate.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

*/s/ William Fick*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 22, 2020.

*/s/ William Fick*