UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HAOYANG YU, *et. al.*,<br><br>Defendants | CRIMINAL No. 1:19-cr-10195-WGY |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION DISMISS**

**INDICTMENT DUE TO SELECTIVE ENFORCEMENT AND PROSECUTION**

The defense claims that the United States Attorney's Office (USAO) has unfairly targeted the defendant, Haoyang Yu, because he is an American of Chinese descent.  Dkt. Nos. 55; 56 at 3, 4.  On this basis, it requests that the Court dismiss the Indictment pending against him.  Dkt. Nos. 55, 56.  Yu's claim is entirely baseless.  The USAO filed this case because Yu had stolen sensitive trade secrets in Massachusetts; used them to build a series of technology products, some with military applications; marketed these products and other advanced military technologies on his company website; and then sold some products – occasionally overseas without obtaining the U.S. government approvals that he knew were required.  In short, Yu is no victim of selective prosecution: The USAO opened and pursued this investigation because of his misconduct, the natural consequence of which is the Indictment pending before this Court.  Yu's requests for dismissal, additional discovery, and a hearing should be denied.

## BACKGROUND

### A.  The Origins of this Prosecution

Contrary to the defense's assertions, Yu did not attract the United States's attention because the government was seeking to prosecute U.S. citizens of Chinese descent.  Instead, nearly a year before the Department of Justice's China Initiative was announced, two separate industry representatives – independently, from distant ends of the country, and nearly

simultaneously – notified various U.S. government agencies that they believed the defendant was committing a crime.[1]

### 1.  December 2017 Referral to the Department of Commerce

First, on December 19, 2017, Department of Commerce (DOC), Office of Export Enforcement Special Agent Benjamin Hickok received an email from a semiconductor industry consultant frequently hired to provide companies with export law expertise.  *See* Ex. 1 (DOC Referral).  The consultant's email passed along a message from one of his Massachusetts clients. It read in part:

> We have a new competitor [Tricon MMIC] on the scene which smells a bit fishy if you ask me. Its *(sic)* an apartment above a UPS store. None of us here know this person or this company and there is 100% no way that they could come up with this product line in 6 months. Its *(sic)* not possible. They are most likely reselling someone else's part and what makes me nervous is that at least one is a 3A001.b.2.d part.

*Id.*

This alphanumeric code – 3A001.b.2.d – is an Export Control Classification Number from the DOC's Commerce Control List (CCL).  15 C.F.R. Pt. 774.  The list catalogues products that may require an export license from the Department of Commerce before they can be legally exported to specific countries and users.  Items that fall into CCL section 3A001.b.2.d are electronic components whose export is controlled principally because of national security concerns.  15 C.F.R. Pt. 774, Supp. 1, Category 3 – Electronics.  In addition, these parts can be used in missile technology and threaten regional stability, nuclear nonproliferation, and anti-terrorism efforts.  *Id.*  Thus, in this case, the industry source wrote that he was "nervous" because the "new competitor" – Tricon MMIC (Tricon) – was stealing and marketing products that could be used military settings.  Ex. 1.

The email went on to provide several links to Tricon's public website; to its entry on the Massachusetts Secretary of State's website; to an online database listing the company officers; to

---

[1] If the Court were to hold an evidentiary hearing on this motion, the government would call witnesses that would testify to the facts described herein.

a Google map showing that the company's address also belonged to a UPS store; and to a brochure of Tricon's products.  *Id.*  The message concluded by saying, "If you are so inclined to pass this information along to some authority, … please feel free to do so."  *Id.*  This language is evidence of the source's compliance with the Export Administration Regulations, which stress that "industry has an important role to play in preventing exports … contrary to the national security and foreign policy interests of the United States."  15 C.F.R. § Pt. 732, Supp. 3, pt. (b).

Partly for this reason, DOC policy instructs agents who work in its Office of Export Enforcement to conduct industry outreach, to ask company representatives whether they are aware of new exporting companies, and to solicit information on suspicious activities.  Thus, when Special Agent Hickok received this message – a referral specifically of the kind he requests, he began researching Tricon and conducting open source inquiries on the defendant.  By January 2018, Special Agent Hickok had verified the information in the referral and requested assistance from Homeland Security Investigations (HSI).  He had also obtained an export classification for at least one of Tricon's products, begun researching one of Tricon's partners, and followed up with a sales representative whom Yu had contacted on behalf of Tricon, his new company.  The case grew from there.

### 2.   January 2018 Referral to the Defense Counterintelligence and Security Agency

Meanwhile, unbeknownst to Special Agent Hickok, a Texas defense contractor notified authorities on January 23, 2018, that Tricon might be using the contractor's photographs and datasheet to market Tricon parts.  Ex. 2 (DCSA Referral).  One of the contractor's security officers reported this concern at a Dallas meeting attended by agents from the Defense Counterintelligence and Security Agency (DCSA),[2] Homeland Security Investigations (HSI), the Federal Bureau of Investigation (FBI), and the Naval Criminal Investigative Service (NCIS).  *Id.*

---

[2] On June 24, 2019, the Defense Security Service was renamed the Defense Counterintelligence and Security Agency (DCSA).  For simplicity, we refer to the agency throughout as the DCSA.  However, some of our exhibits contain documents generated prior to the name change and, thus, refer to the Defense Security Service or are printed on its letterhead.

The security officer also reported that his company had noticed this issue in 2017 and written to demand that Tricon stop using the contractor's product pictures.  *Id.*  The security officer provided Tricon's address in Arlington, Massachusetts.  *Id.*

Following this meeting, DCSA investigators conducted follow-up queries on public information databases.  *Id.*  These queries showed that the defendant's wife had incorporated Tricon in March 2017 and that its address belonged to a UPS store.  *Id.*  A reverse domain query showed that Tricon's website domain had been registered in January 2017 by a company named Whoisguard Protected, based in Panama City, Panama.  *Id.*  On January 30, 2018, DCSA sent the lead to several investigative agencies.  Ex. 3 (DCSA Letter).  Special agents in the Boston offices of NCIS and FBI then began investigating the defendant and Tricon.  Ultimately, their effort was consolidated with the DOC inquiry.  Since March 2018, special agents from DOC, HSI, NCIS, and FBI have been jointly investigating the matter.

### B.  The Underlying Case Conduct

The conduct in this case, as partially detailed in the Indictment, reflects several aggravating circumstances.  First, the defendant not only executed a massive intellectual property heist, during which he downloaded, copied, and stole "hundreds of highly confidential" files belonging to his former employer, Analog Devices, Inc. (ADI).  Dkt. No. 1 ¶¶ 9, 14, 16, 18.  He also used that property to form his own business and then tried to poach his employer's customers.  *Id.* ¶ 8.  Second, because the defendant knew that some of his stolen chips could be used in military equipment – such as in a military radar system, his website indicated that their export was controlled by the U.S. government.  Yet the defendant did not seek or obtain proper permissions before sending these powerful products and their related sensitive information to foreign countries.  *Id.* ¶¶ 12, 20.  Third, the defendant not only conducted domestic sales; he marketed his parts to international customers and shipped products to Spain.  *Id.* ¶¶ 12, 20.  Chinese websites also advertised his goods, which made investigators question whether he might be involved in economic espionage.  Fourth, additional investigation showed that the defendant's website advertised some sensitive and exclusively military technologies that have no known

civilian applications.  These are some of the elements that made and continue to make this case worthy of prioritization in the U.S. Attorney's Office.

## ARGUMENT

### A.   The Rigorous Standard for Evaluating Selective Prosecution Claims

"In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute."  *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380, n.11 (1982)).  "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review."  *Wayte*, 470 U.S. at 607.  "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Id.*  In addition, as the Supreme Court has recognized:

> [Judicial review of charging decisions] entails systemic costs of particular concern.  Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.  All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

*Id.*  In short, given these considerations, there is a "presumption of regularity" attached to prosecutorial decisions, and – with that – "a presumption of good faith."  *United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008); *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926).

The doctrine of "selective prosecution" is a narrow exception to the general rule that a prosecutor's charging decisions are immune from judicial review.  *See generally United States v. Armstrong*, 517 U.S. 456 (1996).  Under the selective prosecution doctrine, a prosecutor cannot

base his or her charging decision upon an "'unjustifiable standard such as race, religion, or other arbitrary classification.'"  *Id.* at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Nonetheless, the defendant bears a heavy burden in showing selective prosecution, because the prosecutor's presumption of regularity remains.  This presumption is "formidable" and can be "overcome only by a proffer of 'clear evidence' that the prosecutor acted impermissibly in pursuing a case."  *Lewis*, 517 F.3d at 25 (quoting *Armstrong*).

Specifically, the defendant must make two showings.  First, he must proffer "clear evidence" that similarly situated individuals of a different race – or in this case, ethnicity – were not prosecuted.  *Id.*  This standard is "a demanding one."  *Armstrong*, 517 U.S. at 463.  "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."  *Lewis*, 517 F.3d at 27 (citing *Armstrong*).  In determining whether offenders are similarly situated, an inquiring court should "assess every" fact that is "at least arguably material" to the prosecutorial decision.  *Id.*  These facts might include, among many others, the comparability of the crimes, the manners in which the crimes were committed, the evidence against the defendants, and relative efficacy of each prosecution as a deterrent.  *Id.*  Finally, it is not enough to show that a large number of individuals of a certain race or national origin *have been* prosecuted for a particular offense.  Rather, the defendant must show that similarly situated individuals of other races or national origins "who were *not* prosecuted."  *United States v. Magana*, 127 F.3d 1, 8 (1st Cir. 1997) (emphasis added) (citing *Armstrong*).

Second, the defendant must show that the government pursued his prosecution "for the forbidden reason" – *i.e.* based on an impermissible motive.  *United States v. Daniels*, 142 F. Supp. 2d 140, 143 (D. Mass. 2001); *see also Armstrong*, 517 U.S. at 465.  In other words, here, to show discriminatory purpose, the defense must present clear, credible evidence that the government is prosecuting Yu "at least in part because" he is of Chinese descent.  *Wayte v. United States*, 470 U.S. 598, 610 (1985).

6

The standard for obtaining discovery in support of a selective prosecution claim is "somewhat below 'clear evidence,' but is nonetheless fairly high." *Lewis*, 517 F.3d at 25. To meet this standard, the defendant must put forward "'some evidence' tending to show both discriminatory effect and discriminatory intent." *Id.* (quoting *Armstrong,* 517 U.S. at 468). Discovery will not be allowed unless the defendant's evidence supports both branches of the inquiry: "[F]ailure on one … dooms the discovery motion as a whole." *Id.* This "still rigorous" standard applies in part because "[d]iscovery concerning decisions to prosecute imposes substantial costs on the prosecutor." *Magana*, 127 F.3d at 8. It may be that producing such discovery "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy." *Armstrong*, 517 U.S. at 468; *see also United States v. Bass*, 536 U.S. 862, 864 (2002) (per curiam) (reversing selective-prosecution discovery order that "threaten[ed] the performance of a core executive constitutional function") (internal quotation marks and citation omitted).

As set forth below, Yu has wholly failed to meet either prong of the selective prosecution doctrine and is not entitled to discovery or a hearing, let alone dismissal of this action.

**B.    Yu Has Not Established That Similarly Situated Actors Were Not Prosecuted.**

Yu has failed to show that similarly situated actors could have been – but were not – prosecuted. *Armstrong*, 517 U.S. at 469. He bases his argument to the contrary on a single civil case, anecdotal data, and two law review studies. Even taken as a whole, this information does not demonstrate a choice to decline prosecuting other offenders in situations similar to Yu's. In fact, the defense identifies no situation that is similar to Yu's. That failure alone requires that his motions for dismissal, discovery, and a hearing be denied.

**1.   The MACOM Offenders Were Not Similarly Situated.**

The defense makes a detailed comparison of this prosecution to only one other case: *Analog Devices, Inc. v. MACOM Tech. Solutions Holdings, Inc.*, No. 18-cv-11028-GAO (D. Mass.) (MACOM Suit). In that civil action, Yu's former employer, ADI, sued another company for patent infringement, trade secret misappropriation, and unfair and deceptive trade practices. MACOM Suit, Dkt. No. 1. The case was filed in May 2018 and voluntarily dismissed less than

two months later.  *Id.*; MACOM Suit, Dkt. No. 40.  The complaint alleges that three former ADI

employees took the company's intellectual property and then used it to accelerate MACOM's

development of competing products.  MACOM Suit, Dkt. No. 1, ¶ 4.  That case is not

comparable to the one pending before this court.

To begin, the MACOM case was never referred to a federal investigative agency.  Thus,

no one in the federal law enforcement community was familiar with it at the time of the suit, and

even now, the government's knowledge of the case is almost entirely confined to the information

on the public docket.  From this vantage, the government cannot identify everything that makes

it different than the one at bar.  In particular, in the absence of complete records, it is impossible

to evaluate the strength of the case, including whether it was provable beyond a reasonable

doubt.  Such a fact is obviously "material" to the prosecutorial decision.  *Lewis*, 517 F.3d at 27.

Yet, even in the absence of full records, it is clear that the MACOM suit is significantly

different than the instant one.  Most important, the cases allege dissimilar kinds of misconduct,

and thus, the MACOM suit does not present "similarly situated" offenders.  *Lewis*, 517 F.3d at

27.  Unlike here, there is no evidence that the MACOM defendants illegally exported controlled

U.S. technology for their own profit or marketed military technologies.  *See* Dkt. No. 1 at 13,

Counts 13-15.  This distinction alone and the risk it posed to U.S. national security is obviously

the kind of "material" fact that justifies Yu's criminal investigation and prosecution.  *Lewis*, 517

F.3d at 27.  Its conspicuous absence from the MACOM suit demonstrates – right from the outset

– that the offenders in these cases have not "committed roughly the same crime."  *Id.*  The

comparison of the cases is inapt and insufficient to meet the selective prosecution standard.

In addition, the scale of these frauds is vastly different.  While the MACOM complaint

describes the theft of a handful of products, Yu is accused of stealing information associated with

about 20 different ADI semiconductor designs.  Dkt. No. 1 ¶ 8.  The defense attempts to collapse

this distinction by noting that Yu and the MACOM bad actors stole information relating to some

of the same products.  Dkt. No. 56 at 7.  But those products alone do not account for the entirety

of Yu's pilfered catalog.  "Yu downloaded hundreds of highly confidential schematic design files

as well as design layout and modeling files." Dkt. No 1 ¶ 9.  Some were worth millions of

dollars and among the most sensitive and valuable intellectual property that ADI, a multi-billion

dollar company, owns.  *Id.*  The defense misleadingly claims that Yu is accused of stealing far

less data, which it characterizes as "four relatively small files."  Dkt. No. 56 at 7.  It is true that

the Indictment charges Yu with uploading four files to his Google Drive account; each contained

extremely valuable information, some of which related to military-only technology.  Dkt. No. 1,

Counts 9-12.  However, the Indictment also clearly alleges that Yu stole "[p]erformance data and

specifications, schematics, design layout and modeling" for some of ADI's most profitable

semiconductor parts.  Dkt. No. 1, Counts 1-8.  In fact, charges relating to these acts, which the

defense ignores, comprise the bulk of the indictment.  Again, these are not "similarly situated"

offenders, and the cases are not comparable.

Finally, even if this case presented substantially similar circumstances—which it does

not—the defense's identification of a single case dooms its claim.  As courts have recognized, a

defendant typically must provide evidence of more than a few similarly situated persons because

there always will be examples where deserving individuals escape prosecution for a variety of

innocuous reasons, including the lack of a criminal referral to law enforcement or limited

resources.  *United States v. Tibbetts*, 646 F.2d 193, 195–96 (5th Cir. 1981) (finding no selective

prosecution of a tax protestor partly because: "Due to limited resources of the government, there

will always be some tax evaders and tax protestors who elude prosecution by the government.

This factor is not sufficient to show selective prosecution."); *United States v. Johnson*, 577 F.2d

1304, 1308–09 (5th Cir. 1978); *United States v. Brewer*, 681 F.2d 973, 975 (5th Cir. 1982)

(same); *United States v. Hayes*, 589 F.2d 811, 819 & 819 n.4 (5th Cir. 1979) (finding that

defendant failed to satisfy first prong of the selective prosecution test because he only presented

evidence of three other cases in which there was no federal prosecution after a state prosecution

had been pursued in good faith).

//

//

9

### 2.   Without Detail, Additional Illustrative Examples Are Unpersuasive.

To further support his claim that similarly situated individuals have received different treatment, the defendant cites U.S. Attorney's Office press releases, some civil cases brought in this district, and some civil cases brought in the Commonwealth of Massachusetts.  Dkt. No. 56 at 5-6.  This information is incomplete and unpersuasive.

To begin, it is unclear whether the press releases to which the defense refers represent all of the relevant investigations, cases, or even press releases that the USAO has sponsored during any relevant timeframe.  Dkt. No. 56 at 5-6.  More important, none of these releases does what the defense needs it to do – which is to establish that a similarly situated defendant was *not* prosecuted.  *Armstrong*, 517 U.S. at 470.

For this, the defense relies on its list of civil trade secret cases lodged in federal and state courts.  Dkt. No. 56 at 6.  However, the defense itself states that its civil examples – from this district and from the state of Massachusetts – are "illustrative" only and "not a complete catalogue" of all trade secrets cases.  Dkt. No. 56-1 at 1.  In other words, these examples are useless, because they do not provide information on what fraction of trade secret cases involve people of Chinese decent.  More importantly, they provide no detail, information, or argument that would allow the court to weigh how similar the facts and circumstances of any of these cases are to the instant one.  The defense has made no attempt to explain whether there are "legitimate prosecutorial factors," including insufficient evidence, that explain why the other civil cases have not been charged as criminal ones.  *See Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)).  But even theoretical comparisons would be complicated: The civil laws that apply in the Commonwealth of Massachusetts or even in the federal system are not analogous to federal criminal laws.  When and why a private party chooses or declines to file suit is a choice often influenced by factors that might never enter the prosecutorial calculus.  Not to mention the fact that successful criminal prosecutions are held to proof beyond a reasonable doubt, a much higher standard of proof than

those required in successful civil matters.  In conclusion, these comparisons do not present the similarly situated offenders that the selective prosecution analysis requires.

### 3.  The Defense's Law Review Arguments are Misleading.

Finally, having failed to identify similarly situated defendants who were not prosecuted, the defense instead focuses on the large number of Chinese defendants who have been prosecuted for trade secret theft.  Dkt. No. 56 at 6-8.  Indeed, given Congressional and Executive findings that the Chinese government has systematically encouraged and enlisted individuals to steal intellectual property from the United States, it hardly is surprising that a large number of Chinese defendants have been prosecuted.  However, these prosecutions do not reflect any improper bias or motive—but rather a response to an identified threat targeting the United States.  In addition, in making this portion of its argument, the defense seems to misunderstand its burden: In order to prevail on a selective prosecution claim, a defendant must establish that similarly situated individuals of a different ethnicity were *not* prosecuted.  *Magana*, 127 F.3d at 8 (citing *Armstrong*).  The government further notes that, in providing this evidence, the defense has offered no guidance on how this Court should square it with the First Circuit's caution, as stated in *Lewis*, that prosecutorial decisions "are often highly ramified, and courts must be chary of relying on raw statistics as purported proof of selective prosecutions."  *Lewis*, 517 F.3d at 27 (also citing *Bass,* 536 U.S. at 864; *United States v. Thorpe,* 471 F.3d 652, 658 (6th Cir.2006)).  Even putting all of this aside, the defense's arguments regarding these studies are misleading.

First, the defense calls upon data in the *Cardozo Law Review*, which analyzed federal Economic Espionage Act charges brought between 1997 and 2015.  *See* Andrew Chongseh Kim, *Prosecuting Chinese "Spies": An Empirical Analysis of the Economic Espionage Act*, 40 Cardozo L. Rev. 749 (2018).  According to this article, the proportion of defendants with likely Chinese surnames increased under the Obama administration: They represented 17% of the defendants charged between 1997 and 2008 and 52% of the defendants charged between 2009 and 2015.  *Id.* at 786.  According to the defense, this "study bluntly concluded that these disparities are 'consistent with concerns of racial profiling and racial bias.'"  Dkt. No. 56 at 7.  In

fact, it did no such thing.  The entirety of the sentence from which the defense quotes reads as follows: "Although these findings are consistent with concerns of racial profiling and racial bias, this Article argues that the complete explanation may be much more complex."  Kim at 754.

The author goes on to explicitly explain that the study made no effort to contextualize its findings.  Thus, it does not account for – and does not claim to account for – changes in threats that occurred during the nearly 20 years of data it sampled.  During those years, for example, internet, mobile phone, and smart phone usage became commonplace; Google went from an idea to a company worth more than $1 trillion; and China regained control of Hong Kong, joined the World Trade Organization, sent its first manned flight into space, hosted its first Olympic Games, and became the world's second-largest economy.  The author further states that his study did not determine whether cyberespionage generally or the Chinese government specifically posed a greater threat to the American economy over this time.  *Id.*  He also explicitly stated that it is possible that people with likely Chinese surnames were committing economic espionage at a greater rate than they did before 2009, which is indeed what has happened.  *Id*.  The author ultimately concluded, "It is possible that the DOJ is legitimately more concerned about spying by and for China than other spying.  If so, the disparities revealed by this Study could be a byproduct of a legitimate focus on crimes that benefit China, which disproportionately involve defendants of Chinese descent."  *Id.* at 754-55.  In short, despite the defendant's argument, this study does not support his argument; it does establish that any inappropriate bias or equal protection violation has occurred or does not even seek to do so.

The defense also cites an article from *Wake Forest Law Review*, which analyzed civil suits brought during the first year of the Defend Trade Secret Act (DTSA).  *See* David S. Levine & Christopher B. Seaman, "The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act," 53 *Wake Forest L. Rev.* 105 (2018).  Beginning in 2016, this law allowed trade secret owners to sue for misappropriation in federal court.  The study found that, during the first year, less than two percent of the claims were brought against Chinese nationals.  *Id.* at 147.  The defense uses this to argue that, when viewed in combination

with the 52% figure from *Cardozo Law Review*, the data show an improper bias in criminal

prosecutions of Americans of Chinese descent.  Dkt. No. 56 at 9.

Again, this argument is unconvincing, principally because it is not helpful to compare the

figures in these two articles.  They quantify much different phenomena.  Unlike the *Cardozo*

piece, the *Wake Forest* analysis makes no effort to identify Chinese Americans who might also

have been sued: It only identifies Chinese nationals.  This discrepancy means an undercount is

baked into its results.  Further, because "the bulk of trade secret litigation involves …a rogue

employee who departs with trade secret information and joins a competitor," claims under the

DTSA are more likely to involve suits against other companies who may be able to pay damages.

*Id.* at 112.  Thus, unlike criminal cases, these suits are less likely to name personal defendants.

Further, the piece looked at data from only one year, 2016 to 2017, and as the article itself states,

in that particular year, Chinese espionage seemed to be waning at least momentarily.  *Id.* at FN

44.  Therefore, this particular year may not have captured typical numbers.  And in any case, the

single year post-dated the *Cardozo* study, which ended in 2015.  Thus, the studies do not cover

the same potential universe of cases.  Comparing their findings is not a convincing way to argue

that Yu is being improperly investigated or prosecuted, never mind that this technique still fails

to present the quality of detail that would allow a robust comparison of the facts between Yu's

situation and another potential defendant's.

In sum, the defense has wholly failed to show that similarly situated actors could have

been prosecuted but were not.  Thus, its selective prosecution claim, including its requests for

discovery and a hearing, fails.

### C.   The USAO Did Not File This Case For an Impermissible Motive

The defense fares no better under the second prong of the selective prosecution analysis.

It asserts that Yu has been "unfairly targeted" because he was born in China, entered the U.S.

through a student visa program, and is married to a Chinese citizen.  Dkt. No. 56 at 2.  The

defense is wrong—Yu has not been improperly investigated or prosecuted because of his

Chinese heritage or because of his wife's.  Rather, this investigation was initiated and criminal

charges were brought because Yu's conduct warranted each of these governmental actions.  Yu was initially brought to investigators' attentions by two entirely separate industry insiders who noted his website's seemingly blatant use of stolen property, some of which is specifically controlled in the interests of national security.  He committed a massive theft.  His stolen products were being advertised internationally.  And, at least occasionally, he was exporting his boosted semiconductor products in violation of U.S. export controls.

In support of its assertions regarding prosecutorial motive, the defense makes a number of claims, none of which withstands scrutiny.

### 1.   The China Initiative Is Not Discriminatory.

The defense complains about the Department of Justice's China Initiative and boldly argues that it is "discriminatory on its face."  Dkt. No. 56 at 10-12.  However, this initiative is a legitimate law enforcement effort that successfully and properly targets a documented threat about which Congress has expressed concern for decades.

For example, in 2000, Congress began requiring annual reports on the People's Republic of China's current and future military strategy.  *See* National Defense Authorization Act for Fiscal Year 2000, Public Law 111-84.  Those annual reports have concluded that, in order to support its military modernization, "China uses a variety of methods to acquire foreign military and dual-technologies, including cyber theft, targeted foreign direct investment, and exploitation of the access of private Chinese nationals to such technologies."[3]  Interestingly, in this case, Yu is accused of stealing "dual-technologies," those that have both commercial and military applications.  *Id.*

In 2011, the U.S. House of Representatives Permanent Select Committee on Intelligence launched an investigation of two Chinese telecommunications companies and the national security issues they posed to the United States.  The committee's subsequent 2012 report found

---

[3] *2017 DOD Annual Report to Congress: Military and Security Developments Involving the People's Republic of China 2017* at ii.  Available at http://dod.defense.gov/portals/1/Documents/pubs/2017_China_Military_Power_Report.pdf.

that "Chinese intelligence services, as well as private companies and other entities, often recruit those with direct access to corporate networks to steal trade secrets and other sensitive proprietary data." *See Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE*, October 8, 2012, at 2.[4]  The report also concluded that the Chinese government is engaged in a widespread campaign of intellectual property theft against the United States. *Id.*  It is difficult to calculate the specific cost of this campaign, but the annual figure is commonly estimated in the hundreds of billions of dollars.[5]

In light of this and related concerns, in November 2018, DOJ announced the China Initiative to combat economic espionage.[6]  While the department has long recognized the serious threat that the Chinese government poses to American national and economic security, this initiative was designed to focus DOJ's resources in confronting that threat.  See Ex. 4 (Statement of John Demers, Assistant Attorney General, National Security Division, U.S. DOJ, Before the Committee on the Judiciary, U.S. Senate, for a Hearing on China's Non-Traditional Espionage Against the U.S.: The Threat and Potential Policy Responses, Dec. 12, 2018).  In particular, it sought to raise awareness among all U.S. Attorney's Offices of the dangers posed by the Chinese government; to improve DOJ's ability to respond to newer technological challenges in bringing economic espionage prosecutions; and to increase industry and public outreach.  *Id.*  DOJ is not prioritizing the cases inspired by the China Initiative because the defendants are typically Chinese or are of Chinese descent.  Instead, the Department is prioritizing them in response to a specifically identified threat targeting United States's intellectual property.  The defense tries to elide this by quoting Attorney General Barr, FBI Director Wray, and U.S. Attorney Lelling.  It

---

[4] Available at https://stacks.stanford.edu/file/druid:rm226yb7473/Huawei-ZTE%20Investigative%20Report%20(FINAL).pdf (visited July 15, 2020).

[5] *See, e.g.*, Office of the United States Trade Representative, *Findings of the Investigation into China's Acts, Policies, and Practices related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974*, at 9. ("Chinese theft of American IP currently costs between $225 billion and $600 billion annually.") Available at https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF (visited July 15, 2020).

[6] *See* https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage (visited July 10, 2020).

insinuates that their comments are intended to describe all Chinese people. But that is false. A fair and complete review of these comments shows that these officials make clear that the Chinese government poses this threat, not all Chinese people. In short, the department's China Initiative is not discriminatory; it is an appropriate response to a foreign actor, whose threatening conduct is directed at the United States.

The United States District for the District of Columbia's decision in *United States v. Concord Management & Consulting LLC*, 18-cr-32 (Oct. 16, 2018) demonstrates this point. Ex. 5. In that case, a Russian corporation was charged by the Special Counsel for its role in the Russian government's interference with the 2016 election. *Id.* at 2. The Russian corporation complained that it was a victim of selective prosecution because the Special Counsel's mandate was to examine cases involving the Russian government and, therefore, was focused on individuals and corporations of a particular national origin. *Id.* at 3. The court rejected this claim and noted that "the Special Counsel is prosecuting individuals and entities because of their involvement in the Russian government's efforts to interfere in the 2016 presidential election — not because of their Russian nationality." *Id.* at 3 (internal quotation and citation omitted).

More specific to this case, the defense's reliance on the China Initiative is misplaced because the initiative was launched *well after* a decision had already been made to investigate Yu. Specifically, the Attorney General launched the initiative on November 1, 2018. However, as noted above, various federal agencies received referrals regarding Yu's crimes in late 2017 and January 2018. The USAO issued subpoenas in the spring 2018. By April 2018, several members of the investigative team – including its lead AUSA – had met with a team of ADI officials. In short, a mature investigation was already in process months before the China Initiative was announced. That program did not animate this investigation or prosecution.

### 2. There Is No Evidence of Discrimination in This Case.

Beyond the China Initiative, the defense generally complains that "the federal government's actions against Mr. Yu have been motivated, at least in part, by discriminatory animus toward people of Chinese ethnicity." Dkt. No. 56 at 12. It cites statements from

President Trump, who has had absolutely no involvement or interaction with this case.  *Id.*  It again misleadingly quotes FBI Director Wray and U.S. Attorney Lelling.  *Id.* at 12-13.  It cites a congressman's comments from more than five years ago and a "wave of criminal cases against Chinese defendants."  *Id.* at 14-15.

The defense's premise seems to be that, if more people of Chinese descent are prosecuted for a specific crime – or for any crime, then the United States must have improperly targeted them.  But disparate impact differs from discriminatory intent.  The defense's premise assumes that all people have the same opportunity, motivation, and ability to commit economic crimes.  It ignores, for example, that the Chinese government, unlike others, sometimes coerces its own citizens to commit economic espionage.  In other words, the defense's logic does not account for the Chinese government's focus, commitment, and tactical methods in stealing U.S. intellectual property.  Under the circumstances, it would be imprudent for the United States not to investigate when there is reasonable suspicion that a specific person is working as an agent of the Chinese government – or of any other foreign nation.

Perhaps at bottom, the defense seeks to cast doubt on the notion that the Chinese government poses the intellectual property threat that the United States claims.  However, the defense's aspersions of the collective judgment of Congress and the Executive about the risks posed by the Chinese government should be disregarded by the Court.  Not only has the defense offered nothing in support of its contentions, but more fundamentally, this Court is not the proper forum to evaluate the security risks posed by a foreign government.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010) (deference to the political branches is particularly appropriate with respect to national security and foreign affairs, given the relative institutional capacity, informational access, and expertise of the courts); *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 49 (1999) (explaining that even if the Executive "disclose[d] its ... reasons for deeming nationals of a particular country a special threat," courts would be "unable to assess their adequacy").

Ultimately, the defense cites absolutely no specific evidence indicating that Yu has been identified and prosecuted for any reason other than his own criminal conduct.  In this case, the government did not go out "looking for" Mr. Yu, any other American of Chinese descent, any Chinese citizen, or any person.  Dkt. No. 56 at 13.  Instead, the industry itself alerted the federal government to the defendant's brazen law-breaking, and the United States followed the evidence where it has led.  Instead of addressing these issues, the defense reaches back more than 20 years to describe the investigation of Los Alamos scientist Wen Ho Lee.  *Id.* at 16-17.  Of course, there are always regrettable instances in which prosecutors make mistakes, as do all human beings. Mindful of our oaths and of the far-reaching consequences of our decisions, the USAO is committed to making as few errors as possible and, nevertheless, acknowledging and rectifying them when they occur.  But none of this argument is specific to Yu.  None of it addresses a single fact in his case, except that he is an American of Chinese descent.  None of this begins to overcome the "formidable" presumptions of regularity and good faith that accompany prosecutorial charging decisions, especially when there is no evidence, much less "clear evidence," that the government "acted impermissibly in pursuing a case."  *Lewis*, 517 F.3d at 25.

The defense has failed to demonstrate that the government filed this case based on an improper motive.  Thus, its selective prosecution claim, including its requests for discovery and a hearing, also fail.

**D.      The Defense Is Not Entitled to Discovery in Support of Its Failed Claim**

The defense motion fails to meet the "rigorous" standard for overcoming the "presumption of regularity" that attaches to prosecutorial decision-making, and it is not entitled to discovery on a claim of selective prosecution or enforcement.  *Armstrong*, 517 U.S. at 468.

As outlined above, the defense has failed to identify even one similarly-situated actor who was not prosecuted.  It has also failed to demonstrate that the case against Yu was brought "at least in part because" he is an American of Chinese descent.  Failure on even one of these prongs dooms his discovery motion to denial in the selective prosecution context.  *Lewis*, 517 F.3d at 29 (because "the defendant has failed to make the threshold showing required under the

first prong of the test; he has failed to adduce some evidence that the prosecution manifested a discriminatory effect," his "discovery motion founders, and further consideration of the evidence pertaining to discriminatory intent would serve no useful purpose").

Moreover, the defense's reliance on *United States v. Tuitt* is misplaced.  In that case, the defendant, among other things, offered evidence that no whites in the western counties of Massachusetts were federally prosecuted for the cocaine base offenses with which he was charged.  *United States v. Tuitt*, 68 F. Supp. 2d 4, 8 (D. Mass. 1999)  The defendant then contrasted the 1998 federal data with state court data, which established that whites accounted for 10% of prosecutions in state court in the same year.  *Id.*  In other words, the defendant presented "some evidence" that he had been treated differently than similarly-situated offenders, who were not prosecuted.  *Lewis*, 517 F.3d at 25.  In this case, the defense has not done the same.  Instead, it has largely done exactly what *Armstrong* and *Tuitt* warn against – rely on evidence that is "anecdotal or confined to statistics arising out of the federal district itself."  *Id.* at 9.  Further, the government also believes that the defense again misconstrues its burden when it alleges that the government has made the "deliberate choice" to assert that "persons from China are 'Public Enemy No. 1.'"  Dkt. No. 56 at 19.  In *Tuitt*, the court invoked a "deliberate choice" *not* to prosecute a similarly situated individual.  *Tuitt*, 68 F. Supp. 2d at 10.  Here, the defense has offered no similarly situated individuals.

Neither has the defense met the First Circuit standard for discovery in a selective enforcement claim.  Instead, the defense invites this Court to adopt a different standard newly endorsed by the Third, Seventh, and Ninth circuits – without even acknowledging that it would be a departure.  *See United States v. Sellers*, 906 F.3d 848 (9th Cir. 2018); *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017); *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015).  Neither does the defense state that each of the circuits adopting the new standard has done so only in the narrow context of defendants who were charged after stash house reverse-sting operations.  In those cases, these courts have ruled, the discovery standards for selective enforcement claims must be relaxed if only because, given the nature of the investigation, there

19

literally are no similarly situated defendants who are not charged.  Obviously, the defendant here does not face such an obstacle, and the defense has given the court no reason to depart from circuit precedent.

Even if it were to consider doing so, the proffers made in the other circuit cases are much more robust than the one made here.  For example, the defense cites *United States v. Lopez*, No. 19-cr-323, 2019 U.S. Dist. LEXIS 196848, at *7-8 (S.D.N.Y. Nov. 13, 2019).  But Lopez – like all of the defendants in this class of new standard cases – offered statistical analysis and raw data to support his claim of selective enforcement.  *Id.*  Here, the defense proffered no competent raw data or statistical analysis: Its datasets are incomplete.  Its flimsy statistical analyses do not even pretend to gather cases with similar aggravating factors.  The instant case is not analogous to *Lopez, Sellers, Washington*, or *Davis*.

Finally, the government renews its objections to the discovery requests listed in Ex. E ¶¶ 16-27.  They seek information that is beyond the scope of Fed. R. Crim. P. 16, the Local Rules, *Brady, Giglio*, their progeny, and the *Jencks* Act.  Many of the requests are overbroad, pertaining to topics unrelated to this prosecution.  For example, Paragraph 25 requests "[a]ll documents and communications concerning the presidential statement issued on March 22, 2018, entitled 'President Donald J. Trump is Standing Up for American Innovation.'"

The defense has not met its burden for discovery.  Its request for discovery, as with its requests for dismissal and a hearing, should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    <u>/s/ Amanda Beck</u>
Amanda Beck
Jason Casey
B. Stephanie Siegmann
Assistant United States Attorneys
617/748-3683

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_/s/ Amanda Beck_____
Amanda Beck
Assistant United States Attorney

Date: July 15, 2020