IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HAOYANG YU, *et al*. | No.  19-cr-10195-WGY<br><br>LEAVE TO FILE GRATED<br>9/11/2020 D.E. 72 |

# REPLY IN SUPPORT OF
# MOTION TO DISMISS DUE TO UNCONSTITUTIONAL SELECTIVE
# ENFORCEMENT AND PROSECUTION

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: September 8, 2020

# **TABLE OF CONTENTS**

Introduction ................................................................................................................................... 1

Argument ...................................................................................................................................... 2

I.   The prosecution ignores the less demanding standard that applies to claims of selective *enforcement*, as opposed to selective *prosecution*, and Mr. Yu easily clears that lower bar. ...................................................................................................................................... 2

II.  Regardless of who provided the initial tips or when the China Initiative formally began, the critical decisions to investigate and to prosecute Mr. Yu were impermissibly based, at least in part, on his Chinese ethnicity. ............................................................................... 5

    A.   The circumstances of the initial tips are irrelevant, because the investigative pursuit of Mr. Yu was impermissibly based on his Chinese ethnicity. ............................... 5

    B.   The DOJ's China Initiative confirms, rather than disproves, the government's discriminatory intent. ........................................................................................... 7

    C.   The prosecution's bluster about the supposed strength of its case serves only to distract from the Constitutional problem. .............................................................. 9

III. The prosecution fails to distinguish the MACOM case and ignores the compelling statistics that demonstrate disparate treatment of ethnically Chinese people who are accused of stealing trade secrets. .................................................................................................... 10

    A.   The prosecution fails to distinguish the MACOM case or to minimize its significance as smoking-gun evidence of selective prosecution. .......................... 10

    B.   The prosecution also fails to reckon with the publicly available statistics about criminal and civil trade secrets cases. .................................................................. 13

Conclusion ................................................................................................................................. 17

Certificate of Service ................................................................................................................. 18

i

## **INTRODUCTION**

The strikingly similar MACOM case teaches that, when Anglo-American individuals steal technology from U.S. companies, they typically face civil claims (or no consequences at all), but when Chinese Americans are suspected of stealing *the same technology* from *the same company*, they are often indicted on criminal charges. That troubling lesson is entirely consistent with the sharply skewed national statistics about trade secret cases. Although civil cases rarely involve ethnically Chinese defendants, almost all criminal investigations and prosecutions target them. Indeed, the U.S. Attorney's Office has not identified any recent case in this district that did not involve some purported China connection.

The discriminatory effect on ethnically Chinese individuals is no accident. When it comes to proclaiming their anti-Chinese animus, President Trump, along with senior officials from the White House, DOJ, and FBI use fog horns, not dog whistles. They have loudly, repeatedly, and inexcusably labeled "the Chinese" as rapists, thieves, and liars who endanger the United States.

Here, the prosecution has doubled-down on the discriminatory investigation and prosecution of Mr. Yu. According to the Opposition, the DOJ openly targets Chinese people because they allegedly steal more intellectual property, and the China Initiative is considered a necessary weapon, along with trade wars and diplomatic maneuvers, to answer the "threat" that China poses. Among other problems with that prejudiced approach, it yields misguided prosecutions of innocent individuals, such as Mr. Yu, a U.S. citizen *with no connection to the Chinese government*.

At this initial stage, Mr. Yu has already produced "some evidence" of both discriminatory effect and intent (even though only proof of one is required to proceed with his selective enforcement claim). Thus, after an evidentiary hearing, this Court should dismiss the indictment against Mr. Yu and his company, Tricon MMIC, LLC, thereby vindicating the constitutional

1

principle that no person may be subjected to selective investigation or prosecution based on his or her ethnicity, race, or national origin.

If—as the prosecution contends—Mr. Yu is not even entitled to discovery concerning his Motion to Dismiss, the doctrines of selective enforcement and prosecution are dead letters that provide no guarantee of equal protection under the law for criminal defendants.

## ARGUMENT

**I.    The prosecution ignores the less demanding standard that applies to claims of selective *enforcement*, as opposed to selective *prosecution*, and Mr. Yu easily clears that lower bar.**

Throughout its Opposition, the prosecution erroneously contends that Mr. Yu must establish both discriminatory intent and effect, such that "failure on even one of these prongs dooms his discovery motion to denial." Opp. at 18. That argument fails to distinguish between selective enforcement and prosecution claims, even though Mr. Yu asserts both. At least three circuits have held that a defendant challenging non-prosecutorial decision-making need only produce "some evidence" of *either* discriminatory intent *or* discriminatory effect. *United States v. Washington*, 869 F.3d 193, 220-21 (3d Cir. 2017); *see also United States v. Davis*, 793 F.3d 712, 721 (7th Cir. 2015) (en banc); *United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018); *see also United States v. Lopez*, 415 F. Supp. 3d 422, 426 (S.D.N.Y. 2019) (adopting *Davis-Washington-Sellers* standard). "Distinct from what is required under *Armstrong/Bass*" for a selective prosecution claim, "a defendant need *not*, at the initial stage" of a selective enforcement claim "show that . . . similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement." *Washington*, 869 F.3d at 221 (emphasis added).

Although *Davis*, *Washington*, and *Sellers* concerned reverse stash-house sting operations, *see* Opp. at 19, their reasoning—more specifically, their careful reading of *United States v. Armstrong*, 517 U.S. 456, 464 (1996)—applies to any claim that attacks investigative, as opposed

to prosecutorial, decision-making. As these cases point out, in *Armstrong*, the Supreme Court was especially concerned with respecting the "special province" of federal prosecutors and "the presumption of regularity [that] supports their prosecutorial decisions." 517 U.S. at 464 (internal quotation marks and citations omitted). In *Davis*, the en banc panel explained that law enforcement agents are not owed the same special solicitude:

> Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause. . . . Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.

*Davis*, 793 F.3d at 720-21; *see also Washington*, 869 F.3d at 219 (holding "the special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *Armstrong* . . . does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity"); *Sellers*, 906 F.3d at 853 (observing "agents occupy a different space and role in our system than prosecutors; they are not charged with the same constitutional functions, and their decisions are more often scrutinized by—and in—courts"). Moreover, as these cases point out, "employing the *Armstrong* discovery standard would functionally preclude discovery in any selective enforcement case" because it would require a claimant to prove a negative. *Lopez*, 415 F. Supp. 3d at 426; *see Sellers*, 906 F.3d at 853.

The standard outlined in *Davis*, *Washington*, and *Sellers* governs here: agents at several federal agencies made numerous decisions to pursue investigations of Mr. Yu. This investigative

decision-making, which led to the instant prosecution, is not protected prosecutorial decision-making. The agents' credibility, as well as the circumstances and inferences surrounding their decisions to pursue Mr. Yu, would be subject to scrutiny in any other setting.

The prosecution supplies no reason why this Court should reject the standard articulated by *Davis*, *Washington*, and *Sellers* for selective enforcement claims. If anything, the federal agents who investigate trade secret complaints deserve enhanced scrutiny, given their close relationship with the private U.S. businesses that they regulate, which stand to benefit from the regulators' investigations of rivals. *See* Opp. at 2 (discussing relationship between Department of Commerce ("DOC") and industry consultants); *id*. at 3 (highlighting role of private industry in policing exports); *id*. at 3 ("DOC policy instructs agents … to conduct industry outreach, to ask company representatives whether they are aware of new exporting companies, and to solicit information on suspicious activities").

Where claims of selective enforcement or "'mixed' claims that involve prosecutors acting in investigative or other capacities" are raised, a standard other than *Armstrong* applies. *Washington*, 869 F.3d at 220. Some evidence on either *Armstrong* prong—discriminatory intent or effect—suffices to state a selective enforcement claim. *See Sellers*, 906 F.3d at 856. Moreover, a defendant's proffer "may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) *even if* the underlying challenge is to law enforcement decisions." *Washington*, 869 F.3d at 221 (emphasis in original). Thus, even if Mr. Yu "presented no evidence of discriminatory effect . . . evidence of discriminatory intent may be enough to warrant discovery." *Sellers*, 906 F.3d at 856.[1]

---

[1] Indeed, *Armstrong* itself "reserve[d] the question whether a defendant must satisfy the similarly situated requirement in a case involving direct admissions by prosecutors of discriminatory purpose." 517 U.S. at 469 n.3 (internal quotation marks, brackets, and citation omitted).

In emphasizing the lower bar for selective *enforcement* claims, Mr. Yu does not concede his selective prosecution claim. At this initial stage, Mr. Yu has presented sufficient evidence on both prongs to warrant discovery, a hearing, and eventual dismissal of the indictment for impermissible selective enforcement and selective prosecution based on his Chinese ethnicity.

**II.     Regardless of who provided the initial tips or when the China Initiative formally began, the critical decisions to investigate and to prosecute Mr. Yu were impermissibly based, at least in part, on his Chinese ethnicity.**

   **A.     The circumstances of the initial tips are irrelevant, because the investigative pursuit of Mr. Yu was impermissibly based on his Chinese ethnicity.**

The prosecution contends that two anonymous tips from industry sources prompted the criminal investigation of Mr. Yu and his company, Tricon MMIC, LLC ("Tricon"). *See* Opp. 1-4. First, those tips are outside the record, and the government's reliance on them confirms that an evidentiary hearing is required. Second, the tips have limited significance to the equal protection analysis, because private industry cannot serve as the gatekeeper controlling who is investigated and prosecuted by law enforcement.

Notwithstanding the alleged "tips," the FBI and other federal agencies bear responsibility for their decisions to open an initial regulatory investigation and, then, to conduct an aggressive criminal investigation. Notably, when describing the history of the case, the Opposition omits any discussion of the many decisions that investigators made after the receipt of the tips. *See, e.g.,* Opp. at 3 ("The case grew from there"). The case did not simply "grow" by itself. Rather, a series of discrete decisions to "grow" the case were impermissibly based on unfounded suspicions and false stereotypes about people who are ethnically Chinese, including the false assumption that they likely have some secret connection or ultimate loyalty to the Chinese government.

For example, the prosecution recounts that, after receiving a tip from an unidentified "semiconductor industry consultant" who thought "something smells a bit fishy" about Tricon,

5

DOC Special Agent Benjamin Hickok "began researching Tricon and conducting open source inquiries on the defendant." Opp. at 3. It was then, of course, that SA Hickok identified Mr. Yu and his wife, and the fact that they have ethnic Chinese surnames. Thereafter, SA Hickok asked for help from DHS, singling out Tricon (and Mr. Yu) to obtain an export classification from DOC, even though many companies produce nearly identical products, do not consider them subject to export controls, and sell them to international customers without licenses. *See* D.E. 61 at 8-9.

Similarly, when an unidentified "Texas defense contractor" complained to unidentified "authorities" that Tricon "might be using the contractor's photograph and datasheet" on Tricon's website to market its own products, DCSA investigators "conducted follow-up queries on public information databases," which revealed information about Mr. Yu and his wife. Opp. at 3-4. At that point, DSCA investigators referred the matter to NCIS and FBI agents in Boston, who "began investigating the defendant and Tricon." *Id.* at 4.

With respect to both tips, the key fact—which the Opposition conspicuously fails to mention—is that, early on, investigators discovered Mr. Yu was ethnically Chinese. The eventual "significant case" designation is riddled with references to China, *see* D.E. 56 at 2 & Ex. A, and the commitment of investigative resources was stunning. Four different federal agencies (FBI, DOC, DCRA, and NCIS) all coordinated their investigations, which entailed extensive physical and electronic surveillance, including the long-term installation of a pole camera outside the Yu family home. These efforts yielded images of Mr. Yu and Ms. Chen taking care of their children, but no evidence that Mr. Yu (or his company) ever sold, sent, or otherwise exported any sensitive technology to the Chinese government or any Chinese official.

The prosecution's assertion that "investigators *question[ed]* whether [Mr. Yu] might be involved in economic espionage" because "Chinese websites also advertised his goods," Opp. at

6

4 (emphasis added), warrants careful scrutiny. Tricon is a U.S. company, based in Massachusetts, with no business or marketing operation in China and only an English-language website. The Chinese websites that advertised Tricon's products were well-known frauds selling counterfeit goods and advertising products from other American companies (ADI among them), including export-controlled items to which they do not have access. *See* D.E. 61 at 12-13.

Regardless, even if the Chinese websites were a legitimate reason to "question whether [Mr. Yu was] involved in economic espionage," Opp. at 4, that "question" was emphatically resolved in the negative. Exhaustive investigation revealed no reason to believe that Mr. Yu sold his wares in China, much less stole sensitive, military technology from a U.S. company to help the Chinese government. That should have been the end of the criminal matter. Yet even after investigators and prosecutors realized, or should have realized, that their biased worries about Mr. Yu were wrong, they pressed ahead, pursuing a criminal case against him. Indeed, they continued to package and market the case as a "national security" matter. *See, e.g.,* D.E. 56-3 (Mar. 4, 2019 SCR report falsely asserting that Mr. Yu was selling products to China and labeling him a "national security threat").

**B.      The DOJ's China Initiative confirms, rather than disproves, the government's discriminatory intent.**

The prosecution insists that the China Initiative is "a legitimate law enforcement effort" that "targets a documented threat"—specifically, efforts by the Chinese government to steal technology from U.S. companies. Opp. at 14; *see id.* at 16 ("[The DOJ's] China Initiative is not discriminatory; it is an appropriate response to a foreign actor, whose threatening conduct is directed at the United States."). But Mr. Yu is neither "the Chinese government" nor "a foreign actor" who presents a national security threat.

7

Mr. Yu is a U.S. citizen, who has lived and worked in this country for nearly 20 years and has no criminal record. In its Opposition, the prosecution smears Mr. Yu with the broad brush of anti-China rhetoric, implying without any basis that he must be a Chinese spy who has engaged in criminal activity to "benefit China." Opp. at 12. This is not a case against China, however. But the DOJ has charged Mr. Yu and the U.S. Constitution demands that he be treated as an individual, not stereotyped as a member of an ethnic group.

The erroneous contention that law enforcement can intentionally target ethnically Chinese people because they steal more trade secrets than non-ethnically Chinese people amounts to a confession of unlawful discrimination. For example, without any evidence, the prosecution asserts that "people with likely Chinese surnames" have engaged in "economic espionage at a greater rate than they did before 2009." *Id.* (stating "[that] is indeed what has happened"). The DOJ cannot lawfully "target" ethnically Chinese people, including U.S. citizens with no official or professional connection to the Chinese government or Chinese businesses, for investigation and prosecution.

Although diplomatic and economic decisions about foreign policy regarding China are matters for the Executive, criminal prosecutions of individual defendants, and the protection of their constitutional rights, are core concerns of the Judiciary. The hostile view that "China is raping our country," as President Trump has repeatedly declared, may justify imposing tariffs on Chinese goods, but it cannot excuse selectively employing the criminal justice system against Chinese Americans or nullify the guarantee of equal protection.

The government also asserts that the China Initiative cannot serve as evidence of discriminatory intent, because "a decision had already been made to investigate Mr. Yu" before the Initiative was announced. Opp. at 16. That argument ignores the significant ramp-up in activity against Mr. Yu immediately after President Trump declared a trade war with China, a pre-cursor

8

to the China Initiative.[2] *See* Mot. at 3; DOJ-YU-145 (noting Yu case was opened March 23, 2018); Opp. at 4 ("Since March 2018, special agents from DOC, HSI, NCIS, and FBI have been jointly investigating the matter"). Further, the China Initiative—the rhetoric, fear-mongering, and intentional focus on individuals associated with China—is offered, here, as evidence of discriminatory *intent*. The Initiative itself need not have produced this investigation (and indeed, the government does not deny that it may have produced this *prosecution*). *See* Opp. 16. Rather, the China Initiative is strong evidence of anti-Chinese animus, which triggered the decision to investigate, and eventually to prosecute, in this case.

> **C.    The prosecution's bluster about the supposed strength of its case serves only to distract from the constitutional problem.**

In summarizing its view of the evidence against Mr. Yu, the prosecution misunderstands the equal protection analysis. The constitutional question is not whether Mr. Yu is guilty of the charged offenses. (Mr. Yu has pleaded not guilty, and he denies the charges.) Rather the question is whether the government impermissibly chose to investigate and to prosecute Mr. Yu based on his Chinese ethnicity.

A simple hypothetical example makes the critical point: if the government were faced with two defendants, both guilty of robbing banks, it would be unconstitutional to select one defendant for prosecution because he was African-American, or Muslim, or from China. That, however, is what the investigators and prosecutors have done here. They impermissibly selected Mr. Yu and Tricon for aggressive investigation and criminal prosecution, at least in part, because Mr. Yu (and his wife) are ethnically Chinese.

---

[2] *See* https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-standing-american-innovation/ (Mar. 22, 2018).

The facts of the MACOM case and the publicly available statistics about trade secret litigation establish that the government has not taken the same punitive approach toward individuals who are not ethnically Chinese. *See* Part III, *infra* (discussing the MACOM case in more detail). Moreover, the "aggravating circumstances" that supposedly distinguish this case are overblown, at best. Calling MMICs "sensitive . . . military technologies," Opp. 4, is either woefully uninformed or grossly misleading: as the government knows, and as Manfred Schindler, an industry expert on MMICs, has explained, these circuits are commodities, which have been on the market for decades and are developed, manufactured, and sold in volume around the world. *See* D.E. 62 (Schindler Decl.) ¶¶ 8-12.

MMICs are "not 'new' technology," and they are used as basic components in radio, cellular, satellite communications, wireless networking, radar, internet-of-things, remote controls, and medical devices. *Id*. ¶¶ 8-9. Far from top-secret or cutting-edge devices, MMICs are "relatively easy to reverse engineer," and it is "not uncommon" for companies to reverse engineer MMICs to develop similar, competing products. *Id.* ¶¶ 10-11. By analogy, the fact that nuclear warheads include screws and wires does not make those items into national security concerns. Further, the government's puffery about export violations and "foreign countries," Opp. at 4, elides the fact that the only international facet of this case charged by the government is a shipment of MMICs by Mr. Yu and Tricon to a customer in *Spain*, not China (or any other "hostile" country).

**III.   The prosecution fails to distinguish the MACOM case and ignores the compelling statistics that demonstrate disparate treatment of ethnically Chinese people who are accused of stealing trade secrets.**

   **A.   The prosecution fails to distinguish ADI's civil lawsuit against MACOM or to minimize its significance as smoking-gun evidence of selective prosecution.**

The prosecution tries to distinguish the nature and scale of the misconduct in the MACOM case. *See* Opp. at 8-9. It offers no evidence, however, to support its characterization. Indeed, both

10

the MACOM case and this one involve some of ADI's same MMIC products, such as HMC994A, which MACOM's employees admitted stealing and the prosecution claims Mr. Yu misappropriated. As a metric of relative culpability, the MACOM case involved three types of products—amplifiers, VCOs, and switches—while Mr. Yu's case involves only amplifiers. In addition, the MACOM defectors stole far more data than Mr. Yu is charged with taking. *See* DE 56-6 at 9 (alleging Mr. Traut downloaded 3 GB of data to one or more external devices); *id*. at 12 (alleging Mr. Winslow downloaded 500 GB of data to nearly 20 external devices); *id*. at 21 (alleging Mr. Papamitrou downloaded 80 GB of data to "external drives and cloud-based accounts"). MACOM was also a far bigger competitor for ADI and was, in fact, a source of exports to China and elsewhere. *See* https://www.macom.com/support/contact-us (click on "APAC" region). A case against MACOM employees would have been relatively easy to bring, and to win, because at least two of the former ADI employees who joined MACOM admitted in writing that they had intentionally stolen trade secrets from ADI to use at MACOM, a clear violation of 18 U.S.C. § 1832. *See* D.E. 56-6 ¶¶ 58, 89.

The prosecution also mistakenly argues the MACOM case was different because it did not involve export controls for sensitive, military technologies or sales to China or other foreign countries. Like Tricon, MACOM develops, manufacturers, and sells MMICs. Unlike Tricon, however, MACOM has a substantial presence in China: it has four offices in China, oversees an extensive network of distributors throughout the country, and maintains a dedicated support line for its Chinese customers. *See* https://www.macom.com/support/contact-us. In 2019, MACOM formed a joint venture with a Chinese company to export sensitive technologies to China. *See* https://www.macom.com/about/news-and-events/press-release-archive/row-col1/news--event-archive/macom-and-goertek-form-joint-ven. In addition, on its website, MACOM advertises a

11

"comprehensive portfolio" of "aerospace and defense" products for various applications, "[f]rom military communications to radar and sensing to electronic warfare." *See* https://www.macom.com/applications/aerospace-and-defense. To the extent that the potential sale of MMICs to customers in China raises any national security concerns, the individuals in the MACOM case posed precisely that threat.

The prosecution's claim of ignorance about ADI's civil case against MACOM is disingenuous. *See* Opp. at 8. As the prosecution well knows, and as Mr. Yu would establish at an evidentiary hearing, agents and prosecutors investigating Mr. Yu discussed the MACOM case with ADI representatives by no later than March 2019, months before Mr. Yu was indicted. In any event, investigators and prosecutors could have, and should have, known about this major theft of trade secrets from ADI because the relevant allegations were filed in public pleadings by ADI on the court docket. If such issues really implicated national security concerns, as the prosecution insists, certainly agents would, at minimum, consider readily available court records in this district. Further, when Mr. Yu was indicted in June 2019, the five-year statute of limitations for criminal charges against MACOM and its employees had not yet run:  Winslow only left ADI with the company's trade secrets in February 2015, and MACOM launched new products that copied technology taken from ADI in September 2016 and January 2018. *See* D.E. 56-6 ¶¶ 61-64, 68-69. Neither MACOM nor the admitted thieves who work there—none of whom are ethnically Chinese—ever faced criminal charges, or even a personal lawsuit.

Finally, the MACOM case cannot be disregarded as just "a single case," as the prosecution suggests. Opp. at 9. In fact, the MACOM case involved three or four separately identified individuals, all of whom could have faced criminal charges. And so long as Mr. Yu establishes that he was selected for investigation or prosecution based in part on his ethnicity, that is all he

needs to show. In the hypothetical example of the black and white bank robbers, it would make no difference if the white bank robber, who was not prosecuted, was just "a single case." If the black defendant established that he had been selected for investigation and prosecution based on his race, that would warrant dismissal of the case against him.

The remarkable similarity between this case and the MACOM case makes the inference of ethnic bias reasonable, if not inescapable. Individuals who were not ethnically Chinese stole even more of the same technology, from the same company, to assist an even bigger competitor with a substantial footprint in China, but they faced no criminal charges. They were not even investigated. Instead, the two companies settled a civil case in this district. And the suggestion that "the strength of the case," Opp. at 8, played some role in deciding not to pursue any of the bad actors at MACOM is belied by the fact that at least some of them admitted *in writing* that they had stolen trade secrets from ADI (a charge that Mr. Yu denies). *See* D.E. 56-6 ¶¶ 58, 89.

### B. The prosecution also fails to reckon with the publicly available statistics about criminal and civil trade secrets cases.

The prosecution next attempts to minimize the significant statistical information that Mr. Yu has presented about the ethnic demographics of defendants in criminal and civil trade secret cases. It argues that, absent extensive details about each particular case, any statistical analysis of other cases are irrelevant because meaningful comparisons cannot be made. *See* Opp. at 10-11.

For starters, the law is clear that a successful claim of selective prosecution does not require identical cases, only evidence that similarly situated defendants, who were not members of the same protected group, did not suffer similar scrutiny. A "similarly situated offender" is one who has committed "*roughly* the same crime under *roughly* the same circumstance." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008). In *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019), the Supreme Court recently articulated the standard for a comparator in the *Batson* context:

"[a]lthough a defendant ordinarily will try to identify a similar white prospective juror whom the State did not strike, a defendant is not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent." *Id.* at 2249 (emphasis added). The same is true here.

Within the universe of trade secrets theft (even further limiting that universe to trade secrets involving technology products such as MMICs), Mr. Yu puts forward compelling evidence that ethnically Chinese defendants have been singled out and treated more harshly at every step of the investigation-to-prosecution continuum. *See, e.g.*, Andrew C. Kim, "Prosecuting Chinese 'Spies': An Empirical Analysis of the Economic Espionage Act," 40 CARDOZO L. REV. 751, 753-54 (2018) (noting that among prosecutions under the Economic Espionage Act, ethnically Chinese defendants are twice as likely to be found innocent as other defendants and receive harsher sentences than others when convicted). As Mr. Yu noted, over the past 7 years, every press release from the U.S. Attorney's Office for this District about a criminal trade secrets prosecution has involved a connection to China, and all but one involved ethnically Chinese defendants. *See* Mot. at 5-6. In its Opposition, the prosecution has not identified a single comparable case brought against a defendant who is not ethnically Chinese or alleged to have some illicit connection to the Chinese government.

The prosecution admits "prioritizing" cases "inspired by" the China Initiative, and it insists that the official animus toward China warranted by the "threat." Opp. at 15. Given the jingoistic rhetoric from the government, including the DOJ, disclaimers about respect for Chinese *people*, as opposed to the Chinese government, cannot be credited. *See* Opp. at 16 (asserting that public comments by officials "make clear that the Chinese government poses this threat, not all Chinese people"). There is no shortage of examples where, in word and action, the government has gone

14

beyond attacking the Chinese government to vilifying all Chinese people. *See* Mot. at 12-13 (quoting former FBI supervisor as explaining that "[t]he message from leadership . . . is that 'Chinese Americans are being weaponized as a tool by foreign nationals'"); Mot. at 12 (quoting President Trump as tweeting "'That's the Chinese M.O. – Lie, Cheat, Steal in all international dealings'"); WION, "FBI warns American businesses to stop dealing with Chinese companies" (Aug. 24, 2020) (FBI reporting that "Chinese businesses lie, cheat and steal from American businesses");[3] *see also, e.g.*, Forbes, "Trump Once Again Calls Covid-19 Coronavirus The 'Kung Flu'" (June 24, 2020).[4]

U.S. Attorney Andrew Lelling has made the connection to Chinese *people* explicit, stating that under the China Initiative, "'unfortunately, a lot of our targets are going to be Han Chinese. If it were the French government targeting U.S. technology, we'd be looking for Frenchmen.'" Mot. at 13; *cf. Armstrong*, 517 U.S. at 469 n.3 (reserving question whether defendant must satisfy similarly situated requirement in selective prosecution claim "involving direct admissions by prosecutors of discriminatory purpose"). The irony here is that by "looking for [China]men" and using of the criminal justice machinery to address the "Chinese . . . threat," Opp. at 15, the government has netted Mr. Yu, who has nothing to do with China except for his ethnic heritage.

As Mr. Yu has also noted, while only 2 percent of federal *civil* trade secrets defendants are ethnically Chinese, *see* Mot. at 7 (citing Wake Forest article), two-thirds of *criminal* trade secrets defendants are ethnically Chinese. *See* Mot. at 14-15; DOJ Press Release, "Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since

---

[3] *Available at* https://www.wionews.com/world/fbi-warns-american-businesses-to-stop-dealing-with-chinese-companies-322844.

[4] *Available at* https://www.forbes.com/sites/brucelee/2020/06/24/trump-once-again-calls-covid-19-coronavirus-the-kung-flu/#6bc728001f59.

15

2018" (Aug. 4, 2020) (lauding fact that "[a]bout 80 percent of all economic espionage prosecutions brought by the [DOJ] allege conduct that would benefit the Chinese state, and there is at least some nexus to China in around 60 percent of all trade secret theft cases");[5] *see also* National Law Review, "The Department of Justice's National Security Division Chief addresses China's Campaign to Steal U.S. Intellectual Property (Aug. 24, 2020) (citing the same numbers);[6] FBI Tweet (Aug. 13, 2020)[7] (stating "the FBI opens a China-related counterintelligence case nearly every 10 hours").

The *twenty percent* acquittal rate for Chinese defendants charged with economic espionage (the average acquittal rate across federal crimes is around 5%)[8] is further evidence of the government's misguided policy to prosecute Chinese defendants even absent evidence to support those prosecutions. *See* Mot. at 15. The Wen Ho Lee case illustrates the problem. The Opposition tries to dismiss that debacle, noting that it occurred "more than 20 years ago." Opp. at 18. Unfortunately, the same pattern—a prejudicial rush to judgment against an ethnic Chinese individual—continues to plague the DOJ; if anything, encouraged by President Trump's vituperative China-bashing, the problem has only gotten worse.

Again, in its Opposition, the prosecution does not dispute the data. The numbers are so skewed that *even if* the Court were to accept all of the prosecution's distinctions and attempts at explanation, those factors cannot explain away the extent of the disparity. Because "[n]o reason"

---

[5] *Available at* https://www.justice.gov/opa/information-about-department-justice-s-china-initiative-and-compilation-china-related.

[6] *Available at* https://www.natlawreview.com/article/department-justice-s-national-security-division-chief-addresses-china-s-campaign-to.

[7] *Available at* https://twitter.com/FBI/status/1294091521361350658?s=09.

[8] *See, e.g.*, U.S. Attorneys' Annual Statistical Report for FY 2017, Table 2A at page 7, https://www.justice.gov/usao/page/file/1081801/download.

16

for the disparity "is shown" by the prosecution, "the conclusion cannot be resisted[] that no reason for it exists *except hostility to the race and ethnicity to which [Mr. Yu] belong[s]*." *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (emphasis added); *cf. Flowers*, 139 S. Ct. at 2248 (noting, in *Batson* context, that "the numbers . . . are too disparate to be explained away or categorized as mere happenstance").

Finally, the prosecution incorrectly asserts that disparate impact cannot constitute evidence of discriminatory intent. *See* Opp. at 17 ("Disparate impact differs from discriminatory intent"). But disparate impact, if severe enough, *is* evidence of discriminatory intent. *See United States v. Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999) (holding "discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose") (citing *Gomillon v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo*, 118 U.S. 356).

Ultimately, Mr. Yu puts forward substantial evidence—far more than the "some evidence" required, *Washington*, 869 F.3d at 220-21—of discriminatory intent and effect. Because this case is the result of unconstitutionally selective enforcement of the laws and unconstitutionally selective prosecution, based at least in part on Mr. Yu's Chinese ethnicity, the Court should order discovery, convene an evidentiary hearing, and dismiss the indictment.

## CONCLUSION

For the foregoing reasons, this Court should hold an evidentiary hearing and, thereafter, grant this Motion to Dismiss all pending charges against Defendant Haoyang Yu.

17

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

_/s/ William Fick_
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
_wfick@fickmarx.com_
_dmarx@fickmarx.com_
_abarsky@fickmarx.com_

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 6, 2020.

_/s/ William Fick_