IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                                      No.  19-cr-10195-WGY

HAOYANG YU, *et al.*

## MEMORANUDM OF LAW IN SUPPORT OF
## MOTION TO DISMISS INDICTMENT DUE TO VINDICTIVE
## PROSECUTION AND OUTRGEOUS GOVERNMENT MISCONDUCT

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: April 1, 2021

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ ii

Background ............................................................................................................ 1

Argument .............................................................................................................. 3

I.    The prosecution improperly sought to coerce Mr. Yu to waive his Sixth
      Amendment right to a jury trial by threatening to indict his wife, Ms. Chen. 5

II.   The prosecution vindictively punished Mr. Yu for exercising his right to a jury
      trial by indicting his wife. ............................................................................ 10

III.  By using criminal charges against Ms. Chen for leverage against Mr. Yu, the
      prosecution has engaged in outrageous government misconduct. .................. 15

Conclusion ........................................................................................................... 19

Certificate of Service ........................................................................................... 19

## TABLE OF AUTHORITIES

### Cases

*Berger v. United States*, 295 U.S. 78 (1935)......................................................................4

*Blackledge v. Perry*, 417 U.S. 21 (1974) ...........................................................................9

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ................................................3, 5, 9, 12

*Brady v. Maryland*, 373 U.S. 83 (1963) ..........................................................................4

*Chaffin v. Stynchcombe*, 412 U.S. 17 (1973).................................................................9

*Kaur v. Maryland*, 141 S. Ct. 5 (2020) ..........................................................................4

*Kent v. United States*, 272 F.2d 795 (1st Cir. 1959) .......................................................6

*Lafler v. Cooper*, 566 U.S. 156 (2012)............................................................................7

*Lovett v. Butterworth*, 610 F.2d 1002 (1st Cir. 1979) ..................................................11

*Lynumn v. Illinois*, 372 U.S. 528 (1963) .....................................................................6, 7

*Missouri v. Frye*, 566 U.S. 134 (2012) ...........................................................................8

*North Carolina v. Pearce*, 395 U.S. 711 (1969)............................................................9

*Obergefell v. Hodges*, 576 U.S. 644 (2015) .................................................................14

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .....................................................................8

*Rochin v. California*, 342 U.S. 165 (1952) ..............................................................13, 16

*Trammel v. United States*, 445 U.S. 40 (1980) ............................................................14

*United States v. Adams*, 870 F.2d 1140 (6th Cir. 1989)..............................................12

*United States v. Anzalone*, 923 F.3d 1 (1st Cir. 2019)...........................................13, 14

*United States v. Batchelder*, 442 U.S. 114 (1979)..........................................................3

*United States v. Breton*, 740 F.3d 1 (1st Cir. 2014).....................................................14

*United States v. Buckley*, 847 F.2d 991 (1st Cir. 1988) ..............................................6, 7

*United States v. Daniels*, 821 F.2d 76 (1st Cir. 1987) .................................................. 7

*United States v. Djokich*, 693 F.3d 37 (1st Cir. 2002) .......................................... 13, 14

*United States v. Dwyer*, 287 F. Supp. 2d 82 (D. Mass. 2003) ................................... 12

*United States v. Goodwin*, 457 U.S. 368 (1982) ......................................................... 9

*United States v. Jefferson*, 315 F. Supp. 2d. 1187 (M.D. Ala. 2004) .......................... 15

*United States v. Jenkins*, 537 F.3d 1 (1st Cir. 2008) ............................................ 9, 12

*United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013) ............................... 10, 11, 12

*United States v. Lanoue*, 137 F.3d 656 (1st Cir. 1998) ............................................... 9

*United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) ............................ 13

*United States v. Russell*, 411 U.S. 423 (1973) .......................................................... 13

*United States v. Santana*, 6 F.3d 1 (1st Cir. 1993) ................................................... 13

*United States v. Santana*, 808 F. Supp. 77 (D. Mass. 1992) .................................... 14

*United States v. Therrien*, 847 F.3d 9 (1st Cir. 2017) ............................................... 13

*United States v. Tobin*, 598 F. Supp. 2d 125 (D. Me. 2009) ...................... 9, 10, 11, 12

*United States v. Tursi*, 576 F.2d 396 (1st Cir. 1978) .................................................. 6

*United v. Tuitt*, 68 F. Supp. 2d 4 (D. Mass. 1999) .................................................. 12

*Wayte v. United States*, 470 U.S. 598 (1985) .............................................................. 3

*Wolfle v. United States*, 291 U.S. 7 (1934) ............................................................... 14

## Statutes

18 U.S.C. § 554 ............................................................................................................. 1

18 U.S.C. § 1343 ........................................................................................................... 2

18 U.S.C. § 1425(a) ...................................................................................................... 2

18 U.S.C. § 2314..............................................................................................2

18 U.S.C. § 1832(a) ........................................................................................1

## Other Authorities

John H. Langbein, "Torture and Plea Bargaining,"
    46 UNIV. CHICAGO L. REV. 3 (1978)....................................................7

Note, "Breathing New Life into Prosecutorial Vindictiveness Doctrine,"
    114 HARV. L. REV. 2074 (2011)..........................................................12

William G. Young, U.S. District Judge, to
    Joseph R. Biden, U.S. President, Letter (Mar. 9, 2021) ...................................8

William G. Young, "An Open Letter to U.S. District Judges,"
    THE FEDERAL LAWYER (July 2003).................................................3, 8

## BACKGROUND

On June 11, 2019, a grand jury returned an indictment charging Defendant Haoyang Yu with the theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1) & (a)(4) (Counts 1 through 4); copying, uploading, downloading a trade secret in violation of § 1832(a)(2) & (a)(4) (Count 5); possession of a trade secret in violation of § 1832(a)(3) & (a)(4) (Counts 9 through 12); and smuggling in violation of 18 U.S.C. § 554 (Counts 13 through 15). D.E. #1 ("original indictment"). Mr. Yu pleaded not guilty to those charges. D.E. #17.

Thereafter, in discussions with defense counsel, the prosecution repeatedly urged that Mr. Yu should plead guilty to all counts of the original indictment. When Mr. Yu indicated that he intended to exercise his constitutional right to a jury trial, at which the prosecution would bear the burden of proof beyond a reasonable doubt and he would have the opportunity to confront his accusers and present his defense, the prosecution increased its pressure on Mr. Yu to plead guilty. That pressure involved coercive threats against Mr. Yu; his wife, Yanzhi Chen; and by extension, their two young sons.[1]

Specifically, the prosecution stated that, if Mr. Yu insisted on having a jury trial, it would obtain a superseding indictment, not only charging Mr. Yu with additional offenses, including immigration offenses that could jeopardize his U.S.

---

[1] Notably, in May 2018, the FBI installed a pole camera outside the Yu residence to surveil the entire family around-the-clock for almost a year. *See* D.E. #56-4 at 2. The pole camera and other physical surveillance principally yielded images of Mr. Yu and Ms. Chen taking care of their young children. The prosecution then used Mr. Yu's love for, and commitment to, his family for leverage against him.

citizenship, but also charging Ms. Chen as his criminal confederate. Eventually, in early September 2020, the prosecution emailed a "draft" superseding indictment to defense counsel (nearly identical to the one eventually obtained), noting that it planned to make a grand jury presentation as early as the following week. The message was clear: plead guilty now, or you and your wife will be charged, you both could be convicted and sentenced to lengthy prison terms, your children could be left without parents, and your entire family could be cast out of the country.

Notwithstanding those powerful threats, Mr. Yu refused to waive his constitutional right to jury trial – and refused to plead guilty to crimes that he did not commit. Accordingly, the prosecution followed through with its threats.

On October 1, 2020, almost 16 months after the original indictment was returned, and 6 days before a scheduled motion hearing, the prosecution obtained a superseding indictment, charging Mr. Yu with essentially the same trade secret offenses (Counts 1 through 15); different export offenses (Counts 21 and 22)[2]; wire fraud in violation of 18 U.S.C. § 1343 (Counts 16 through 18); interstate and foreign transport of stolen goods in violation of § 2314 (Counts 19 and 20); visa fraud in violation of § 1546 (Count 23); and unlawful procurement of U.S. citizenship in

---

[2] The prosecution belatedly recognized that the "smuggling" charges in the original indictment were unfounded because the MMICs that Mr. Yu allegedly sold to a buyer in Spain were not, in fact, export controlled. The prosecution's novel and dubious theory in the superseding indictment is that Mr. Yu violated export laws by the mere transmission of design specifications to the Taiwanese foundry that manufactures MMICs for much of the global market, even though the foundry was already – independent of Mr. Yu – equipped with all the "technology" at issue. Mr. Yu expects to file a Renewed Motion for *Franks* Hearing that explains these issues in more detail.

violation of § 1425(a) (Count 24). D.E. #78 ("superseding indictment"). The superseding indictment also charged Ms. Chen in the wire fraud counts based on the far-fetched theory that she committed a federal crime by allegedly sending wire transfers to the Taiwanese foundry that manufactured MMICs for Mr. Yu's small company, Tricon MMIC, LLC (the same foundry that manufactured these devices for ADI, the alleged victim company in this case, and for many other companies around the world), or because an email to the foundry listed her name on an attached form. *Id.*

Mr. Yu and Ms. Chen have both pleaded not guilty to the charges in the superseding indictment. D.E. #93. And although Mr. Yu is confident that a jury of his peers will ultimately conclude that neither he nor his wife are guilty of these crimes or any others, no person – and no family – should be put in his position in the first place. In violation of the Fifth and Sixth Amendments, Mr. Yu has plainly been punished, along with his wife and children, for having the audacity to exercise his constitutional right to a jury trial. Accordingly, to vindicate Mr. Yu's right and to condemn the prosecution's heavy-handed tactics, the case should be dismissed.

## **ARGUMENT**

"Through the jury, we place the decisions of justice where they rightly belong in a democratic society: in the hands of the governed." William G. Young, "An Open Letter to U.S. District Judges," THE FEDERAL LAWYER (July 2003) at 30. In this case, however, the prosecution sought to make the "decisions of justice" for itself, avoiding a jury, excluding this Court, and undermining the democratic ideals that U.S. Constitution embodies.

3

Prosecutorial discretion is broad, but it is not unfettered. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). And while plea bargaining is sanctioned, "there are undoubtedly constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). Here, the prosecution threatened Mr. Yu that if he refused to plead guilty and, instead, exercised his constitutional right to a jury trial, it would bring more serious charges against him, including ones that could jeopardize his U.S. citizenship; bring new charges against his wife, Ms. Chen, for allegedly assisting in a supposed wire fraud; and as a result, put their two young children at risk of losing both parents to lengthy prison terms.

Such tactics have no place in our criminal justice system, and they offend several core principles of the U.S. Constitution. Imposing coercive pressure on a defendant's plea decision violates the Sixth Amendment guarantee of a jury trial in "all criminal prosecutions." Further, penalizing the defendant for refusing to plead guilty and demanding a jury trial, which the law plainly permits him to do, violates the Fifth Amendment guarantee of due process. And engaging in outrageous conduct in an effort to secure criminal convictions – such as threatening a defendant's wife and children – also offends the most basic notions of fairness and justice.

Although Mr. Yu has demonstrated tremendous bravery in the face of the prosecution's coercive tactics, by maintaining his innocence and demanding a trial before a jury of his peers, no person should be subjected to such harsh treatment, which is not only fundamentally unfair but undermines public confidence that the

prosecution aims only to do justice based on the facts, not to secure convictions at any cost. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("The United States wins its point whenever justice is done its citizens in the courts."); *Berger v. United States*, 295 U.S. 78, 88 (1935) (holding the government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done").

In discussing concerns about prosecutorial misconduct (specifically, intentional interference with the attorney-client privilege), Justice Sotomayor recently made the following observation:

> Prosecutors wield an immense amount of power, and they do so in the name of the State itself. That unique privilege comes with the exceptional responsibility to ensure that the criminal justice system indeed serves the ends of justice. Prosecutors fall short of this task, and therefore do a grave disservice to the people in whose name they litigate, when they permit themselves to enjoy unfair trial advantages and defendants' expense.

*Kaur v. Maryland*, 141 S. Ct. 5, 7 (2020) (Sotomayor, J., concurring in denial of certiorari). Such a "grave disservice" has been done here.

I.   **The prosecution improperly sought to coerce Mr. Yu to waive his Sixth Amendment right to a jury trial by threatening to indict his wife, Ms. Chen.**

In *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), the Supreme Court sanctioned plea bargaining, a formerly "clandestine practice" that would not exist in "an ideal world" where every defendant facing felony charges were tried by a jury of his or her peers, as the Sixth Amendment to the U.S. Constitution contemplates. *Id.* at 361. When the Court "accept[ed] the basic legitimacy of plea bargaining," it "reject[ed] . . . any notion that a guilty plea is involuntary in a constitutional sense simply because

it is the end result of a bargaining process. . . . so long as the accused is free to accept
or reject the prosecution's offer." *Id.* at 365.

At the same time, however, the Supreme Court recognized that prosecutorial
discretion in plea bargaining inherently carries "the potential for both individual and
institutional abuse," and thus, "there are undoubtedly constitutional limits on its
exercise." *Id.* Of particular relevance here, the Court did not give – and has never
given – the prosecution *carte blanche* to induce a guilty plea by threatening "some
person *other* than the accused." *Id.* at 364 n.8 (emphasis in original). The facts
presented in *Bordenkircher* did not present that question (the threat was only to
charge Bordenkircher himself with a recidivist offense that carried a longer
sentence), and the decision did not address it. To the contrary, the Court recognized
that such situations might present "greater dangers." *Id.*

> This case does not involve the constitutional implications
> of a prosecutor's offer during plea bargaining of adverse or
> lenient treatment for some person *other* than the accused.
> . . . which might post a greater danger of inducing a false
> guilty plea by skewing the assessment of the risks a
> defendant must consider.

*Id.* (emphasis in original).

Before *Bordenkircher*, the First Circuit "recognized that there are special
considerations attending a guilty plea offered in consideration of lenient treatment
for a person *other* than the defendant." *United States v. Tursi*, 576 F.2d 396, 398 (1st
Cir. 1978) (citing *Kent v. United States*, 272 F.2d 795, 798 (1st Cir. 1959)). "Generally,
the fear has been that there is a greater danger of coercion in such a situation[.]" *Id.*;
*see United States v. Buckley*, 847 F.2d 991, 1000 n.6 (1st Cir. 1988) (recognizing "the

6

potential danger inhering in this sort of bargain"). And since *Bordenkircher*, the Supreme Court has never revisited this specific issue, nor held that prosecutors may freely threaten spouses or young children to pressure defendants to forgo jury trials.

In *Lynumn v. Illinois*, 372 U.S. 528 (1963), a case that pre-dated *Bordenkircher* and involved a coerced confession rather than a coerced plea, the Supreme Court illustrated how threats of harm to a defendant's family can offend due process. The defendant confessed to having sold marijuana to a cooperator "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id.* at 534. The Supreme Court held it was "clear" that a confession made "under such circumstances" was "not voluntary." *Id.* Rather the threats concerning the defendant's children "combined to produce an impellingly coercive effect." *Id.* at 534-35. Accordingly, the Court set aside the judgment of conviction. *See id.* at 538.

In this case, the prosecution sought to employ similarly coercive tactics to extract a guilty plea from Mr. Yu. The prosecution told Mr. Yu, through his counsel, that if he declined to plead guilty, it would obtain a superseding indictment that charged even more serious offenses against him (including immigration offenses that could lead to the revocation of Mr. Yu's U.S. citizenship) and name his wife, Ms. Chen, as his criminal confederate. The message was clear:  either "voluntarily" waive your right to a jury trial or face the risk that you and your wife will both go to prison for many years and your young children will effectively be orphaned. The fact that the

prosecution has predictably disclaimed any coercive intent did nothing to diminish the "impellingly coercive effect" of its threats. *Id.* at 534-35.

The danger of undue coercion when the prosecution attempts to induce a guilty plea based on threats against close family members (spouses, children, etc.) "imposes a special responsibility on the district court." *Buckley*, 847 F.2d at 1000 n.6. Because this issue typically arises in a motion to withdraw a guilty plea or an appeal from a conviction following a guilty plea, that responsibility typically takes the form of careful, *post hoc* consideration concerning "voluntariness." *Id.* Here, however, there was no plea. Despite the attempted coercion, Mr. Yu has steadfastly refused to waive his constitutional rights. As a result, this Court must use other means to evaluate whether the prosecution's unsuccessful pressure tactics exceeded the bounds that *Bordenkircher* set for permissible plea bargaining. Indeed, the courts have "an independent interest" in ensuring that bargaining processes, whether they produce pleas or not, are just and fair. *United States v. Daniels*, 821 F.2d 76, 81 (1st Cir. 1987) (Breyer, J.); *cf. id.* (recognizing that the rules for plea bargaining "protect[] not only the parties, but also the fairness, integrity [and] public reputation of judicial proceedings") (second bracket in original; internal quotation omitted).

The U.S. Constitution does not establish any "authority for plea bargaining." John H. Langbein, "Torture and Plea Bargaining," 46 UNIV. CHICAGO L. REV. 3, 9 (1978) (explaining that "[p]lea bargaining, like torture, is coercive," and "the difference is of degree, not kind"). "Instead," the Sixth Amendment provides "an opposite guarantee" in *all* criminal prosecutions—that is, "a guarantee of a trial." *Id.*

Yet because of coercive tactics like those employed by the prosecution in this case, the "reality" is "that criminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (citing statistics that 97 percent of federal convictions and 94 percent of state convictions are the result of guilty pleas); *see Missouri v. Frye*, 566 U.S. 134, 143-44 (2012) ("In today's criminal justice system, . . . the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant."). As a result, as this Court has long recognized, the jury trial has all but disappeared in the United States, even for criminal defendants. *See* Letter of William G. Young, U.S. District Judge, to Joseph R. Biden, U.S. President (Mar. 9, 2021) (urging the President "to use all the powers of [his] high office to restore the American jury to its central role in our jurisprudence"); Young, "Open Letter," at 31 (noting that "the rate of criminal jury trials in federal court is plummeting" due, in large part, to, the ability of prosecutors to "manipulat[e]" the Sentencing Guidelines and to threaten "savage sentences" for defendants who exercise their trial rights).

Simply bolstering the right to effective assistance of counsel, which was the Supreme Court's primary goal in *Lafler*, *Frye*, and previously, *Padilla v. Kentucky*, 559 U.S. 356 (2010), will not reverse this dangerous course. Resurrecting the right to a jury trial requires more direct and decisive action, including by trial judges who are most directly exposed to these issues. As this Court implored its colleagues, the judiciary must "take up the burden of defending our nation's juries and make our voices heard whenever and wherever the right to a jury trial is at issue (and in doing

so secure the core values of the district court judiciary." Young, "Open Letter," at 34. That includes, of course, cases like this one where the prosecution tries to use threats against family members or other coercive tactics to twist the constitutional jury guarantee into a cudgel with the power to crush defendants and their families by exposing them to much greater harm if eventually convicted at trial.

## II.   The prosecution vindictively punished Mr. Yu for exercising his right to a jury trial by indicting his wife.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *North Carolina v. Pearce*, 395 U.S. 711, 738 (1969); *see Blackledge v. Perry*, 417 U.S. 21, 25-29 (1974). Thus, "for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Bordenkircher*, 434 U.S. at 363 (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 32-33 n.20 (1973)); *see United States v. Lanoue*, 137 F.3d 656, 664 (1st Cir. 1998) ("A vindictive prosecution, if proved, violates a defendant's Fifth Amendment right to due process."). The Supreme Court has described this guarantee of due process, enshrined in the Fifth Amendment to the U.S. Constitution, as "basic" and "uncontroversial." *United States v. Goodwin*, 457 U.S. 368, 372 (1982).

"A defendant may establish a vindictive prosecution either (1) by producing evidence of actual vindictiveness or (2) by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness to warrant a presumption of vindictiveness." *United States v. Jenkins*, 537 F.3d 1, 3 (1st Cir. 2008). "If the defendant creates a presumption of vindictiveness the burden shifts to the government to show that

legitimate reasons exist for the prosecution." *Lanoue*, 137 F.3d at 664 (citing *Goodwin*, 457 U.S. at 376 n.8); *see United States v. Tobin*, 598 F. Supp. 2d 125, 128-29 (D. Me. 2009) ("Once raised, the government must rebut a presumption of vindictiveness 'by showing objective reasons for its charges,' such as the discovery of new evidence.") (quoting *Jenkins*, 537 F.3d at 3).[3]

Common examples of such objective reasons include "newly discovered evidence," "intervening criminal activity," and a "material change in the law." *Tobin*, 598 F. Supp. 2d at 131. For example, in *Lanoue*, "the most important reason offered by the prosecutor" for the new, more serious charges leveled against the defendant was discovery of "new evidence . . . that was unavailable when [the prosecutor] originally dismissed it"). In *Tobin*, the court recognized the "quintessential appearance of vindictiveness," because after the defendant successfully appealed his convictions, the prosecution brought new, more serious charges, even though it had "not identified any newly discovered evidence that might justify its charging decisions." *Id.* at 129. Timing is also a "critical issue." *Id.* at 132. The purported reason for the prosecution to pursue a more aggressive course should be closely scrutinized

---

[3] The First Circuit has cautioned that "courts should go very slow in embracing presumptions of prosecutorial vindictiveness in pretrial proceedings." *United States v. Stokes*, 124 F.3d 39, 45 (1st Cir. 1997). It would be "incorrect to suggest," however, "that *Goodwin* categorically bars a district court from finding that the requisite 'stake'" – that is, the motivation to penalize a defendant for exercising his rights – "could arise in the pretrial setting." *LaDeau*, 734 F.3d at 567. "In fact, *Goodwin* 'declined to adopt a *per se* rule that in the pretrial context no presumption of vindictiveness will ever lie.'" *Id.* (quoting *United States v. Meyer*, 810 F.2d 1242, 1246 (D.C. Cir. 1987)); *see also United States v. Barner*, 441 F.3d 1310, 1317-18 (11th Cir. 2006) (rejecting argument that pre-trial claims are categorically barred).

when that reasons supposedly surfaces only *after* a defendant has exercised a constitutional or statutory right, such as the right to a jury trial.

*United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013) (affirming the dismissal of a superseding indictment and holding the prosecution had sought to penalize the defendant for successfully moving to suppress critical evidence), exemplifies the proper application of the vindictive prosecution doctrine in the pre-trial context. *See*. The prosecution initially charged LaDeau with possession of child pornography, an offense punishable by a sentence of 0-to-10 years' imprisonment. But after LaDeau won a significant suppression motion, the prosecution "upped the ante" and charged him with receipt, an offense that implicated a 5-year minimum mandatory and a 25-year statutory maximum. Because that new, more serious charge was "based on evidence that had been in the government's possession since before the initial indictment," LaDeau moved to dismiss the superseding indictment. *Id.* at 564. The district court ruled that the circumstances triggered a presumption of vindictiveness and that the prosecution had failed to rebut it, notwithstanding the prosecutor's representation in an affidavit that he never intended "to retaliate" against LaDeau for exercising his rights. *Id.* at 565.

In affirming the district court's dismissal of the indictment, the appeals court identified two hallmarks of vindictiveness – both of which are present in this case. First, the Sixth Circuit noted that there was "little reason to suspect that the prosecutor's view of LaDeau's case changed significantly between the two indictments," because the prosecution "already possessed all of the relevant evidence

that supported the superseding indictment will before procuring the first indictment." *Id.* at 568. Second, it also recognized that "the burden that LaDeau's successful suppression motion placed upon the government was significant." *Id.*

Here, as in *LaDeau*, the prosecution had all the evidence relevant to its superseding indictment, both concerning the more serious charges against Mr. Yu and the new charges against his wife, Ms. Chen. There was "no new revelation or discovery to support the government's sudden shift" to a far more aggressive pursuit of Mr. Yu and Ms. Chen. *Id.* at 571 (noting that "the evidentiary landscape" was not "materially altered" in a way that would have justified the prosecution's decision). Moreover, the burden of having to conduct a jury trial in a complex, trade secrets case, which will involve complex technological issues as well as difficult intent questions, is certainly "significant," one that the prosecution would prefer to avoid. *Id.* at 568.

Critically, in evaluating the prosecution's conduct, the constitutional analysis is not narrowly focused on Mr. Yu and Ms. Chen. Rather, "[t]he vindictive prosecution doctrine imposes critical 'constitutional limits' upon the exercise of prosecutorial discretion." *Tobin*, 598 F. Supp. 2d at 132 (quoting *Lovett v. Butterworth*, 610 F.2d 1002, 1005 (1st Cir. 1979) (quoting *Bordenkircher*, 434 U.S. at 365)). "Those limits protect all current and future criminal defendants, including those whose conduct may be properly described as 'insidious' or 'thoroughly bad.'" *Id.*; *see LaDeau*, 734 F.3d at 566 ("By allowing for a presumption of vindictiveness to be drawn under narrow circumstances, the *Blackledge* rule is a prophylactic one."). Thus, "courts must

assess the likelihood of prosecutorial vindictiveness with the doctrine's 'prophylactic' purposes in mind." *Tobin*, 598 F. Supp. 2d at 129.

> The vindictive prosecution doctrine seeks not only to alleviate the accused's apprehension of persecution but also to prevent the chilling of "the exercise of legal rights by other defendants who must make their choices under similar circumstances in the future."

*Id.* at 130 (quoting *Jenkins*, 504 F.3d at 700). By filing a superseding indictment with more serious charges against Mr. Yu, including immigration offenses, and new charges against his wife, Ms. Chen, shortly after Mr. Yu refused to plead guilty and exercised his right to a jury trial, the prosecution "exceeded those limits." *Id.* at 132.

The prosecution's self-serving denials of any vindictive intent cannot dispel the applicable presumption. *See LaDeau*, 734 F.3d at 571-72 (holding that "subjective rationales" offered by the prosecution in an affidavit did not constitute "objective explanations" which were necessary to rebut the presumption of vindictiveness). Further, given the circumstances and the stakes, those assertions should, at a minimum, be explored through discovery and subjected to challenge at an evidentiary hearing. *See United States v. Dwyer*, 287 F. Supp. 2d 82, 88 (D. Mass. 2003) (ruling that to obtain discovery in support of a vindictive prosecution claim in a pre-trial context, a defendant "need only provide some objective evidence tending to show a likelihood of vindictiveness") (citing *United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir. 1989), and Note, "Breathing New Life into Prosecutorial Vindictiveness Doctrine," 114 HARV. L. REV. 2074, 2095 (2011)); *cf. United v. Tuitt*, 68 F. Supp. 2d 4, 18 (D. Mass. 1999) (applying the same standard for a selective prosecution claim

where the defendant presented evidence that "raise[d] an eyebrow high enough as to require further explanation").

### III. By using criminal charges against Ms. Chen for leverage against Mr. Yu, the prosecution has engaged in outrageous government misconduct.

When the prosecution "violates 'fundamental fairness' and 'shock[s] . . . the universal sense of justice,'" it "encroaches on a defendant's due process rights." *United States v. Anzalone*, 923 F.3d 1, 5-6 (1st Cir. 2019) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973) (further internal quotations omitted). In those "limited circumstances," based on "outrageous government misconduct," a court may dismiss criminal charges against the defendant. *United States v. Djokich*, 693 F.3d 37, 43 (1st Cir. 2002); *see, e.g.*, *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991) (dismissing indictment because government engaged in outrageous conduct that interfered with attorney-client relationship). In this case, by its outrageous tactics, the prosecution has sullied two of the central pillars of our society:  the trial by jury and the institution of marriage.

"Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Rochin v. California*, 342 U.S. 165, 173 (1952). A court must "consider outrageous government conduct claims 'holistically,' evaluating the 'totality of the relevant circumstances' while recognizing that 'outrageousness, by its nature, requires an *ad hoc* determination that cannot 'usefully be broken down into a series of discrete

15

components." *Anzalone*, 923 F.3d at 5-6 (quoting *United States v. Therrien*, 847 F.3d 9, 14 (1st Cir. 2017) (quoting *United States v. Santana*, 6 F.3d 1, 6-7 (1st Cir. 1993))).

When a prosecutor or agent engages in "extreme and outrageous government conduct," a district court may "bar conviction of [the] defendant" either in the exercise of "the supervisory powers of the federal courts" or, alternatively, to vindicate "the concept of fundamental fairness embodied in the due process clause." *United States v. Santana*, 808 F. Supp. 77, 84 (D. Mass. 1992); *see Anzalone*, 923 F.3d at 5 (citing *Djokich*, 693 F.3d at 43). In this way, the outrageous misconduct doctrine serves as a final bulwark to "prevent[] the government from going too far." *Santana*, 6 F.3d at 12.

Here, in its zeal to secure a guilty plea, the prosecution warned Mr. Yu that, if he exercised his constitutional right to a jury trial, it would obtain a superseding indictment, charging him with more serious offenses, charging his wife with new offenses, and threatening their two young children with the loss of their parents. The fact that the prosecution sought to leverage Mr. Yu's love for, and commitment to, his wife and their children makes its efforts to avoid a jury trial all the more offensive.

> Marriage is sacred to those who live by their religions and offers unique fulfillment to those who find meaning in the secular realm. Its dynamic allows two people to find a life that could not be found alone, for marriage becomes greater than just the two persons. Rising from the most basic human needs, marriage is essential to our most basic profound hopes and aspirations.

*Obergefell v. Hodges*, 576 U.S. 644, 656-57 (2015); *see id.* at 663-70 (discussing at length why marriage is both "a fundamental right" and "a keystone of our social order"); *see Trammel v. United States*, 445 U.S. 40, 44 (1980) (noting that "the marital

relationship" has been "described by this Court as the best solace of human existence") (internal quotation omitted). Indeed, "the protection of marital confidences is 'regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails.'" *United States v. Breton*, 740 F.3d 1, 10 (1st Cir. 2014) (quoting *Wolfle v. United States*, 291 U.S. 7, 14 (1934)).

In *United States v. Jefferson*, Judge Myron S. Thompson observed that a similar threat by the prosecution had presented a defendant with an excruciating choice reminiscent of "a wrenching part from William Styron's novel, *Sophie's Choice*." 315 F. Supp. 2d. 1187, 1189 (M.D. Ala. 2004). Judge Thompson recounted that the defendant had been "reduced to tears" in the courtroom "when told . . . that he would need to make a choice between not pursuing his appeal or risking that his wife would be indicted and his children left without a parent." *Id.* In the end, the prosecution withdrew its threat, and the court allowed the defendant's motion for an extension of time in which to file his appeal. Nevertheless, Judge Thompson felt "compelled" to offer the following observations to "all prosecutors and all defense attorneys":

> As the court watched Jefferson, tears in his eyes, pace back and forth in open court, and when he finally asked to be taken back to his cell because he was unable to choose between appealing his case (which he believed he had a right to do) and risking the indictment of his wife (with the added result that his child might be left without a parent), the court could not help but recall a wrenching part from William Styron's novel, *Sophie's Choice*. . . .
>
> While the practice of not indicting a loved one in exchange for a guilty plea and waiver of other rights is an accepted,

17

and perhaps sometime even useful and fair, prosecutorial bargaining tool, prosecutors, and defense attorneys who engage in this practice must be aware of *how easy it is to cross the line between what is fair and just and humane and what is simply inhumane.*

*Id.* (emphasis added).

As the Court knows, despite the DOJ's puffery about its China Initiative, this case is not a high-profile prosecution of a Chinese spy. But for Mr. Yu's ethnic Chinese identity, this case is a run-of-the-mill civil dispute about the alleged theft of trade secrets related to decades-old electronic devices, which are bought and sold on global markets as basic commodities. Those facts are part of the overall calculus, because "outrageousness . . . can only be evaluated by taking into account the totality of the relevant circumstances." *Santana*, 6 F.3d at 7.

Like many civil disputes, this case involves complex issues about whether the parts at issue were trade secrets and, if so, whether Mr. Yu misappropriated them from his former employer, ADI. Further, as a criminal prosecution, this case also involves critical issues about Mr. Yu's intent. The prosecution bears the burden of proving its case beyond a reasonable doubt, and Mr. Yu has the right to challenge that case in open court and to have a jury of his peers decide whether he knowingly and intentionally committed any crime. To avoid that trouble – and the risk that its evidence will fall short – the prosecution told Mr. Yu, in substance, that if he chooses to have a jury trial, his wife will be seated at the defense table next to him. It is the very sanctity of marriage that made the prosecution's threat so powerful to Mr. Yu, and its use of that tactics so offensive to any sense of justice. The collective punishment of entire families – husbands, wives, and children – has long been a

hallmark of uncivilized societies. In short, such "brutality" should be denied "the cloak of law," *Rochin*, 342 U.S. at 174, and the courts should fulfill their "responsibility" to ensure that due process is respected. *Id.* at 169.

## CONCLUSION

For the foregoing reasons, Defendant Haoyang Yu respectfully requests that this Court dismiss the superseding indictment against him.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

*/s/ William Fick*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 1, 2021.

*/s/ William Fick*

19