IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

HAOYANG YU, *et al.*

No.  19-cr-10195-WGY

**<u>RENEWED MOTION FOR *FRANKS* HEARING</u>**

Defendant, Haoyang Yu, respectfully renews and incorporates by reference his motion for a hearing pursuant to *Franks v. Delaware*, 48 U.S. 154 (1978), D.E. #60 & #61, which this Court denied by docket endorsement on July 17, 2020, on the basis that "[t]here has been no substantial preliminary showing of falsity" D.E. #69.

Since then, however, the prosecution has acknowledged falsity with respect to a key element of the purported probable cause to obtain over a dozen search warrants for electronic accounts and physical premises associated with Mr. Yu (including his home) and his company. Specifically, the prosecution now concedes that, contrary to the allegations in the search warrant affidavit, the MMIC semiconductor at issue, TM-5054, was *not* subject to export control.

On July 2, 2020, investigators obtained a "license determination" from the Department of Commerce Bureau of Industry and Security ("BIS") classifying the TM-5054 as "EAR99" (no BIS license required for export). *See* Ex. A. Yet in its opposition to Mr. Yu's *Franks* motion, which was filed nearly two weeks later, the prosecution wrongly continued to insist that the TM-5054 "*was* controlled for export." D.E. #66 at 14, n.6 (filed 7/15/20) (emphasis in original). The prosecution finally

1

disclosed the contrary BIS "EAR99" determination to undersigned counsel in a phone call on or around August 21, 2020, and it later produced the actual classification document (Ex. A) by email on August 26, 2020, well after this Court had already denied the *Franks* motion.[1]

The prosecution cannot continue to hide behind the earlier, conclusory export classification obtained by investigating agents in 2018 that reached an erroneous conclusion, one that the BIS has since reversed. As Mr. Yu explained in the memorandum supporting his motion, D.E. #61 at 7-9, when seeking the search warrants in this case, the affiant failed to disclose to the magistrate judge important facts and context about that document as well as extensive, publicly available information about the TM-5054 and functionally identical commercial products on the market that would have undermined the probable cause presentation concerning any suspected export violation. And now we know, with certainty, this omitted information pointed toward the *correct* conclusion: there was no probable cause to believe an export violation occurred.

---

[1] In the August 21, 2020 phone call with defense counsel, the prosecution also indicated that, in light of the BIS determination, it would seek dismissal of counts 13-15 of the then-pending original indictment, D.E. #1, which had charged Mr. Yu with unlawfully exporting the TM-5054 to a customer in Spain. Instead, however, the prosecution permitted those baseless counts to remain in place for over a month until it obtained a superseding indictment on October 1, 2020. D.E. #78. The superseding indictment abandoned charges related to the export of the TM-5054. Instead, it advances a novel and dubious theory that Mr. Yu violated export laws by the mere transmission of design specifications for a different product to the Taiwanese foundry that manufactures MMICs for much of the global market and was already, independent of Mr. Yu, equipped with all the "technology" at issue.

The affiant had alleged probable cause to believe that Mr. Yu unlawfully exported the TM-5054 in violation of 50 U.S.C. 1705 and 18 U.S.C. § 554. Section 1705 requires that a violation be committed "knowingly" while section 554 requires that a violation be committed "willfully."

The affiant stated that the Department of Commerce "classifies" the TM-5054 as controlled for export, implying the existence of an official, public, "knowable" determination by a government agency. That was misleading because the DOC "classification" was actually a closely held secret, the product of a selectively targeted request from law enforcement, that was not published or revealed to Mr. Yu until after he was indicted. In other words, this "fact" had no bearing on whether Mr. *knowingly* or *willfully* violated the law.

The affiant also omitted other known and/or readily available facts undermining the assertion that the TM-5054 was subject to export control:

- Analog Devices ("ADI") and its resellers treat the "nearly identical" ADI product, HMC-994A, as *not* subject to export control;

- Publicly available technical data show that ADI's HMC-994A actually has *greater* power output than the TM-5054 at the frequency relevant for export control classification;

- In June 2018 (three months before the first warrant affidavit), at the behest of law enforcement, ADI tested the TM-5054, confirming the publicly available power output data;

- Many other companies produce MMICs functionally identical to the TM-5054, and those companies publicly classify their products as *not* subject to export control.

3

At a minimum, these omitted facts defeat the probable cause determination because they supply ample basis to conclude Mr. Yu reasonably *believed* the TM-5054 was not subject to export control. Therefore, he lacked the necessary *mens rea*.

Similar defects plagued the affiant's allegations of probable cause to believe that Mr. Yu misappropriated ADI trade secrets, in violation of 18 U.S.C. § 1832. The affiant focused on similarities between Tricon's TM-5054 and ADI's HMC-994A, suggesting that those similarities necessarily supplied probable cause to suspect trade secret theft. But the affiant failed to disclose that multiple companies sell MMICs with design and performance specifications virtually identical to the TM-5054 and HMC-994A, which is not surprising because they are commodity products that can easily be "reverse engineered." *See* D.E. #61 at 9-11. The self-serving and demonstrably false statement by an ADI employee that Mr. Yu "could not have built" his MMICs "unless he had help from a current employee or took Analog Devices' proprietary modeling and file reviews" did not absolve the affiant of the obligation to disclose contrary information to the magistrate judge. Moreover, by the time the prosecution applied for search warrants, ADI was not merely an alleged "victim" of trade secret theft but had become a *de facto* government agent assisting the prosecution.[2] A false statement by ADI is, therefore, attributed to the government for

---

[2] For example, in June 2018, rather than enlisting a government-employed or independent expert, law enforcement agents provided ADI employees with samples of Mr. Yu's products, and together, they "test[ed]" and analyzed those products. D.E. #58-8 (DOJ-YU-000038-46). Among other things, ADI took high-resolution microscope photos of the samples, confirming the ease with which MMICs can be "reversed engineered."

4

*Franks* purposes, even if the affiant was "personally ignorant of its falsity." *Franks*, 438 U.S. at 163 n.6. Simply put, with regard to alleged trade secret theft, the affiant included false inculpatory information from ADI, which was acting as a government agent, and omitted other publicly available, exculpatory information, which would have precluded a finding of probable cause.

Even in the absence of plainly *false* statements, "material *omissions* from a warrant affidavit also may furnish the basis for a successful *Franks* challenge." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (emphasis added). The affiant touted his "specialized training," consultations with multiple government agencies, and intimate familiarity with the MMIC technology at issue in this case. D.E. #61 at 5-6 (quoting the first search warrant affidavit). Not only did the affiant have a "duty of further inquiry," given the "obvious and unexplored reason[s] to doubt" that Mr. Yu had knowingly and intentionally stolen any "trade secrets," *Tanguay*, 787 F.3d at 53, but he also inexcusably omitted readily available information in a way that bolstered his highly misleading presentation. Only an evidentiary hearing will permit the Court to assess "the totality of circumstances" surrounding the issuance of the warrants, which is the "appropriate test" in a *Franks* inquiry. *Id.*

## Conclusion

For the foregoing reasons, as well as those set forth in Mr. Yu's original motion papers, D.E. #60 & #61, the Court should convene a *Franks* hearing.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

*/s/ William Fick*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 1, 2021.

*/s/ William Fick*