IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HAOYANG YU, *et al*. | No.  19-cr-10195-WGY |

**MOTION TO RECONSIDER THE COURT'S MAY 11, 2011 ORDER
DENYING DEFENDANT HAOYANG YU'S MOTION TO DISMISS
SUPERSEDING INDICTMENT**

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: May 14, 2021

**TABLE OF CONTENTS**

Table of Authorities ......................................................................................................... ii

Background ....................................................................................................................... 1

Argument ......................................................................................................................... 2

I.      The prosecution may not attempt to coerce a defendant to plead guilty by threatening to indict his wife, punish him for refusing to plead guilty, or otherwise engage in outrageous conduct to obtain a conviction. ........................................................................................ 2

II.     The prosecution failed to justify its charging decisions – and, thus, to excuse its coercive threats – against Mr. Yu's wife, Ms. Chen, because the supposedly "new evidence" was neither new nor proof of criminal activity. ............................................................................. 4

        A.      At best, the "new evidence" merely corroborated key facts that the prosecution already knew from other sources. ......................................................................... 4

                1.  Ms. Chen's "Confession" ......................................................................... 4

                2.  Bank of America Records ......................................................................... 6

                3.  Win Semiconductor Records ..................................................................... 7

        B.      In its effort to cast Mr. Yu as a threat to national security, the prosecution exaggerated the import of its "new evidence." ....................................................... 8

                1.  Alleged possession of GaN technology on "Yu's computers" ....................... 8

                2.  Alleged sale of MMICs to "Turkish military supplier" ................................ 9

                3.  Alleged indirect sale of unrelated "intellectual property" to Huawei ............ 10

                4.  Alleged correspondence with potential Indian and Israeli customers............ 11

Conclusion ...................................................................................................................... 11

Certificate of Service ...................................................................................................... 12

# TABLE OF AUTHORITIES

## Cases

*Blackledge v. Perry*, 417 U.S. 21 (1974) ...................................................................................... 3

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ............................................................................. 2, 3

*INS v. St. Cyr*, 533 U.S. 289 (2001) ............................................................................................. 4

*Kent v. United States*, 272 F.2d 795 (1st Cir. 1959) ..................................................................... 3

*Lafler v. Cooper*, 566 U.S. 156 (2012) ......................................................................................... 3

*Missouri v. Frye*, 566 U.S. 134 (2012) .......................................................................................... 3

*North Carolina v. Pearce*, 395 U.S. 711 (1969) ........................................................................... 3

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ..................................................................................... 4

*Santobello v. New York*, 404 U.S. 257 (1971) .............................................................................. 2

*United States v. Anzalone*, 923 F.3d 1 (1st Cir. 2019) ................................................................. 3

*United States v. Barner*, 441 F.3d 1310 (11th Cir. 2006) ............................................................ 3

*United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013) .............................................................. 3

*United States v. Russell*, 411 U.S. 423 (1973) ............................................................................. 3

*United States v. Tursi*, 576 F.2d 396 (1st Cir. 1978) ................................................................... 3

## Other Authorities

Anthony Capaccio & Nick Wadhams, "U.S. Backs Patriot Missile Sale to Turkey in Breakthrough," Bloomberg (Dec. 18, 2018) ......................................................................... 10

MACOM Press Release, "MACOM and Goertek Form Joint Venture to Service China's 5G Build Out" (Apr. 24, 2019) ............................................................................................................. 9

Stephen Nellis, "Analog Devices shares dip as Huawei ban complicates 5G growth in China," Reuters (Nov. 24, 2020) ....................................................................................................... 11

Defendant Haoyang Yu respectfully requests that this Court reconsider its May 11, 2021 Order [D.E. #112] denying his Motion to Dismiss Due to Vindictive Prosecution and Outrageous Government Misconduct [D.E. #103-4]. In its Opposition [D.E. #110], the prosecution effectively conceded the legal framework for relief but, at the same time, incorrectly argued "new evidence" justified its coercive tactics. The prosecution spun a misleading "story" about a "continuing investigation" that "uncovered" important evidence, Opp. at 2, and it falsely cast Mr. Yu as an IP super-predator who has endangered U.S. national security. Yet the record tells a very different tale. Mr. Yu is not, and has never been, a Chinese spy who stole U.S. technology to benefit Chinese military or economic interests. Rather, Analog Devices, Inc. ("ADI"), a multibillion-dollar U.S. company has leveraged the power of the DOJ to pursue a former employee, who started a small, start-up company and has never sold any controlled "chips" to any foreign customer.

## BACKGROUND

After the prosecution obtained an Indictment against Mr. Yu and his company, Tricon MMIC, LLC, on June 11, 2019 [D.E. #1], it issued a warning:  plead guilty, or we will also indict your wife, Defendant Yanzhi Chen, and add immigration charges to strip your U.S. citizenship. Mr. Yu refused to bow the prosecution's pressure; instead, he maintained his innocence and invoked his constitutional right to a jury trial. Then, as threatened, the prosecution obtained a Superseding Indictment that included new charges against Ms. Chen and additional immigration charges against Mr. Yu. [D.E. #78.]

On April 1, 2021, Mr. Yu moved to dismiss the Superseding Indictment due to vindictive prosecution and outrageous government misconduct. [D.E. #103-4.] On April 1, 2021, Ms. Chen joined [D.E. #105], and on May 3, 2021, the prosecution opposed. [D.E. #110.] On May 11, 2021, this Court denied Mr. Yu's Motion by electronic order before he had an opportunity to respond to the prosecution's arguments. [D.E. #112.]

1

## ARGUMENT

Confronted with the bedrock principle that due process plainly prohibits punishing a defendant for exercising his or her constitutional rights, the prosecution sought to justify its coercive attempt to secure a guilty plea from Mr. Yu by citing "new evidence" that supposedly explains its aggressive charging decisions. The problem for the prosecution, however, is that the cited information was neither new nor proof of any criminal activity by Mr. Yu or Ms. Chen. And even if the prosecution had some new basis to add Ms. Chen or up the ante against Mr. Yu, it expressly offered to forego those charges to extract a guilty plea from Mr. Yu.

Despite the many baseless accusations in the Opposition – some of which have nothing whatsoever to do with the charged offenses – the key fact remains:  although the prosecution could have charged Ms. Chen from the start, it chose to use the explicit threat of such charges for leverage against Mr. Yu. The same is true for the pending immigration charges against him. There is no dispute that, *if Mr. Yu had waived his constitutional right to a jury trial*, his wife would have avoided any charges and his U.S. citizenship would not be in jeopardy.

**I.      The prosecution may not attempt to coerce a defendant to plead guilty by threatening to indict his wife, punish him for refusing to plead guilty, or otherwise engage in outrageous conduct to obtain a conviction.**

The applicable legal framework for evaluating the prosecution's pre-trial conduct is not in dispute. The constitutional right to a jury trial is sacrosanct, *see* U.S. Const., 6th amend., and a guilty plea, which waives that right, must be knowing and voluntary. *See Santobello v. New York*, 404 U.S. 257, 261-62 (1971). Accordingly, in the give-and-take of plea negotiations, the prosecution may not use threats that coerce a defendant to plead guilty. *See Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978) (recognizing "constitutional limits" to plea bargaining given "the potential for both individual and institutional abuse"). When the prosecution threatens to indict a spouse or other family member, special concerns about coercion arise, because such threats "pose

2

a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider." *Id.* at 364 n.8; *see also United States v. Tursi*, 576 F.2d 396, 398 (1st Cir. 1978) (recognizing "special considerations" when prosecution offers "lenient treatment for a person *other* than the defendant"). Moreover, the prosecution cannot punish a defendant for exercising his constitutional right to a jury trial. *See Blackledge v. Perry*, 417 U.S. 21, 25-29 (1974) (citing *North Carolina v. Pearce*, 395 U.S. 711, 738 (1969)). Nor may it engage in outrageous conduct, which violates fundamental fairness or offends the universal sense of justice, to secure a conviction, whether by plea or at trial. *See United States v. Anzalone*, 923 F.3d 1, 5-6 (1st Cir. 2019) (citing *United States v. Russell*, 411 U.S. 423, 432 (1973)).

The prosecution did not challenge that basic framework. Instead, it made two erroneous legal arguments. First, the prosecution insisted that a presumption of vindictiveness can never arise in the pre-trial context. Opp. at 9-11. But the First Circuit has never adopted a categorical bar on pre-trial vindictiveness claims, and other circuits have expressly rejected that contention. *See United States v. LaDeau*, 734 F.3d 561, 567 (6th Cir. 2013); *United States v. Barner*, 441 F.3d 1310, 1317-18 (11th Cir. 2006). Second, the prosecution claimed that, under the guise of plea bargaining, it has *carte blanche* to threaten the spouses, children, or other family members of defendants. Opp. at 18-20. But that is not the law. In support of its erroneous position, the prosecution cited *Kent v. United States*, 272 F.2d 795 (1st Cir. 1959), a decision from more than 50 years ago, long before the Supreme Court decided *Bordenkircher*, not to mention *Missouri v. Frye*, 566 U.S. 134 (2012) and *Lafler v. Cooper*, 566 U.S. 156 (2012), in which the Court recognized the "reality" that, "today," the criminal justice system is "for the most part a system of pleas" and, thus, that the plea bargaining process requires careful constitutional scrutiny.

II.     **The prosecution failed to justify its charging decisions – and, thus, to excuse its coercive threats – against Mr. Yu's wife, Ms. Chen, because the supposedly "new evidence" was neither new nor proof of criminal activity.**[1]

      A.     **At best, the "new evidence" merely corroborated key facts that the prosecution already knew from other sources.**

The prosecution defended its charging decisions by asserting that it "developed significant new evidence" between the Indictment, which charged only Mr. Yu and Tricon, and the Superseding Indictment, which also charged Ms. Chen. Opp. at 13. The prosecution emphatically asserted that "*[n]one of this evidence was known to the government*" when it first charged Mr. Yu. *Id.* (emphasis added); *see also id.* at 14 (claiming to have collected "voluminous new evidence"). But the record, including the automatic discovery, demonstrates that is not true. The prosecution knew about Ms. Chen's putative role in Tricon, when it opted to use her as a pawn in its pursuit of Mr. Yu rather than name her as a co-defendant.

      1.     **Ms. Chen's "Confession"**

The prosecution argued that it could not have charged Ms. Chen until after agents interviewed her on June 14, 2019, because only then, Ms. Chen "provided incriminating detail about Tricon's criminal scheme and her role in it." Opp. at 2. Putting aside the patent mischaracterization of that interview as Ms. Chen's "confession" – an issue addressed in Ms. Chen's motion to suppress her statements [D.E. #101-2] – the record leaves no question that, before the interview, agents already knew about Ms. Chen's alleged involvement with Tricon.

---

[1] This Motion focuses on the prosecution's threat to charge Ms. Chen rather than its contemporaneous threats to bring immigration charges against Mr. Yu, because in its Opposition, the prosecution conceded that it could have brought those additional charges against Mr. Yu from the outset, but "declined," so that it could use Mr. Yu's U.S. citizenship as a bargaining chip to obtain his guilty plea. Opp. at 16. Like a threat against one's spouse, a threat concerning citizenship (or immigration status more generally) raises special concerns about coercion given the severity of the potential penalty. *See Padilla v. Kentucky*, 559 U.S. 356, 365-66 (2010) (citing *INS v. St. Cyr*, 533 U.S. 289, 322 (2001)).

In May 2018, relying on a secretly solicited, false "classification" of certain Tricon products as subject to export controls, investigators seized an outbound shipment from Tricon and gave the contents to ADI for analysis. Using "reverse engineering" to establish probable cause, investigators then obtained a dozen search warrants for a variety of electronic accounts and data. Investigators also searched Tricon's public information, bank records, FedEx account, and UPS box, all of which happened months before the Indictment issued against Mr. Yu and Tricon.

Based on that investigation, the affidavit of Special Agent Thomas Anderson, of the Department of Homeland Security's Homeland Security Investigations, in support of his application for a warrant to search the Yu residence (and more than a half-dozen email addresses) recited a litany of information about Ms. Chen[2], including that she incorporated Tricon, rented a box from UPS, opened a "business account" with FedEx (identifying herself as the "primary shipper" and "account owner"), "exported [a] package" of MMICs to a "customer in Spain," and was the addressee of a package from Win Semiconductors Corp. ("Win"), a foundry in Taiwan, that contained a GaAs wafer with MMICs that agents believed were "designed and fabricated based on stolen trade secrets" from ADI. DOJ-YU-000999-1042.

During physical surveillance on May 13, 2019, about one month before the search of the Yu residence, FBI agents reported having followed Ms. Chen to two grocery stores and a bank and, later with her sons, to math tutoring and soccer practice. DOJ-YU-000130-34. During the nearly 7 hours spent watching Ms. Chen run errands, agents observed her ship a package from a FedEx store in Burlington, Massachusetts, and "retrieve a new, empty envelope" from that same

---

[2] By summarizing this "information," Mr. Yu does not concede the accuracy or completeness of the "evidence" that investigators claimed to have collected about him, Ms. Chen, or Tricon. Rather, for the purpose of this Motion, the point is simply that the same information was available when the prosecution chose to indict only Mr. Yu and Tricon and to use the threat of additional charges against Ms. Chen to obtain a guilty plea from Mr. Yu.

store. DOJ-YU-000132. Then, on May 22, 2019, agents learned that "Ms. Chen had received a new shipment from Win." [D.E. #110 at 2.]

Put simply, on June 14, 2019, Ms. Chen neither "confessed" to any crime nor provided agents with material information that they did not already claim to know based on their absurdly extensive investigation of the Yu family and their daily comings-and-goings. Although the prosecution cherry-picked isolated and ambiguous statements by Ms. Chen, often given in response to questions in English that she did not fully understand, it failed to identify any truly "new" information.

If Ms. Chen's interview had involved a bombshell "confession," as the prosecution would now have this Court believe, there would have been no reason to delay by more than 15 months, from July 2019 to October 2020, the decision to charge her. As the record establishes, in the interim, the prosecution drafted a Superseding Indictment, showed the pleading to Mr. Yu's counsel, and offered not to pursue it, *if Mr. Yu pleaded guilty*.

### 2.    Bank of America Records

In its catalogue of purportedly "new evidence," the prosecution also listed "Bank of America (BofA) records related to Tricon's two business accounts." Opp. at 3. The prosecution claims that records received in October 2019 "confirmed" that Ms. Chen was "the signatory" for both accounts and had "described herself as 'manager'" of Tricon. *Id.*

By that time, however, the prosecution had known for many months – and already possessed relevant BofA documents – about Ms. Chen and Tricon's bank accounts. In fact, with its automatic discovery letter in July 2019, the prosecution produced bank records that identified Ms. Chen as the corporate representative of Tricon, such as the signature cards that Ms. Chen completed when she opened the accounts in March 2017. DOJ-YU-001733-34 (checking # –4098), DOJ-YU-001731-32 (savings # –2809).

While it may be true that the prosecution received *additional* bank records from BofA in October 2019 that "confirmed" what the prosecution already knew, there was certainly nothing "new" about that information, and the omission of any reference to the earlier records from the Opposition was, at best, misleading.

### 3.     Win Semiconductor Records

The prosecution also claimed that "in the summer of 2020," it received documents from Win that were "the principal basis" for the new charges against Ms. Chen and the additional charges against Mr. Yu in the Superseding Indictment. Opp. at 3. For example, the prosecution states Win provided "BoA records" that "connect[ed] Chen to Win's payments," meaning payments by Tricon to Win for manufacturing MMICs. *Id.* at 3-4. These documents, according to the prosecution, are "the principal evidence" in support of Counts 17 and 18 of the Superseding Indictment, which charge Mr. Yu and Ms. Chen with wire fraud.

As noted above, however, before the automatic discovery was produced in July 2019, agents had already collected extensive records from BoA regarding Tricon's accounts. They had also collected from Mr. Yu's Yahoo! account Tricon's customer information form with Win, which identified Ms. Chen and is "the principal basis" for Count 16 of the Superseding Indictment. Those records, and others that investigators had obtained, established that Ms. Chen had opened the BofA accounts and that she, not Mr. Yu, was Tricon's corporate representative. It was certainly no revelation to the prosecution that Win manufactured MMICs in Taiwan for Tricon (as it did for ADI, too) or that Tricon paid Win for those services with funds from its corporate accounts.

Moreover, Win was hardly the only source of information for the prosecution about the Tricon's dealings, dating back to September 2018, with the foundry. As documented in a December 14, 2018 HSI report, agents had already intercepted at least three different FedEx packages from Win to Tricon that identified Ms. Chen as "the contact." DOJ-YU-000145-47.

7

These packages – from July 15, 2018, September 5, 2018, and October 17, 2018, respectively – all contained GaAs wafers with MMICs, and they were each valued at more than $10,000. DOJ-YU-000145-47. In November 2018, in response to a subpoena, FedEx had already provided extensive shipping records, including for shipments from Win to Tricon that were addressed to Ms. Chen. *See* DOJ-YU-001769, 80, 92, 94. In other words, agents already knew that Tricon was paying tens of thousands of the dollars to Win for manufacturing services at the foundry in Taiwan and that Win was sending the GaAs wafers to back to Tricon.

> **B.      In its effort to cast Mr. Yu as a threat to national security, the prosecution exaggerated the import of its "new evidence."**

> **1.      Alleged possession of GaN technology on "Yu's computers"**

The allegation that, on Mr. Yu's computers, agents found copies of files from ADI that "could be used to manufacture chips with gallium nitride ('GaN') technology" is not a reason to deny Mr. Yu's Motion to Dismiss. Opp. at 5; *id.* at 16. The critical question is not whether the prosecution had probable cause to bring charges against Mr. Yu, but whether it inappropriately and unlawfully sought to coerce Mr. Yu to forfeit his constitutional right to a jury trial and to plead guilty to those charges.

The prosecution's argument demonstrates that its main target was always Mr. Yu and that Ms. Chen was merely a pawn in the misguided pursuit of Mr. Yu, who is not and never has been a Chinese spy out to steal valuable U.S. technology for China's strategic benefit. And if the allegations about GaN chips prove anything, it is that Mr. Yu has been the victim of selective prosecution based on his ethnic Chinese identity. Although the prosecution alleged that Mr. Yu possessed "GaN files," which "posed a national security concern," has never alleged that Mr. Yu ever used, transferred, or sold GaN technology or GaN chips. In fact, Tricon never marketed or sold any such device, a fact that the prosecution knew, or should have known, all along.

In contrast, MACOM – the competitor company discussed at length in Mr. Yu's Motion to Dismiss for Selective Prosecution [D.E. #55-6] – publicly touted its joint venture with Geortek, a multibillion-dollar Chinese electronic components company based in Shandong, China. *See* Press Release, "MACOM and Goertek Form Joint Venture to Service China's 5G Build Out" (Apr. 24, 2019).[3] The venture, which is based on Hong Kong, will develop GaN technology and "provide world leading RF components to the 5G market in China." *Id.* Although several executives, who left ADI to join MACOM, admitted to having stolen trade secrets from ADI and settled a civil lawsuit in this court, neither MACOM nor any of the individual bad actors have ever faced criminal charges. Notably, none of them are ethnically Chinese, like Mr. Yu and Ms. Chen.

### 2.    Alleged sale of MMICs to "Turkish military supplier"

The claim that "Yu knowingly provided boosted chips to a Turkish military supplier" is not only misleading but also an example of how the prosecution invokes specious "national security concern[s]" to excuse its disregard for due process. Opp. at 5-6; *see id.* at 16 (claiming Mr. Yu sold "stolen" MMICs to a Turkish company "to benefit a foreign military").

Based on the prosecution's misleading summary, one might assume that Mr. Yu is an international arms dealer. But nothing could be further from the truth. The "sale" at issue involved 25 chips for a total price of $2,900 – about $100 per item. The "chips" were not "boosted" (the allegation is Mr. Yu incorporated stolen trade secrets into chips that he designed and produced), and the price alone demonstrates that these commodity components are not sensitive military technologies. Moreover, the prosecution failed to mention the undisputed fact that Tricon's TM5024, like ADI's HM460, is *not subject to export control*. It is EAR99. And unlike China, Turkey is an ally; in 2018, when Mr. Yu supposedly compromised national security by selling 25

---

[3] Available at https://www.macom.com/about/news-and-events/press-release-archive/row-col1/news--event-archive/macom-and-goertek-form-joint-ven .

basic, unrestricted semiconductors to a private Turkish company, the U.S. sold billions of dollars in sophisticated missile systems and fighters to the Turkish government. *See* Anthony Capaccio & Nick Wadhams, "U.S. Backs Patriot Missile Sale to Turkey in Breakthrough," Bloomberg (Dec. 18, 2018) (discussing $3.5b sale of cutting-edge military technology and hardware).[4]

**3.     Alleged indirect sale of unrelated "intellectual property" to Huawei**

Adding a red herring to the mix, the prosecution asserted that, in 2018, Mr. Yu sold "intellectual property" to Qilu Technologies, a Chinese company, and he knew that the "end-user" was Huawei Technologies Co. Opp. at 6-7, 17. To be clear, Huawei is not part of this case. The Superseding Indictment does not allege that Mr. Yu had *any* interaction with Huawei, much less any dealings that violated U.S. criminal laws or export controls. Huawei is a political bogeyman, and its mention in the Opposition an irresponsible effort to cast Mr. Yu as guilty by association.

Even more remarkable is the fact that, although Mr. Yu has never sold a single chip, or any technology, to Huawei, ADI made a significant percentage of its chip sales to Huawei for its 5G technology, at least until the U.S. effectively blocked further sales in late 2020. *See* Stephen Nellis, "Analog Devices shares dip as Huawei ban complicates 5G growth in China," Reuters (Nov. 24, 2020).[5] The irony is impossible to ignore: according to the prosecution, Mr. Yu had to be stopped, because his loose talk in a chat message about Huawei made him a national security threat, but ADI must be protected as a "victim," even though it openly partnered with Huawei and provided sensitive dual-use technology with military applications.

---

[4] Available at https://www.bloomberg.com/news/articles/2018-12-19/state-department-backs-missile-sale-to-turkey-in-breakthrough .

[5] Available at https://www.reuters.com/article/us-analog-devices-results/analog-devices-shares-dip-as-huawei-ban-complicates-5g-growth-in-china-idUSKBN2842ZF .

####           4.           Alleged correspondence with potential Indian and Israeli customers

Buried in a paragraph at page 7, the prosecution also "notes" that, "since the Superseding

Indictment, evidence of Yu's foreign dealings has expanded." Opp. at 7. That comment is

misleading in several ways:  it has nothing to do with Ms. Chen (or the prosecution's coercive

threats to charge her), does not involve any alleged criminal activity, was based on a handful of

introductory emails (not actual sales), and concerned India and Israel, which are long-standing

U.S. allies and ADI customers.[6] Further, it is not true that "since the Superseding Indictment," the

evidence has "expanded." The communications at issue were discovered in June 2019, if not before

then. The prosecution cannot excuse its improper and unlawful effort to pressure Mr. Yu to plead

guilty by threatening to indict Ms. Chen by now claiming that it has, only recently, got around to

reviewing materials seized years ago.

### CONCLUSION

For the foregoing reasons, Defendant Haoyang Yu respectfully requests that this Court

reconsider its May 11, 2011 decision denying his Motion to Dismiss the Superseding Indictment

against him, Ms. Chen, and Tricon.

---

[6]  For information about ADI's customers, see *https://www.analog.com/en/support/customer-service-resources/sales/find-sale-office-distributor.html* (click "Israel" under Europe and "India" under Asia Pacific).

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

_____/s/ William Fick_____
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 14, 2021.

_____/s/ William Fick_____

12