IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

HAOYANG YU, *et al*.

No.  19-cr-10195-WGY

**DEFENDANT HAOYANG YU'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR UNCONSTITUTIONAL SELECTIVE ENFORCEMENT AND PROSECUTION [D.E. 55-56] AND MOTION TO RECONSIDER [D.E. 314]**

Before trial, this Court opted to defer decision on Defendant Haoyang Yu's motion to dismiss due to unconstitutional selective enforcement and prosecution, because the prosecution argued that certain "aggravating factors" warranted its aggressive pursuit of criminal charges against Mr. Yu, a United States citizen of Chinese ethnicity, and his start-up company, Tricon MMIC, LLC. D.E. 55-56 (motion and memorandum) and D.E. 89 (order).

In explaining its pre-trial ruling, this Court noted the "world of difference" between "trade secret theft among American companies," such as Tricon and Analog Devices, Inc., and "trade secret theft where one of the parties violates export controls or passes stolen technology to a foreign entity." *Id.* at 4. This Court further observed: "If the Government's evidence on these matters," referring to the wide-ranging allegations against Mr. Yu and Tricon of international espionage, export violations, wire fraud, and immigration fraud, "is not persuasive," the pending motion will "have far more bite." *Id.*

Put simply, the prosecution's evidence at trial was *not* persuasive. The jury emphatically rejected the purported "evidence" of alleged extensive criminal activity, finding Mr. Yu not guilty on 18 of 19 charges, including *all* charges of export violations, wire fraud, and immigration fraud, and finding Tricon not guilty on *all* charges against the company. The verdict revealed this case

1

for what it truly is:  a trumped-up civil dispute between a multibillion-dollar, global technology company and its former employee concerning alleged trade secrets. The result also confirmed the ugly truth that the government's sweeping investigation (involving at least *seven* different federal agencies over about *five* years) and aggressive prosecution through *four* successive indictments, three of which included now-dismissed charges against Mr. Yu's wife, Yanzhi Chen. Based on shifting and novel legal theories, the government's relentless pursuit of Mr. Yu was driven, at least in part, by its baseless and offensive assumption that he was a Chinese spy, secretly loyal to China and, thus, a danger to the national security of the United States.

Nevertheless, on June 13, 2022, without further briefing or argument concerning the trial evidence—specifically, whether in light of the prosecution's woefully insufficient trial evidence, the motion to dismiss "ha[d] far more bite"—this Court issued an order denying the motion to the extent based on selective *prosecution* and directing the parties to meet and confer regarding limited discovery relevant to selective *enforcement*, which is governed by a lower evidentiary standard. D.E. 284 (finding "sufficient clearly evidence" of selective prosecution "is simply not present here").[1]

Because the prosecution failed to make most of its case against Mr. Yu (and any of its case against Tricon) and because its failure belied the unsupported pre-trial assertions that aggravating factors, such as export violations, justified this criminal case in the first place, this Court should reconsider its ruling and grant Yu's motion to dismiss on the existing record. Alternatively, the Court should permit Mr. Yu to proceed with claims of *both* selective prosecution and enforcement.

---

[1] Despite extensive efforts of undersigned counsel, detailed in a separate Motion to Compel filed herewith, the parties have been unable to reach agreement about discovery concerning selective enforcement, and the prosecution still has not even provided the limited materials it had agreed to produce in a letter dated July 18, 2022.

At a minimum, whether just one or both theories are still in play, discovery and an evidentiary hearing are warranted. Mr. Yu's motion does not make "insubstantial claims," D.E. 284 (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)), and if the record here does not call for further discovery and a hearing, the doctrines of selective prosecution and enforcement are, indeed, dead letters that offer defendants no meaningful constitutional protection.

## BACKGROUND

Before trial, Defendants Haoyang Yu and Tricon MMIC, LLC[2] moved to dismiss all charges against them, because the prosecution unlawfully targeted Mr. Yu, a U.S. citizen, along with his company, Tricon, a Massachusetts LLC, for unconstitutional selective enforcement and prosecution based on his Chinese ethnicity. *See* D.E. 55, 56 (*citing United States v. Armstrong*, 517 U.S. 456 (1996), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

On October 9, 2020, this Court announced that it would "continue to hold Yu's first motion, on selective prosecution, under advisement." D.E. 89. At that time, this Court explained, "[m]ore evidence is required to determine whether the eyebrow-raising statistics Yu has mustered are, in fact, relevant to his own case." *Id.* at 3. Those statistics, drawn from federal and state courts, demonstrated the alarmingly disproportionate rates of criminal prosecution for alleged trade secret offenses against defendants of Chinese ethnicity, including U.S. citizens of Chinese descent, like Mr. Yu. *See* D.E. 56-1 (Appendix A of Comparable Cases of Alleged Trade Secret Theft in Federal and State Courts in Massachusetts).[3]

---

[2] The jury found Tricon not guilty of all charges, *see* D.E. 262, and based on that verdict, on May 26, 2022, this Court discharged Tricon from this case.

[3] Since Mr. Yu filed his motion in June 2020, marshalling relevant statistics regarding the disparate treatment of Chinese Americans, further research has confirmed those concerns. For example, a prominent organization of Asian American leaders, the Committee of 100, published an exhaustive report in September 2021, titled "Racial Disparities in Economic Espionage Act Prosecution: A Window into the New Red Scare" (ed. Andrew Chongseh Kim) (Sept. 21, 2021), *available at*

The Court further noted, "trials have a way of testing the evidence." *Id.* That is certainly true, and regarding the adversarial testing in this case, the results are in:  the evidence fell far short of proof beyond a reasonable doubt on 18 of 19 charges. The jury unanimously rejected *all* the prosecution's charges regarding alleged export violations, immigration fraud, and wire fraud. That verdict damns the sole count on which the jury found Mr. Yu guilty (Count 1), because the prosecution's purported justification for charging Mr. Yu—along with his company and his wife, Yanzhi Chen—depended on all those additional alleged offenses, which the prosecution cited as "aggravating factors." D.E. 94.[4]

While the verdict was an important vindication for Mr. Yu, it was not complete. Indeed, although Mr. Yu is not "convicted" unless and until judgment enters and sentence is imposed, *see Commonwealth v. Simmons*, 448 Mass. 687, 688 n.2 (2007) ("It is well established that a judgment of conviction does not enter unless sentence is imposed."), he was let go from his job immediately after the prosecution touted the verdict in a press release. Moreover, even one felony conviction will leave him subject to myriad collateral consequences courts have characterized as "civil death."

---

https://www.committee100.org/wp-content/uploads/2021/09/Whitepaper-Final-9.21-UPDATE-compressed.pdf . The report found that many innocent U.S. citizens of Chinese descent have been falsely accused and unfairly targeted for investigation and prosecution. *See id.* at 27 (concluding that "as many as 1 in 3 American citizens of Asian descent charged under the EEA may have been falsely accused); *see also id.* at 36 (commentary by Ashley Gorski and Patrick Toomey) (noting hyperbolic rhetoric about China from DOJ and FBI officials and finding "[a]gents and prosecutors have heeded the call, subjecting individuals with ties to China to disproportionate scrutiny, extreme charging decisions, and novel prosecution theories").

[4] While the trial has revealed the lack of evidence regarding the purported "aggravating factors," it is important to remember that selective enforcement and prosecution are unconstitutional even if a defendant is "guilty" of a serious offense. In the seminal case of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the issue was not whether laundry businesses run from wooden buildings in dense San Francisco neighborhoods could pose a severe fire hazard warranting regulation and possible prosecution, but whether it was permissible to enforce supposed public safety ordinances selectively against persons of Chinese nationality.

*United States v. Nesbeth,* 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016). Meanwhile, ADI now has also filed a civil lawsuit, alleging breach of contract, against Mr. Yu in the Business Litigation Session of Suffolk Superior Court. *See Analog Devices, Inc. v. Yu*, No. 2284CV01985-BLS1 (Suffolk Super. Ct.) (filed August 29, 2022).

## ARGUMENT

**I.   The jury unequivocally rejected all the alleged aggravating factors that supposedly distinguished the criminal prosecution of Mr. Yu from garden-variety civil trade secret disputes.**

In its October 9, 2020 Order, this Court summarized the prosecution's argument about why this case was different—and why the criminal prosecution of Mr. Yu was warranted—as follows:

> Yet, if all of the Government's allegations are true, Yu is not similarly situated to these other parties. The Government represents in the Superseding Indictment and at oral argument that not only is Yu suspected of stealing trade secrets, but also has recently worked as a security-cleared government contractor, is suspected of visa fraud, and has been caught violating export controls with respect to Taiwan and Spain, and is suspected of violating export controls to export MMICs to both Turkey and China.

*Id.* at 4.

At trial, however, the prosecution did not even press some of its unfounded "allegations" (*e.g.*, that Mr. Yu violated export laws by sending controlled MMICs to China without a license); the evidence plainly disproved others (*e.g.*, that Mr. Yu violated export laws by sending "controlled" MMICs to Turkey or Spain without required licenses), and the jury rejected all the remaining contentions (*e.g.*, that Mr. Yu violated export laws by sending GDS files to Taiwan or that he committed immigration or wire fraud). The prosecution presented no evidence that Mr. Yu personally worked as a "security-cleared government contractor" or engaged in any misconduct in such a capacity. Nor did it distinguish Mr. Yu's engineering work for ADI (or Tricon) as a chip designer from the work of any other designers in the industry.

The complete absence of any trial evidence to support the prosecution's reckless accusations about export violations in connection with shipments to Turkey and Spain is especially troubling. No evidence established that any shipments to Aselsan in Turkey involved "controlled" MMICs; in other words, the prosecution did not even attempt to prove that Tricon ran afoul of export controls in any dealing with Aselsan. Moreover, Andy Cobin, the distributor for Tricon, expressly advised Mr. Yu that it would be "fine" to send the requested MMICs to Turkey. Ex. 40. That advice was based on the "calculator" that Cobin created in a good-faith effort to comply with the complex regulations. Ex. 74A. Meanwhile, as the evidence established, Mr. Yu declined to send "controlled" samples to Erzia, a potential customer in Spain. In fact, Mr. Yu told the potential customer that he could *not* send samples because the specific parts, TM5051 and TM5052, were "3A001.b.2.d," referring to an EAR provision. Ex. 66. Rather than risk violating any export laws, Mr. Yu asked if Erzia had a U.S. representative with an export license. The limited evidence about Turkey and Spain proves Mr. Yu was careful about export controls and tried to comply with them, not that he willfully violated any such laws.[5]

It also bears noting that, after this Court made clear that it would "hold" Mr. Yu's motion to dismiss, the prosecution tried, again, to argue that the motion should be denied. D.E. 94 ("request[ing] that the motion be denied now"). In a supplemental filing, the prosecution identified yet another, alleged "aggravating factor." *Id.* at 4-7. This time, the prosecution accused Mr. Yu of stealing specific technology with special military applications, chips based on gallium nitride

---

[5] Mr. Yu similarly demonstrated his commitment to compliance with export controls when he walked away from a potential large sale to a customer in Russia, Ex. 85, and when he also declined to deal with an undercover agent posing as "Atallah" from the Middle East who tried to bait Mr. Yu with the prospect of future business, Ex. 521. The contention that Mr. Yu deserved to be prosecuted for allegedly stealing trade secrets because he also violated export laws is not supported by the evidence and could not be further from the truth.

(GaN) rather than gallium arsenide (GaAs), asserting "this technology is so sensitive that, unlike many other ADI products, the United States government requires that these chips be manufactured only in the United States." *Id.* at 5.[6] As the prosecution pointed out, back in October 2020, the then-operative indictment included two counts regarding GaN chips from ADI: HMC1086, HMC1087, and HMC8415. D.E. 78 at 15 (First Superseding Indictment, Counts 10 and 11). But the prosecution *dropped* all those charges about GaN chips when it obtained yet another indictment in January 2022, on the eve of trial. D.E. 178 at 15 (Third Superseding Indictment, Counts 1 through 8). All the charges at trial related to more basic GaAs chips, which are less powerful and primarily used in civil applications. As the Court knows, the prosecution offered no evidence that Mr. Yu stole, developed, or sold specialized GaN chips, in the United States or elsewhere. The irony of that about-face is apparent: in the end, the government did not prosecute Mr. Yu for the very conduct that it previously told this Court warranted his prosecution.

All the prosecution's supposed justifications for pursuing criminal charges against Mr. Yu and Tricon, rather than leaving ADI to pursue available civil remedies, have proven entirely illusory. None of the factors that the prosecution previously identified for this Court meaningfully distinguished this case from the many, garden-variety civil lawsuits by large technology firms against former employees, who have allegedly violated non-disclosure agreements or kept company property. Indeed, after the jury rejected the vast bulk of the prosecution's criminal case, ADI filed a commonplace contract claim against Mr. Yu, and that civil case is pending in state

---

[6] The prosecution never explained its exaggerated "only in the United States" assertions about GaN technology. For example, WIN employs GaN processes to manufacture MMICs in Taiwan. *See https://www.winfoundry.com/en-US/Service/service_foundry* ("WIN has three advanced fabs with a broad range of technology providing the best quality . . . GaN foundry services for MMIC application."). United Monolithic Semiconductors ("UMS") does the same in France. *See https://www.ums-rf.com/foundry-old/technologies/* ("The United Monolithic Semiconductors foundry offers to designers reliable high performance GaAs & GaN processes.").

court.

**II.    The trial revealed yet more evidence that Mr. Yu has been selectively targeted for investigation and prosecution based on his Chinese ethnicity, while others who engaged in similar conduct have faced no such consequences.**

As the Court is already aware, based on the pre-trial submissions, this case is the rare instance of "selective prosecution" in which a "control group" is available—that is, comparable individuals who are not members of same racial or ethnic group as the defendant but who engaged in similar conduct and were neither investigated nor prosecuted for it. The record includes evidence about the civil lawsuit in this district by ADI against MACOM, a major semiconductor company, after Tom Winslow and others left ADI, joined MACOM, and were accused of stealing trade secrets. *See* D.E. 56 at 4-5, 19; D.E. 81 at 10-13. That civil case settled, even though Winslow admitted to his misconduct. During trial, this Court heard testimony about those events. *See* 5/5/22 Tr. 142; 5/23/22 Tr. at 18-19. And as the Court knows, Winslow and the other engineers who went with him from ADI to MACOM never faced criminal charges.

In its supplemental submission (the same filing, discussed above, that hyped the dangers of GaN chips), the prosecution claimed the almost identical MACOM case was different, because there, ADI alleged "patent infringement." D.E. 94 at 10. That assertion was misleading, as the MACOM complaint makes clear. ADI accused MACOM of patent infringement *and also misappropriation of trade secrets*. In fact, ADI brought civil misappropriation claims under federal law, 18 U.S.C. § 1836 (Count 3), and Massachusetts law, M.G.L. c. 93, § 42 (Count 4), as well as a host of other claims (Counts 5 to 9) (e.g., unjust enrichment and breach of fiduciary duty), all based on the core allegations that the white ADI alumni who became MACOM employees stole trade secrets from ADI to compete against it. If anything, the allegation of patent infringement against MACOM was an aggravating factor that made its alleged conduct worse than anything at issue in this case.

Moreover, at trial, the evidence established that other chip companies, in addition to MACOM, engaged in the same conduct that led to criminal charges against Mr. Yu and Tricon. On or about February 4, 2015, ADI itself exported GDS files to WIN Semiconductors in Taiwan for the manufacture of controlled MMICs, but at the time of that "tape out," which included designs that Mr. Yu created, ADI did not have an export license to send "technology" to the foreign foundry. ADI did not even apply for such a license until February 24, 2015, *see* D.E. 227, Sealed Exs. B & C, and BIS did not issue a license until March 31, 2015, *see id.*, Sealed Ex. D.[7] ADI has never been required to answer for its unlicensed export of GDS files, much less face criminal charges. Instead, the prosecution accepted the dubious assertion by ADI's counsel, William Weinreb, the former head of the USAO national security unit that prosecuted Mr. Yu in this case, that ADI had "very strict export control policies and procedures" and was "confident that it had the necessary export licenses for the transfer." D.E. 227, Ex. A (Sept. 29, 2020 Email from W. Weinreb to A. Beck).

Custom MMIC also engaged in the very same supposedly unlawful conduct. In 2015, Custom MMIC sent GDS files for one of its "controlled" MMICs, CMD242, to a foreign foundry in France. Paul Blount, the founder and CEO, admitted on cross-examination, that at the time, Custom MMIC did not have an export license for GDS files. Custom MMIC did not obtain such a license until 2019. *See* 5/16/22 Tr. at 72-74. On the stand, Blount, the prosecution's witness,

---

[7] ADI's *post hoc* excuse conveyed to undersigned counsel during trial—that the GDS files at issue were already completed and, therefore, not "new" technology as of December 23, 2014, when the applicable export regulations changed—cannot be squared with the evidence. As ADI's employee, Mr. Yu made changes to the GDS files that went to WIN as late as January 16, 2015, so those files were, in fact, "new" after the effective date of the amended regulations.

dismissed any export concern as an understandable *faux pas* by a small company that was "getting better" over time. *Id*. at 74 ("It was something that we came to terms with later on, yes.").[8]

In addition, Custom MMIC, a direct competitor of ADI, hired former employees of both Hittite and ADI. John Mahon, who spent almost 8 years at Hittite and ADI, before leaving to join Blount at Custom MMIC, also testified as a prosecution witness. He left ADI in December 2017 and started at Custom MMIC less than one month later in January 2018. 5/24/22 Tr. at 34; Ex. 524 (Mahon's LinkedIn profile). Almost immediately, Mahon designed Custom MMIC's CMD292, a part that is the functional equivalent of ADI's HMC994A. 5/24/22 Tr. at 35; *compare* Ex. 17 (datasheet for HMC994A) *with* Ex. 525 (datasheet for CMD292). As Mahon admitted on cross-examination, the electrical specifications of the two parts are similar, 5/24/22 Tr. at 37-38, as are their functional diagrams, *id.* at 38 ("very similar"), outline drawings, *id.* ("again, very similar"), and physical dimensions, *id.* Custom MMIC even markets its CDM292 as a "replacement for HCM994." *Id.*

Throughout the trial, the prosecution presented similar evidence about Tricon as supposed proof that Mr. Yu was a thief. *See, e.g.*, Ex. 109 (snapshot of Tricon website with table to "cross-reference" parts from Tricon, ADI (Hittite), and Broadcom (Avago)). Indeed, Mr. Yu was charged

---

[8] It is difficult to understand how the prosecution could have been unaware of this important fact—that Blount and his company, Custom MMIC, engaged in the same conduct for which Mr. Yu and Tricon were being prosecuted, given that all three prosecutors met with Blount on April 25, 2022, and according to the FBI report, asked him whether Custom MMIC has "ever submitted an export license to ship items outside of the United States." According to the report, during the meeting, Blount claimed that he could not recall, but on the following day, he advised the prosecution that Custom MMIC first obtained export licenses to send GDS files to foreign foundries, including WIN in Taiwan, in 2019. Blount founded Custom MMIC in 2006 and that the company was selling export-controlled MMICs long before 2019, it was incumbent on the prosecution ask the obvious follow-up question:  had Blount and Custom MMIC sent GDS files for "controlled" MMICs to foreign foundries without an export license? There is no dispute that Custom MMIC did, as Blount reluctantly admitted on cross-examination. The prosecution either failed to inquire of Blount, who is of British rather than Chinese descent, or ignored his answer, focusing instead on Mr. Yu.

with stealing the design for HMC994A and using it to create TM5054. But it appears that investigators have never scrutinized Custom MMIC, Blount, or Mahon, and they certainly have never faced prosecution. Nor has Custom MMIC been hauled into court for hiring away ADI's designers and replicating ADI's MMICs with its own competing parts. *See* Ex. 525; *see also* Ex. 519 (Custom MMIC website with blog post titled "Looking for alternatives or replacements to Avago MMICs obsoleted by Broadcom?" and link to spreadsheet with Broadcom parts "along with cross-reference to our closest replacements"); *cf.* Ex. M (Miller MMIC website with "RF MMIC Cross Reference" comparing Miller parts to similar ADI and Broadcom parts).

Although not admitted as exhibits for consideration by the jury, additional evidence further demonstrated how facts that were deemed suspicious when done by Mr. Yu were considered unremarkable when done by others, like Blount. The prosecution tried to suggest that having Ms. Chen (rather than Mr. Yu) sign corporate registration paperwork for Tricon was part of an elaborate fraud scheme by Mr. Yu. *See* Ex. 31; 5/6/22 Tr. at 56-58. But Blount's wife signed the same paperwork for Kapabl, his new company. *See* Ex. K (proffered but not admitted at trial). Further, the prosecution implied that starting Tricon in the basement of the Yu residence was sign that something illegal was afoot. Yet Custom MMIC was founded in Blount's basement, *see* 5/16/22 Tr. at 50; 5/5/22 Tr. at 122, and no one alleged its modest origins evidenced any wrongdoing.

Given what trial revealed about ADI, MACOM, and Custom MMIC, the prosecution's overblown rhetoric about Tricon rings hollow. In its supplemental submission regarding selective prosecution, the prosecution disparaged Tricon as an "illegal company" and contrasted it with "otherwise reputable company[ies]." D.E. 94 at 6-7; *see id.* at 12 (falsely claiming Mr. Yu "posed a greater national security risk" because he "was running his own fraudulent, small shop, with no oversight or accountability"). But the jury took a starkly different view; it found Tricon not guilty

of all charges, four charges of wire fraud (Counts 13 to 16) and two charges of export violations

(Counts 17 to 18).

**III.    From the inception of the investigation through conduct of the trial, this case has been tainted by anti-Chinese bias which is antithetical to the constitutional guarantees of equal protection and due process.**

   **A.    BIS Special Agent Hickok's false affidavit**

Special Agent Ben Hickok, from the Department of Commerce's Bureau of Industry and

Security, testified as the prosecution's first law enforcement witness. As the case agent who led

the investigation for BIS, Hickok looked at Mr. Yu and saw only his Chinese ethnicity. He swore

out an affidavit for a search warrant in which he falsely described Mr. Yu as a "Chinese national,"

and he failed to correct that inaccurate statement at any later time.

> Q:    Now in the affidavit that you submitted [in support of the application for a search warrant of Mr. Yu's email accounts], when you were being as truthful and honest as possible, . . . do you remember stating that Mr. Haoyang Yu was a Chinese national?
>
> A:    Yes.
>
> Q:    Okay. But that's not true, is it?
>
> A:    It is not.
>
> Q:    He's in fact a U.S. citizen?
>
> A:    Yes.
>
> Q:    So that's a false statement in your affidavit?
>
> A:    That is not a correct statement, yes.
>
> Q:    It's a false statement?
>
> A:    It's a false statement.
>
> Q:    Okay. And when you took the oath to tell the truth in this [affidavit], . . . that is just as powerful as the oath you have taken to tell the truth here in court, isn't it?
>
> A:    Yes.

> Q:      Did you ever do anything to correct this false statement in your affidavit and let the judge know that in fact Mr. Yu is a U.S. citizen?
>
> A:      No. . . .
>
> Q:      . . . when you learned [that Mr. Yu was a U.S. citizen], did you go back to the judge and correct your false statement?
>
> A:      No.
>
> Q:      But at the time when you swore out this affidavit and you signed it, you thought it was important to tell the judge, even though it wasn't true, that Mr. Yu was a Chinese national?
>
> A:      It was a mistake.
>
> Q:      But it was a mistake that you considered important enough to put in this [affidavit] when you asked for permission to execute a search warrant?
>
> A:      Yes.

5/6/22 Tr. at 72-74. Although the false statement by Hickok in his affidavit inaccurately described Mr. Yu, it accurately—and tellingly—reflected how Hickok *saw* Mr. Yu. And the failure to correct that false statement (and to minimize it as merely "incorrect" rather than objectively "false") demonstrates an unfortunate disregard for the seriousness of such ethnic bias, whether subconscious or intentional.

### B.      BIS Special Agent Brian Anderson's Significant Case Report

Shortly after Agent Hickok submitted his false affidavit, in March 2019, this case was formally designated by the Department of Homeland Security as a "significant case." Special Agent Thomas Andersen, who works in HSI's Boston office, drafted that report. Although Agent Anderson's description of Mr. Yu's citizenship ("naturalized United States citizen from China") was accurate, his focus on China—and the suspected connections between Mr. Yu and Tricon, on the one hand, and China, on the other—was unmistakable.

The very first fact noted in the "Significant Case Report" was that Mr. Yu was "from China," and that fact was followed closely by a reference to his wife, Yanzhi Chen, as "an LPR

from China." D.E. 56-3 at 2. Anderson went on to assert Mr. Yu was "selling to international customers, including those in China," and that he had unlawfully exported MMICs to "Japan, Spain, and China." *Id.*

The second of only two paragraphs in the report refers to "China" or "Chinese" at least 7 times. With the exceptions of Japan and Spain, which are each mentioned once in a short list with China, no other country is referenced at all. *See id.* The investigation of Mr. Yu and Tricon was designated a "significant case," with serious national security implications, because it supposedly involved the "[p]rocurement or attempted procurement of U.S. weapons and/or controlled technologies by terrorists or other malicious actors," *i.e.*, China's government or its military. As the evidence at trial revealed, however, there was no support for those biased suspicions about any dangerous China connection.

## C.     The FBI's Tweet about "Chinese born" Mr. Yu

When Mr. Yu and Tricon were first indicted, the Boston office of the FBI tweeted about the case, emphasizing that Mr. Yu was "Chinese born."



The fact that a U.S. citizen is born in another country, whether China, Canada, or Chad, is irrelevant to whether he may have stolen "proprietary information" from a former employer,

except to imply that the person, by virtue of his birth, maintains some connection or loyalty to his "home" country. The painful truth is that if investigators had not inaccurately profiled Mr. Yu, based on his Chinese ethnicity, as a Chinese spy who was stealing sensitive U.S. technology and sending it to China, he and Tricon likely would have never been indicted.

### D.   The prosecution's attempted discriminatory strike against an Asian-American juror

Whether consciously or unconsciously, the anti-Asian bias that has long tainted this case affected how the prosecution targeted Mr. Yu (along with his wife, Yanzhi Chen, against whom the prosecution dropped charges only after Mr. Yu's acquittal on all charges common to both of them) and how it sought to discriminate against potential jurors.

After seating 15 potential jurors, a group that appeared to include only two Asian-American individuals, the Court invited the prosecution to exercise its peremptory strikes. The prosecution consulted as a team and, then, sought to use its first strike against Juror 4, Jimmy H. The following exchange ensued at sidebar:

AUSA:       Juror 4.

Court:       Tell me the name.

AUSA:       Jimmy H[ ].

Court:       H[ ]?  H[ ] is Asian, why are you challenging him?  I see no reason to challenge him?

**(Pause)**

AUSA:       It's based solely on the profession your Honor.

Court:       And what is it?

**(Silence)**

Court:       You don't even know what the profession is.

AUSA:       It is something that we have to resolve . . .

| Court: | It appears that you do.  I'm not being flippant about this, you've challenged one of the few Asian Americans on the panel. |
| AUSA: | We'll withdraw the challenge, your Honor. |
| Court: | It's withdrawn.  Fine.  Anyone else? |

Tr. 62. Such purposeful discrimination based on Asian ethnicity during jury selection, albeit unsuccessful, could hardly have been more blatant.

The prosecution used its very first strike against one of only two Asian jurors in the venire, and the purported non-discriminatory rationale for that strike was plainly a hollow pretext. The prosecution claimed that Jimmy H.'s "profession" suggested his partiality, but when pressed by this Court, it could not even identify his employment. As the Court knows from *voir dire*, Jimmy H. works as a paraprofessional and nurse in a local public school system. *See* Tr. 5/3 at 58. Nothing about that job even hints at any partiality. Notably, the prosecution did not use a strike against another potential juror, sitting in the very next seat, who teaches science in a local public school system but is white. *See id*.

The prosecution's abortive attempt to use its first peremptory strike against an Asian-American juror named "Jimmy" was particularly notable in light of the prosecution's persistent allegation that Mr. Yu's use of the nickname "Jack" in his business dealings was somehow nefarious or suspicious. *See, e.g.*, Government's Motion in Limine to Admit Portions of Defendant's Statement and to Preclude Admission of Self-Serving Hearsay, D.E. 202 at 3 ("The defendant replied that, when working on behalf of his company, Tricon MMIC, LLC ("Tricon"), he used the name "Jack" . . . . This is an incriminating statement because it suggests that the defendant attempted to conceal his true identity by using the alias "Jack" when he managed Tricon's affairs."); Prosecution Opening Statement, 5/5/22 Tr. at 31 ("Now ultimately he resigned from ADI in July of 2017 and you might think 'Well maybe then he started using his real name

because he's not working at ADI, he has nothing to hide,' and you would be wrong. He continued using 'Jack Yu,' never 'Haoyang Yu,' whenever he was running Tricon.").

As documented in both scholarly literature and mass media, "[t]here's a long history of Asian Americans using Anglo or anglicized names—whether they adopted new White-sounding names like John or Jennifer, or changed the pronunciation or spelling of their original name to better suit English speakers." Jesse Yeung, *Why some Asian Americans are embracing their heritage by dropping their anglicized names*, CNN (Apr. 7, 2021). "The practice was popularized in the 19th century due, in part, to fear in the face of intense racism and xenophobia…There were financial motivations, too—immigrant business owners may have felt that an anglicized name would better appeal to customers." *Id.*; *see also, e.g.*, Pedro Carneiro, Sokba Lee, Hugo Reis, *Please Call Me John: Name Choice and Assimilation of Immigrants in the United States, 1900-1930*, 62 LABOR ECONOMICS (Jan. 2020). Striking Jimmy H. would have excluded this lived experience from the jury.

The jury occupies a central position in our system of justice, because it safeguards a person accused of crime against the arbitrary exercise of power. *See Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). Those on the venire must be "indifferently chosen" to secure the defendant's right under the Fourteenth Amendment to "protection of life and liberty against race or color prejudice." *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880). Indeed, the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Porter v. Coyne-Fague*,  35 F.4th 68, 75 (1st Cir. 2022) (internal quotation marks and citation omitted). "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86-88 (1986) (quoting *Strauder*, 100 U.S. at 309).

Moreover, "[r]acial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try," but also the potential juror who is denied "participation in jury service on account of his race." *Id.* And that is not all:

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude [any person based on race or ethnicity] from juries undermine public confidence in the fairness of our system of justice.

*Id.* at 88 (citing *Ballard* v. *United States*, 329 U.S. 187, 195 (1946), and *McCray* v. *New York*, 461 U.S. 961, 968 (1983) (Marshall, J., dissenting from denial of certiorari)).

In this case, although this Court acted *sua sponte* to stop any discriminatory strikes during jury selection, the prosecution's attempt to strike Jimmy H leaves an unmistakable residue, as yet one more indication that this prosecution has been anything but color-blind. The prosecution's abject failure to justify its attempt strike echoes its similarly dramatic failure to prove any of its purported "aggravating factors" at trial, *i.e.*, that Mr. Yu violated export controls or committed immigration fraud.

As the Supreme Court has recently affirmed, the seriousness of such discriminatory conduct, and its consequences for the integrity of the criminal justice system, cannot be overstated. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019) ("In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."). Thus, although this Court prevented the prosecution from running afoul of *Batson*, the attempt to strike one of the only Asian jurors undermines "public confidence in the fairness of the criminal justice system" and calls into question the integrity of the entire prosecution against Mr. Yu. *Id.* at 2242-43.

E.    **The Prosecution's Post-Trial Press Release**

On the afternoon of Saturday, May 28, 2022, two days after the jury returned its verdict, the U.S. Attorney's Office issued a press release, announcing "Lexington Man Convicted of

Possessing Stolen Trade Secrets." The headline buried the lede—that the jury found Mr. Yu *not guilty* of 18 of 19 charges, including 11 charges that he unlawfully possessed any trade secrets that belonged to ADI.

The DOJ's post-trial release also made no mention of Mr. Yu's Chinese ethnicity, a dramatic contrast to earlier releases about his indictment, which emphasized the irrelevant facts that he was born in Harbin, China; entered the United States through "the student visa program," and later became a naturalized citizen. *See* DOJ Press Release, "Lexington Couple and Their Semiconductor Company Indicted on Charges of Theft of Trade Secrets from Norwood Semiconductor Company" (Oct. 1, 2020).[9] For example, the initial release about this case began, "A *Chinese born* naturalized U.S. citizen living in Lexington . . . ." DOJ Press Release, "Lexington Man and Semiconductor Company Indicted for Theft of Trade Secrets" (June 14, 2019) (emphasis added).

Of particular importance to the pending motion, the latest release lauded the guilty verdict on Count 1 as "the *first-ever conviction* following a criminal trial of this kind in the District of Massachusetts" (emphasis added), referring to the unlawful possession of a trade secret in violation of 18 U.S.C. § 1832(a)(4). That characterization only reinforces the inescapable conclusion that this "first-ever" prosecution against Mr. Yu was a dramatic departure from how such disputes between technology companies and their former employees are typically addressed—a departure driven from inception by the disgraceful "China Initiative" and the unwarranted (and prejudicial) belief that Mr. Yu was a Chinese spy who was serving some shadowy Chinese interest.

---

[9] The alleged China connection in the initial press release was obvious to any reader, as the contemporaneous press coverage confirms. *See, e.g.*, Kinling Lo, "China-born US citizen charged over alleged theft of American trade secrets," SOUTH CHINA MORNING POST (Oct. 7, 2020), *available at* < https://sg.news.yahoo.com/china-born-us-citizen-charged-111144590.html >.

## **CONCLUSION**

Since this investigation began, 5 years ago, the Department of Justice has dropped its disgraceful "China Initiative," an explicit exercise in racial profiling against both Chinese Americans and Chinese nationals.[10] That was the right decision, because the DOJ's misguided program, in which the former U.S. Attorney for the District of Massachusetts played a prominent role, was patently inconsistent with the constitutional guarantee of equal protection—and the corresponding prohibition on racial or ethnic discrimination. This case should have been dropped along with the China Initiative, but the prosecution chose to carry on against Mr. Yu, and even "upped the ante" with novel and more attenuated theories when Mr. Yu exposed problems with prior charges.  It now falls to this Court to vindicate the Constitution's fundamental commitment to a color-blind system of criminal justice. To that end, this Court should reconsider its June 13, 2022 Order, D.E. 284, and either dismiss the Count 1 or proceed with discovery (as addressed in a separate motion) and an evidentiary hearing.

---

[10] *See Katie Benner*, "Justice Dept. to End Trump-Era Initiative to Deter Chinese Threats," THE NEW YORK TIMES (Feb. 23, 2022) (in public remarks, Matthew Olson, head of the DOJ's national security division, acknowledged that, "[b]y grouping cases under the China Initiative rubric, we helped give rise to a harmful perception that the department applies a lower standard to investigate and prosecute criminal conduct related to that country or that we in some way view people with racial,     ethnic     or     familial     ties     to     China     differently"),     *available     at* https://www.nytimes.com/2022/02/23/us/politics/china-trump-justice-department.html; *see also* Sheridan Prasso, "China Initiative Set Out to Catch Spies. It Didn't Find Many," BLOOMBERG (Dec. 14, 2021) (reporting that DOJ program "produced few convictions" but "lots of complaints about     racism     and     FBI     misconduct"),     *available     at* https://www.bloomberg.com/news/features/2021-12-14/doj-china-initiative-to-catch-spies-prompts-fbi-misconduct-racism-claims.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

_____*/s/ William W. Fick*_____
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: November 14, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 14, 2022.

*/s/ William W. Fick*_____