IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HAOYANG YU | No.  19-cr-10195-WGY |

**OPPOSITION TO PROSECUTION'S MOTION TO STRIKE**

Defendant, Haoyang Yu, respectfully submits this Opposition to the Prosecution's Motion to Strike the four exhibits attached to his Memorandum Regarding Alleged "Loss" D.E. 347 ("Mtn."). The Court should deny the motion.

Whether or not each individual exhibit is admissible under the Rules of Evidence, they individually and collectively contain information and data that are in evidence and/or are appropriate subjects of judicial notice, which can be taken "at any stage of the proceeding." Fed. R. Evid. 201(d). They also are all well within the "wide discretion in the sources and types of information" this Court my consider at sentencing. *Concepcion v. United States*, 142 S. Ct. 2389, 2395 (2022).

Moreover, the prosecution does not contend in its motion that anything in the exhibits is incorrect or unreliable. Where, as here, Mr. Yu bears no burden to prove anything, and where neither ADI nor its witnesses have themselves alleged any loss, the exhibits serve chiefly to confirm for the Court that, in the absence of direct or even circumstantial evidence to prove its *theories* of loss, the prosecution is urging the Court to adopt factual inferences that the prosecution knows to be unfounded or even outright false.

**Exhibit A – "Chalk A" (comparing the frequency and power ratings of certain MMICs)**

Whether the Court continues to treat Exhibit A as an illustrative "chalk" or a summary

chart in evidence under Fed. R. Evid. 1006, it compiles and summarizes information from reliable sources (other exhibits in evidence and published product data sheets). Multiple witnesses acknowledged the relevance of the underlying types and public sources of information (even as they claimed ignorance of specific competing MMIC products), and it is entirely proper for the Court to consider such information.

Both Faiz and King testified that frequency (GHz) and "P1dB" power (dBm) are the key attributes of chip performance. *See, e.g.*, Tr.12/13/22:17 (King: emphasizing "the frequency range and the power capability"); Tr.11/29/22:15-17 (Faiz: "Q. [T]he main determinants of like what a chip can do are the upper frequency and the power, is that fair? A. Right."); Tr.5/19/22:138 (Nordquist: comparing frequency and power of Tricon and ADI products). Those are the characteristics that Exhibit A compares.

King and multiple other witnesses acknowledged that reference to published product datasheets is a common and appropriate method to evaluate and compare chip performance. Tr.12/13/22:22 (King: "Q. [O]ne way to become familiar with competing MMIC products is to examine published data sheets for those products, right? A. Yes. Q. That's a common thing, companies publish their data sheets, you can look at them and in that way you understand what's on the market, right? A. Yes, that's fair."); Tr.5/5/22:77 (Cowles: describing content of data sheets to convey "important information that customers need to use our parts in their products"); Tr.5/11/22:18 (Elliasevich: "Q. [Y]ou can go on the internet and look for a 50 gigahertz MMIC and find companies to order from, right? A. Yes."); Tr.5/16/22:76 (Blount: describing data sheet as "something to give to a customer so they can decide if they can use a product"); Tr.5/16/22:80 (Blount: explaining that as first step to develop a chip to fill an "obsolescence void" he would first "look at the data sheet" of the obsolete product); Tr.5/19/22:138 (Nordquist: "Q. Did you review

those specification sheets? A. Yes. Q. And how, based on those, how were the chips designed to perform? A. The chips were designed to, at least according to the data sheets, they were designed to be functionally equivalent"); Tr.5/23/22:65 (Monroy: explaining that for license determinations, BIS officials "examine the data sheet or technical specification submitted about the item" including "the frequency rate at which the data sheet says that the MMIC operates . . [and] the power output"). Exhibit A compiles information from data sheets in evidence and published manufacturer websites, with a citation to the web URL for data sheets not in evidence.

In addition, evidence from the Internet Archive (also known as the "Wayback Machine") that Mr. Yu cited in footnotes to establish the dates competing products were available for sale, *see* D.E. 344 at 10, is appropriate for judicial notice. "The Wayback Machine is an online digital archive of web pages. It is run by the Internet Archive, a nonprofit library in San Francisco, California. [E]xaminers use The Wayback [M]achine as a source of information to determine when a Web reference was first made available to the public. District courts have taken judicial notice of the contents of webpages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (internal citations and quotation marks omitted; brackets in original) (collecting cases). And the Court should consider evidence to establish the relevant dates, because the prosecution has previously complained that data sheets for comparable MMICs were undated.

**Sealed Exhibit B – Nordquist Summary Chart**

Exhibit B is a summary chart prepared by the prosecution's expert, Christopher Nordquist, "to compare layouts of amplifiers with similar performance to selected vendor amplifiers" compiled from "published reports, in press releases, vendor datasheets, and websites." It identified

18 such chips as comparable to the HMC1022A. Mr. Yu submits it is admissible under Fed. R. Evid. 1006 and/or 201. Even if the Court determines that the chart is not affirmatively admissible, it is relevant for the Court to know that, notwithstanding the purported "lay" testimony that the prosecution elicited from King about the supposed "uniqueness" of the HMC1022A,[1] the prosecution's actual expert had identified a large number of chips with "similar performance."

**Exhibit C – FBI 302 of Wasylewski Interview**

As noted in Mr. Yu's memo, he provided the Wasylewski 302 not to affirmatively prove anything (since he has no burden of proof) but rather to illustrate the utter disingenuousness of the prosecution's position.

The prosecution's initial "loss" memorandum asked the Court to conclude that every Tricon sale of the TM5051/52 actually displaced an ADI sale of the HMC1022A, including every one of the 70 chips that Tricon sold to Wasylewski's company, Ciao Wireless. The prosecution advanced this claim even though (a) it called no actual customers to testify, (b) King knew nothing about why some ADI customers also purchased Tricon products, (c) King also knew nothing whether those purchases displaced or deterred any ADI sales, and (d) the *only* direct evidence the investigation did develop from Ciao Wireless tends to refute the baseless inference the prosecution asked the Court to accept.

**Exhibit D – ADI Responses to Interrogatories**

The Court can take judicial notice of ADI's sworn interrogatory responses in a civil case

---

[1] In a footnote, the prosecution argues that Mr. Yu waived any objection to undisclosed "expert" testimony. Not so. Mr. Yu repeatedly objected to questions that implicated specialized expertise. When defense counsel requested to be heard at greater length outside the hearing of the witness, the Court demurred. Tr.11/29:87. Thereafter, Mr. Yu requested and obtained the Court's assent to a continuing objection. Tr.11/29:90. In any event, the issue has been timely raised, in the court of first instance, prior to any factual findings by the Court.

arising from the same core facts and circumstances, which were served on January 23, 2023 (after the evidentiary hearings in this case). Mr. Yu does not offer it for the truth of any matter asserted therein. Rather, he offers it simply to establish the indisputable fact that, in related litigation, ADI has been unable or unwilling to allege any specific "loss" and has taken the legal position that proof of "loss" will necessarily be the subject of *expert* testimony. Accordingly, it is not surprising that the prosecution failed to elicit any testimony of claimed "loss" from the ADI-affiliated "lay" witnesses whom it called in this case.

## CONCLUSION

For the foregoing reasons, the Court should deny the prosecution's motion to strike.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

　　*/s/ William W. Fick*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*

Dated: February 13, 2023

## CERTIFICATE OF SERVICE

　　I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 13, 2023.

*/s/ William W. Fick*