IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

HAOYANG YU

No.  19-cr-10195-WGY

REDACTED AT GOVERNMENT BEHEST [A]

> Furthermore, YU and CHEN have a strong nexus to the People's Republic of China.

*—from FBI Report dated March 23, 2018, summarizing the "Open" Case on the day after* ▮▮▮▮▮▮▮▮ *"accepted" the referral based on a law enforcement "presentation"*

### DEFENDANT HAOYANG YU'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR UNCONSTITUTIONAL SELECTIVE ENFORCEMENT

Defendant, Haoyang Yu, respectfully submits this supplemental memorandum in support of his Motion to Dismiss (or at a minimum, for further discovery) based on unconstitutional selective enforcement, incorporating by reference his prior filings, including D.E. 55, 56, 314, 315, and 316. Specifically, this memorandum addresses the significance of certain limited discovery that the prosecution "voluntarily" produced on December 13, 2022, and February 21, 2023.

The prosecution insists that two private "tips" to federal agents in late 2017 and early 2018, "not the defendant's nationality or ethnicity," explain "why he and Tricon MMIC, LLC, were identified as the targets of a federal investigation." Sealed Ex. A (prosecution letter dated December 13, 2022). However, that bald assertion conflates two separate issues. Agents identify suspects to investigate in a variety of ways, commonly including receipt of information from private-citizen-tipsters. But not every suspect becomes an investigative target, and not every target faces charges. The relevant issue is different: even when suspects are ostensibly identified through

---

[A] While defense counsel were prepared to agree to some redactions as a courtesy, the redactions demanded by the prosecution here, particularly in Section III.C., are excessive and inconsistent with United States v. Kravetz, 706 F.3d 47, 56-59 (1st Cir. 2013).

"race neutral" means, did agents then "engage[ ] in racial discrimination…when deciding *which* suspects to refer for prosecution[?]" *United States v. Davis*, 793 F.3d 712, 721 (7th Cir. 2015) (emphasis added).

Here, available evidence supplies a strong basis to conclude the answer to that question is "Yes" — that Mr. Yu's *supposed* (based on implicit or conscious bias) but, in fact, *illusory* "nexus to the People's Republic of China" animated the agents' actions and decisions through every step of their work, including their original decision to refer Mr. Yu to prosecutors, as well as their ongoing investigative activities, which supplied the basis for new theories and charges to prosecutors through multiple superseding indictments. At a minimum, additional discovery is required. While Mr. Yu shares the Court's concern that this case must be brought to an expeditious conclusion, that legitimate goal should not pretermit necessary further proceedings on this important constitutional issue.

## I.    Summary of Legal Framework

Because selective enforcement and prosecution claims "draw on 'ordinary equal protection standards,'" *Armstrong v. United States*, 517 U.S. 456, 465 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)), a defendant must make "a binary showing" of "discriminatory effect" and "discriminatory intent." *United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008). "[A] facially less rigorous standard" applies to warrant discovery. *United States v. Washington*, 869 F.3d 193, 215 (3d Cir. 2017).

With regard the second factor, "[d]iscriminatory purpose," the defendant must offer evidence that government actors—here, law enforcement agents—"selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (quoting *Personnel Admin. Of Mass. v. Feeney*, 422 U.S. 256, 279 (1979)). Notably, a defendant "is not required to produce direct

evidence" of discriminatory intent, which is "rarely available." *Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). "As in any equal protection case, statistical disparities and other indirect evidence maybe used to show bias or discriminatory motive." *Id.*

Selective enforcement claims are easier to sustain than selective prosecution claims because federal agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel." *Davis*, 793 F.3d at 720. "In sum, the sort of considerations that led to the outcome in *Armstrong,*" which denied a motion to dismiss for selective prosecution, "do not apply to a contention that agents …engaged in racial discrimination …when deciding which suspects to refer for prosecution." *Id*. at 721.

## II.     Mr. Yu Made a Substantial Prior Showing.

Even before the prosecution's limited, recent "voluntary" discovery production, Mr. Yu had already supplied powerful evidence of both discriminatory effect and discriminatory intent, briefly summarized here.

### A.     Discriminatory Effect

This Court has previously acknowledged that Mr. Yu "mustered...eyebrow-raising statistics" of racial disparity. D.E. 89 at 3. Those statistics, drawn from federal and state courts, demonstrate the alarmingly disproportionate rates of criminal prosecution for alleged trade secret offenses against defendants of Chinese ethnicity, including U.S. citizens of Chinese descent, like Mr. Yu. *See* D.E. 56-1 (Appendix A of Comparable Cases of Alleged Trade Secret Theft in Federal and State Courts in Massachusetts). Subsequent published research has confirmed these ongoing disparities. *See, e.g*., *Racial Disparities in Economic Espionage Act Prosecution: A Window into*

*the New Red Scare* (ed. Andrew Chongseh Kim) (Sept. 21, 2021).[1]

The record in this case also illustrates a rare instance of selective enforcement in which multiple "control group" comparisons are available, *see* D.E. 315 at 8-12, including (1) the civil lawsuit in this District by ADI against MACOM, a competitor, after Tom Winslow and other white engineers admitted stealing confidential information but never faced criminal charges; (2) unlicensed export of GDS files for "controlled" MMICs by both Custom MMIC and even ADI, which did not result in criminal charges; and (3) various innocuous activities, such as running a business from a residential basement, placing a spouse on incorporation documents, or having a "rudimentary" website,  deemed "suspicious" when performed by Mr. Yu, but not a white British man like Paul Blount.

### B.    Discriminatory Intent

Apart from the inferences about intent that can properly be drawn from indirect evidence such as statistics, Mr. Yu also marshalled powerful direct evidence of discriminatory purpose flowing directly from the mouths of then-President Trump and high-level federal law enforcement officials, including FBI Director Wray. *See* D.E. 56 at 10-14. "The message from leadership is that 'Chinese Americans are being weaponized as a tool by foreign nationals.'" Mara Hvistendahl, "The FBI's China Obsession," THE INTERCEPT (Feb. 2, 2020), at 18 (quoting former FBI supervisor).[2]

---

[1]  *Available  at*  https://www.committee100.org/wp-content/uploads/2021/09/Whitepaper-Final-9.21-UPDATE-compressed.pdf

[2]  On a related point, in its December 13 letter the prosecution insists that the DOJ "China Initiative" is irrelevant because "the investigation of the defendant and Tricon had been under way for *nearly a year* before the China Initiative was announced." Ex. A (emphasis in original). That narrow view is misplaced because the China Initiative did not suddenly activate discriminatory law enforcement on the date it was formally announced (November 1, 2018). Rather, the China Initiative was a reflection, validation, and even doubling-down on anti-Chinese bias that already

Mr. Yu also pointed to specific evidence of bias among agents who worked on his case, including Case Agent Benjamin Hickok's false (and subsequently uncorrected) statement in his sworn search warrant affidavit that Mr. Yu is a "Chinese National," D.E. 315 at 12-13, and Agent Brian Anderson's March 2019 report, replete with "China" references, seeking designation as "Significant Case," and thus, presumably, an increase in available investigative resources. While this evidence post-dates the initial referral to the U.S. Attorney, it is probative of the agents' attitudes and biases about Mr. Yu and the case more generally. Indeed, the fact that agents continued to focus on a phantom "China nexus" in 2019, when investigation to date would have made it abundantly clear that Mr. Yu was not a spy in the employ of the PRC, strongly suggests ingrained attitudes and biases, whether conscious or implicit, that even actual evidence could not dispel.

## III.    The Two "Tips" and the Prosecution's "Voluntary" Production

Mr. Yu has known for years and does not dispute that two private "tips" in late 2017 and early 2018—one from Custom MMIC (Paul Blount and his associates) and one from  a company called ██████[3]— initially brought Mr. Yu to the attention of law enforcement. But contrary to the prosecution's position, the mere existence of those private "tips" does not end the selective enforcement inquiry. Rather, the "tips" simply provide a factual backdrop to understand and evaluate the agents' subsequent actions.  What if any further diligence did the agents do to "vet" the tips?  What was really of interest to the agents? And why?

Available information, including the small number of newly supplied documents, suggests

_____

pervaded federal law enforcement. Moreover, the China Initiative was well under way through the ongoing investigation that eventually led to the original indictment of Mr. Yu in June 2019.

[3] ████████████████████████████████████████
████████████████████████████████████████████

that the agents' handling of the tips, and their ultimate referral to the U.S. Attorney, were strongly influenced by Mr. Yu's *wrongly* perceived "nexus to the People's Republic of China" based on his ethnicity. And notably, neither the ███ "tip" nor the Custom MMIC "tip" were among the allegations that the prosecution eventually brought to trial. This suggests that something else— namely, the phantom perceived "nexus" to China—was motivating the investigators and the case they eventually built for prosecutors, from inception to conclusion.

### A.    Custom MMIC

The substance of the "tip" from Custom MMIC in December 2018 was that Paul Blount was surprised to discover a new competitor without a "pedigree" and noted that one of Tricon's advertised products, the TM5054, could potentially be export controlled. Agent Hickok then obtained an initial DOC determination that the TM5054 was subject to export control (which DOC later *reversed*).[4] But most critically, at the time of the referral to the U.S Attorney in March 2018, Hickok still had *no* evidence that Tricon was *actually* exporting the TM5054 without a license. He did, however, know that Mr. Yu and Ms. Chen were of Chinese descent.

### B.    ███████

The "tip" from ████, in January 2018, complained of the fact that the Tricon website had "a picture of one of ██████ standard products on the front page." YU-008779. ████ also noted that Tricon's datasheets were formatted "just like the ███████████████ datasheets." YU-008782.

Objectively, it is difficult to understand why this "tip" generated any law enforcement interest whatsoever. There is nothing remotely unlawful about one company using a similar *format*

---

[4] As noted in Mr. Yu's *Franks* motion, with minimal diligence Agent Hickok could have developed reason to question the initial "controlled" classification of the TM5054. It was no secret that ADI and its resellers treated the "nearly identical" HMC-994A as *not* subject to export control, and that the ADI product actually had *higher* performance characteristics.  *See* D.E. 61 at 10-11.

to other company's publicly available data sheets. And if agents had done a bare 30 seconds of diligence on Tricon's web page they could have determined that the demonstrative "picture" of the ▇▇▇▇ chip was simply illustrative of a product class — what MMICs generally look like. Tricon wasn't purporting to sell that particular chip.



Trial Ex. 108. Moreover, a Google search of the embedded picture of ▇▇▇▇'s chip would have revealed to agents that the very same image was widely available on the internet, including in a 2011 published paper.[5]

---

[5] *See, e.g.,* https:/▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



Nevertheless, the ▮▮▮ "tip" became the subject of a breathless "Defense Counterintelligence and Security Agency report, dated January 30, 2018, that identified Mr. Yu and Ms. Chen as suspects. *See* Sealed Ex. B. The real reason for law enforcement interest can be inferred from the "administrative information" at the end of the report.

UNCLASSIFIED//FOUO

SCR Serial:    DSS-201801-664

Administrative Information for SCR SERIAL DSS-201801-664

| | |
|---|---|
| Classification Level | UNCLASSIFIED//FOUO |
| Derived From | Multiple Sources |
| USPI Collection Category | Category 3: Foreign Intelligence |
| USPI Details | 3.a. Person reasonably believed to be an officer or employee of, or otherwise acting on behalf of, a foreign power. |
| USPI Reviewed By | ▮▮▮ |
| USPI Reviewed Date | July 1, 2020 |
| Date of Entry | January 30, 2018 |
| DCSA Region | South |
| Facility Address | Null, Richardson, TX 75080 |
| CAGE Code | 1CVM1 |
| Prepared By | ▮▮▮ |
| Prepared By | |
| Date of Incident | January 22, 2018 |
| Originating Country | United States |
| Associated Country | China |
| Export Control | ITAR |
| Write IIR? | Indefinite Hold |
| Reconsideration Comments | ▮▮▮ |
| Local Level Referral | AFOSI, FBI, NCIS |

Ex. B at 4. The innocuous tip from ▮▮▮ had suddenly become "foreign intelligence" information about a "[p]erson reasonably believed to be an officer or employee of, or otherwise acting on behalf of, a foreign power," namely "China." The only basis for this inferential leap was the apparent ethnicity of Mr. Yu and Ms. Chen.

A later report by the U.S. Naval Investigative Service following-up on the ▮▮▮ "tip" notes that the agent's "efforts revealed various identifying details concerning the company [Tricon] and its personnel [Mr. Yu and Ms. Chen], but *no specific indications of ITAR violation*.

These details were later provided during a Red Dart meeting in February 2018, specifically to both the DSS and the FBI members in attendance." Sealed Ex. C (emphasis added).

> 2. ███████ DUNN's efforts revealed various identifying details concerning the company and its personnel, but no specific indications of ITAR violations. These details were later provided during a Red Dart meeting in February 2018, specifically to both DSS and the FBI members in attendance.

In other words, agents acknowledged that there was no apparent violation of the law, but nevertheless passed on the personal details about Mr. Yu and Ms. Chen at something called a "Red Dart" meeting. What is "Red Dart"? Is it perhaps a law enforcement group that *targets* (like a "Dart") persons believed to have a nexus to "Red" *China*? Everything about the law enforcement treatment of the ████ "tip" suggests an implacable desire to conjure a "China nexus" even where none exists and, what's more, even where there is no evidence of a crime.

**C.  HSI Memo ████████████████████**

Among the new documents the prosecution produced in December 2022 was a "February 2019 HSI [Homeland Security Investigations] memorandum ████████████████ ████████████████████ Ex. A at 4 (prosecution letter with quoted language); *see also* Sealed Ex. D (the referenced HSI memorandum). ████████████████████



███

In its December 22 letter, the prosecution glibly contends, "[g]iven that this memorandum was written in February 2019—more than a year after the inception of the defendant's investigation—it does not concern 'how…[the defendant and Tricon] were identified as the targets of a criminal investigation." Ex. A at 4. That assertion misses the point entirely. While it is true that the document post-dates the law enforcement referral of Mr. Yu to the U.S. Attorney, it provides astonishing, powerful, direct evidence of the beliefs and biases of the agency (and thus, its agents) who "led" the investigation. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ The HSI report also raises myriad additional questions:

███████████████████████████████████

███ ████ █ ██ ███ █ ██ ██ ████ ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

### D.    Referral for Prosecution

Also among the new documents produced by the prosecution in December 2022 was a chronological "Digest of Activities," apparently from one of the investigating agencies:

| Date | Party Contacted | Digest of Activities |
|---|---|---|
| 12/19/17 | | INFORMATION RECEIVED |
| 1/22/18 | COMMODITY CLASSIFICATION TO RECEIVED | |
| 3/22/18 | PRESENTED ⟩ AS GJ | ██████████████████████ |
| 3/22/18 | OPENED | |
| 3/22/18 | ROI #1 | ACTIVITIES TO THIS POINT |

Sealed Ex. E. The document appears to show that on March 22, 2018, law enforcement "presented"

the case to ████████████████, who then accepted the referral and caused it to be

"opened" in the U.S. Attorney's Office for further investigation and possible prosecution.

Absent an evidentiary hearing, Mr. Yu cannot know to a certainty what was in the minds

of the investigating agents and what they said in their "presentation" to ████████████.

However, certain features of an FBI report from the following day, March 23, 2018,[6] summarizing

the now "Open" case, provide a telling snapshot into how the agents viewed the investigation and

Mr. Yu—what they were thinking and deemed important at the inception of the investigation, the

day after they "presented" it to ████████. *See* Sealed Ex. F.

First, the cover page of the FBI report contains a reference that may seem cryptic at first

glance:  "FCI – PRC"

---

[6] Perhaps not coincidentally, March 23, 2018 was also the day that then-President Trump announced a raft of new tariffs on goods from China and complained, "We have a tremendous intellectual property theft problem." https://www.cnn.com/2018/03/22/politics/donald-trump-china-tariffs-trade-war/index.html



FD-1057 (Rev 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Electronic Communication

**Title:** ▮▮ Open case on YU Haoyang, CHEN Yanzhi and TRICON MMIC LLC.        **Date:** 03/23/2018

**From:** BOSTON

      Contact: ▮▮ ▮▮ ▮▮

**Approved By:** ▮▮ ▮▮ ▮▮ ▮▮

**Drafted By:** ▮▮

**Case ID #:** ▮▮     ▮▮ YU HAOYANG and
                      CHEN YANZHI dba
                      TRICON MMIC, LLC;
                      ANALOG DEVICES (VICTIM)
                      NORWOOD, MA; and
                      ▮▮

                      FCI - PRC

**Synopsis:** ▮▮ Open case on YU Haoyang, CHEN Yanzhi and TRICN MMIC LLC.

In "FBI-speak," however, this notation could not be more clear. It stands for "FOREIGN COUNTER INTELLIGENCE – PEOPLE'S REPUBLIC OF CHINA."[7] Thus, even though the underlying "tips" from ▮▮ and Custom MMIC had nothing to do with China, the referring agents fundamentally viewed Mr. Yu's case as a "counterintelligence" investigation related to the People's Republic of China.

Consistent with the over-arching "FCI-PRC" label, on the second page of the report, the one-paragraph introductory synopsis ends with the sentence: "Furthermore, YU and CHEN have a strong nexus to the People's Republic of China." Ex. F at 2. The report also notes, "checks

---

[7] *See* Office of the Inspector General, "A Review of the FBI's Handling and Oversight of FBI Asset Katrina Leung" (May 2006) (spelling out "FCI-PRC"), available at https://oig.justice.gov/sites/default/files/archive/special/s0605/index.htm

revealed that both Chen and Yu routinely traveled to China in 2014, 2016 and 2017." Ex. F at 6.[8]

The report even devotes an entire paragraph to Tsinghua University, from which Mr. Yu had graduated in 2000:

> [R]esearch on TSINGHUA UNIVERSITY revealed previous reporting that described the university as a C9 League, or one of China's "Ivy League" schools which receives national funding and has ties to the China Scholarship Council. Also, TU actively supports numerous Chinese military programs and researches subjects of military interest, including the Chinese nuclear program, satellite and potential anti-satellite work and missile and radar related research. Furthermore, TSINGHUA UNIVERSITY associates have previously sought sensitive or dual use or export controlled materials and components from cleared contractors.

Ex. F at 6. Of course, one could make similar observations about the U.S. government and defense ties of myriad American universities, including Harvard and MIT. The only possible relevance of this information in the FBI report was to taint Mr. Yu with suspicion by association, even though he had graduated from Tsinghua nearly *18 years prior* to the report, had been in the United States for decades, and was a naturalized U.S. Citizen.

Finally, lest there be any possible, residual doubt about what *really* motivated the investigating agents, the narrative portion of the report concludes:

> ███████   Writer is opening a full economic espionage investigation on YU Haoyang, CHEN Yanzhi and TRICON MMC based on both referrals from DOC/OEE and DSS and FBI Boston will work the case jointly with DOC/OEE, DSS, NCIS and with FBI Dallas as necessary. AUSA ████████████████ is also working the case.

Ex. F at 7. This conclusion confirms that the "FCI-PRC" classification on page one was no careless mistake. Mr. Yu was tagged with a "PRC nexus" due to his ethnicity. That erroneous and unlawful classification was plainly decisive in choosing him among potential "suspects to refer for

---

[8] Had they cared to do so, investigators could easily have established that Mr. Yu and Ms. Chen have elderly parents in China.

prosecution." *Davis*, 793 F.3d at 721.

## IV.    At a Minimum, Additional Discovery is Warranted

The Court should require the prosecution to provide answers to the questions Mr. Yu posed above (*e.g.*, What is "Red Dart?"  What if any guidance is provided to law enforcement agents to avoid unlawful bias when choosing targets among suspects and making referrals for prosecution?) and others, through both additional document discovery and agent testimony at an evidentiary hearing.

The prosecution plainly did not recognize or acknowledge the exculpatory significance of the handful of documents it did produce.  Moreover, the prosecution's limitation of its production thus far to materials "created or sent prior to the case's referral  to the U.S. Attorney's Office" and "that concern or describe how Haoyang Yu and Tricon were identified as the targets of criminal investigation" is too narrow for at least two reasons.  First, documents that that post-date the referral, and that concern other matters, can still provide strong evidence of bias among the agencies and agents who made the referral.  And second, the ongoing work of agents in the case, beyond the initial referral, surely influenced the nature and extent of the investigation and actions taken by prosecutors, including the return of multiple superseding indictments that abandoned and/or changed legal theories of liability based on different alleged facts.

## <u>Conclusion</u>

For the foregoing reasons, as well as those set forth in Mr. Yu's prior filings, the Court should dismiss this action due to unconstitutional selective enforcement or alternatively, at a minimum, require additional discovery and/or an evidentiary hearing as outlined herein.

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

_____/s/ William W. Fick_____

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
_wfick@fickmarx.com_
_dmarx@fickmarx.com_

Dated: April 5, 2023

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 15, 2023.


*/s/ William  W. Fick*