IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HAOYANG YU | No.  19-cr-10195-WGY<br><br>Leave to file granted on<br>April 26, 2023 |

**DEFENDANT HAOYANG YU'S  REPLY TO PROSECUTION'S RESPONSE TO HIS SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR UNCONSTITUTIONAL SELECTIVE ENFORCEMENT**

The prosecution's Response ("Resp." D.E. 360) to Mr. Yu's Supplemental Memorandum concerning selective enforcement calls to mind an episode of the classic 1970s British comedy[1] series *Fawlty Towers*[2] entitled, "The Germans." Basil Fawlty, played by actor John Cleese, is the proprietor of a small hotel in provincial England. When he learns that German tourists have booked a stay, he emphatically warns his staff:  "Don't mention the War!" But he proves serially incapable of following his own advice.[3] Try as he might, Mr. Fawlty cannot contain his feelings and suspicions about "the Germans," which animate his behavior.

In law enforcement no less than in hotel services, candor requires that we acknowledge manifestations of bias, whether conscious or merely implicit, no matter how much we might wish to repress, ignore, or deny them. The "eyebrow-raising" statistics Mr. Yu has marshalled

---

[1] This Court has recognized that humor can inform the discussion of serious matters. *See, e.g., Suboh v. Borgioli*, 298 F. Supp. 2d 192, 194 (D. Mass. 2004) (Young, J.) (opening judicial opinion by quoting satirical lyrics of "Appointed Forever," set to the tune of "Happy Together" by The Turtles).

[2] *See* https://en.wikipedia.org/wiki/Fawlty_Towers

[3] *See* https://www.youtube.com/watch?v=MfFxoyxQAh4 (excerpt from "The Germans")

1

demonstrate the disproportionate prosecution of persons of Asian descent for intellectual property crimes. And this case opens a window to view one stark example of how law enforcement bias contributes to those statistics.

Despite the prosecution's assertions that repeated references to China in case-opening documents were "innocuous," Resp. at 10, the Response doubles down with language that would effectively condone unlawful targeting of enforcement action against persons of Chinese descent. The prosecution's first argument is circular:

> Given that this matter was initiated by the FBI as an economic espionage investigation, however, references to China or the defendant's "nexus" to China are hardly unexpected. "Economic espionage" is defined by statute as the theft of trade secrets for the benefit of a "foreign government, foreign instrumentality, or foreign agent." Reports generated in economic espionage investigations *must* identify the foreign country suspected of benefitting from the stole trade secrets and the target's nexus to it.

Resp. at 2 (statutory citation omitted) (emphasis in original). This "explanation" completely elides the question of *why* the FBI chose to treat Mr. Yu as an "economic espionage" suspect who was supposedly trying to benefit China in the first place.

When agents opened their "full economic espionage investigation," Sealed Ex. F at 7, they had no reason to suspect that Mr. Yu actually did anything to benefit a "foreign government, foreign instrumentality, or foreign agent." As discussed previously and further below, the "tips" provided meagre basis to suspect *any* actual wrongdoing, much less international "espionage."

As for the supposed "*strong nexus* to the People's Republic of China," Sealed Ex. F at 2 (emphasis added), then as now, the prosecution can point to nothing other than the national origin of Mr. Yu and his wife, his degree from the prestigious Tsinghua University earned nearly two decades earlier, and a handful of visits to China where his elderly parents and in-laws reside. *See* Resp. at 11. The suggestion that such commonplace connections, taken together, attain a

critical mass that warrants suspicion of nefarious loyalty to a foreign government should be deeply chilling to the tens of thousands of highly-skilled Tsinghua alumni who live, work, and study in the United States, to say nothing of the nearly 5.4 million individuals who comprise the American Chinese diaspora,[4] many of whom are native-born or naturalized citizens and nevertheless retain close familial ties to China.

The prosecution's emphasis on "threats from the Chinese government," Resp. at 2 & 12-13, echoes then-U.S. Attorney Andrew Lelling's contemporaneous, blunt explanation of a discriminatory U.S. government policy to target ethnically Chinese people:

> The bottom line is that this is an effort by a rival nation state to steal U.S. technology. . . that rival nation is made up almost exclusively of Han Chinese. And so, unfortunately, a lot of our targets are going to be Han Chinese. It if were the French government targeting U.S. technology, we'd be looking for Frenchmen.[5]

It is difficult to imagine a more explicit call for law enforcement to "look[ ] for [China]men" to refer for prosecution, even though persons of all races steal trade secrets from U.S. companies.

While this Court has determined that discretionary prosecutorial decisions are shielded from legal scrutiny, law enforcement investigation and referral decisions are not, even if encouraged by a misguided U.S. Attorney. Language in the "HSI Memo," Sealed Ex. D, which the prosecution has insisted upon keeping under seal,[6] separately confirms that federal law enforcement views Mr. Yu's case, specifically, through the same biased lens.

---

[4]   *See*   https://www.migrationpolicy.org/article/chinese-immigrants-united-states#:~:text=The%20Chinese%20diaspora%20in%20the,ninth%20largest%20in%20the%20country.

[5]   https://www.science.org/content/article/us-prosecutor-leading-china-probe-explains-effort-led-charges-against-harvard-chemist

[6] Mr. Yu intends to file a motion to unseal various materials related to selective enforcement prior to the hearing scheduled for May 11, 2023.

The prosecution variously describes Mr. Yu's Supplemental Memorandum as "misleading" and "incomplete" and "inaccurate," Resp. at 1-2, but the substance of the prosecution's filing fails to substantiate those derisive adjectives. The prosecution also ironically claims that Mr. Yu is "wrong to suggest that the trial evidence is an appropriate measure of whether the agents' initial suspicions about the defendant and Tricon were untethered from his ethnicity," even though, as this Court recognized, it was the *prosecution* that relied heavily on its *anticipated trial evidence* of crimes *other than* trade secret theft in its original response to Mr. Yu's motion to dismiss. *See* D.E. 89 at 4 ("There is a world of difference between trade secret theft among American companies, and trade secret theft where one of the parties violates export controls or passes the stolen technology to a foreign entity. If the Government's evidence on these matters is not persuasive, however, Yu's motion would have far more bite.").

To be clear, the purpose of Mr. Yu's Supplemental Memorandum was to address the significance of the limited, small handful of additional documents that the prosecution "voluntarily" provided. Those documents strongly reinforced the inference that Mr. Yu's ethnicity and national origin animated the agents' treatment of the meagre "tips" and the steps they took (and failed to take) to investigate those tips.

The prosecution's "Timeline," Resp. at 3-6, fails to support its claim that something other than an illusory "PRC nexus" animated the investigation:

- *December 18, 2017* — The first component of the Custom MMIC/Blount "tip," that Tricon is "fishy" and could not have come up with its product line in 6 months, was unfounded[7] as agents could easily have ascertained from other knowledgeable industry sources. Ivan Eliashevich (from Win) confirmed that one-man design shops are "not unusual," and that a "first run" containing multiple designs within a couple of months is "not uncommon." 5/11/22 Tr. at

---

[7] The "tip" from Blount was also cynically self-interested since the appearance of a new competitor would potentially diminish the value of Custom MMIC at a time when Blount was courting buyers for his company.

4

22-23. And John Mahon testified that within months of leaving ADI for Custom MMIC, he had designed multiple chips that were functional equivalents of ADI products. 5/24/22 Tr. at 35. The second component of the "tip," that Tricon's TM5054 might be export controlled, suggested no wrongdoing. Even taken together at face value, these "tips" supplied no evidence whatsoever of economic espionage for the benefit of China.

- *December 19, 2017 – January 2018* — Agent Hickok's "confirmation" of innocuous facts including Tricon's Massachusetts business registration, mailing address, and MMIC product offerings adds nothing to suggest any wrongdoing. It did, however, make Agent Hickok aware of Mr. Yu's and Ms. Chen's apparent national origin and ethnicity. Hickok later misidentified Mr. Yu as a "Chinese National," put that false statement in a sworn affidavit used to obtain search warrants, and never corrected it.

- *January 2018* — The Commodity Classification that the TM5054 was export controlled (which BIS later rescinded), and the "fact"[8] that Hickok determined Tricon had not applied for any export licenses, supplied no basis to suspect that Tricon unlawfully exported the item.

- *January 23, 2018* — The Company A "tip" to DSS could easily have been debunked with a quick Internet search. Tricon used the image of a long-available Company A chip on its website to illustrate what MMICs look like generally, in much the same way the image had been used in a 2011 published paper available in multiple places on the Internet.[9] And there is nothing protected or confidential about the appearance/format of published chip data sheets. Even taking the "tip" at face value, the fact that Mr. Yu formerly worked for Company A's predecessor did not "validate" concerns about misappropriation of Company A's intellectual property because there was no information that any actual Tricon products infringed that IP.

- *January – February* 2018 — The DSS "suspicious contact report" recording the Company A "tip," Resp., Ex. 5, supports Mr. Yu's position. Company A supplied no reason to suspect "economic espionage" for the benefit of China.

---

[8] The prosecution provides no citation to discovery or record evidence confirming that Hickok inquired in January 2018 whether Tricon had obtained any export licenses, and this "fact" is absent from Hickok's report dated March 23, 2018. Gov. Ex. 2.

[9] The prosecution insisted that Mr. Yu redact the *public* internet link to the published paper/image in publicly-filed version of his Supplemental Memorandum on the basis that an informed reader might be able to "reverse engineer" the identity of Company A from the link. Mr. Yu submits that Company A has no privilege or confidentiality interest in its "tip," certainly not one that can trump the public interest in presumptive disclosure of court documents. Mr. Yu will also address that issue in his planned motion to unseal.

5

But based on nothing more than the ethnicity of Mr. Yu and his wife, coupled with Mr. Yu's decades-old degree from Tsinghua University, an institution with PRC government ties little different than U.S. government ties to the likes of MIT or Harvard, DSS classified the tip as "foreign intelligence" information about a "[p]erson reasonably believed to be an office or employee of, or otherwise acting on behalf of a foreign power," namely, "China."[10]

- *February 2018* — The additional "facts" cited in the Company A Powerpoint, Resp., Ex. 6 at 11, add little. Corporate ownership by a spouse is not inherently suspicious or unusual; Blount registered his new company under his wife's name. Nor is there anything inherently suspicious about creating a home-based company or using a UPS Store address. Blount founded Custom MMIC in his basement, and Hickok observed that another local company, Quantum Micorwave, also used a UPS Store address. *See* Resp., Ex. 2 at 3. And again, even taken at face value, these "facts" supplied no evidence whatsoever of economic espionage for the benefit of China.

- *March 2018* — ADI's allegation that the Tricon TM5054 is an "exact replica" of ADI HMC994A should have put Agent Hickok on notice either that there was something wrong with the BIS classification of the TM5054 or that ADI was illegally exporting *its* product. The ADI website clearly represented the HMC994A was being sold as an EAR99 product—not subject to export controls—and that its performance on relevant metrics surpassed the Tricon product. And while ADI expressed preliminary "suspicion" that Mr. Yu "may" have been stealing IP, it provided no basis to conclude Mr. Yu was acting for the benefit of China or any other foreign power.

- *March 22, 2018* — The DOC investigation notably focused on possible "illegal export" even though Hickok had not yet developed information Tricon made *any* exports.

- *March 23, 2018* — The FBI opened an "economic espionage" investigation based on a supposed "strong nexus" to the PRC despite the utter lack of evidence for such a "nexus."

---

[10] The prosecution complains, Resp. at 5 n.6, that Mr. Yu filed as an exhibit a version of the DSS report that did not include the Tsinghua University paragraph. *See* Sealed Exhibit B. However, Mr. Yu quoted that paragraph in full in his Supplemental Memorandum, at page 13; the omission from the filed exhibit version was inadvertent and Mr. Yu is *emphasizing*, not hiding, the unwarranted DSS suspicion toward all persons associated with the University. Meanwhile, the prosecution filed its version of the DSS report (its Exhibit 5) conspicuously omitting page 4, containing the "Administrative Information" with the unsupported assertion that Mr. Yu is "reasonably believed" to be acting on behalf of the PRC.

**Conclusion**

At the end of "The Germans," the hotel guests, who have suffered through Mr. Fawlty's irrepressible antics of misplaced bias, ask how the British could have won the War. One might similarly inquire how American law enforcement agencies can hope to successfully meet any *real* security challenges posed by the PRC *government* if they permit a jaundiced view of Chinese *Americans* to transform facts that, at most, suggest possible malfeasance by a former employee of a private sector company, into grounds for a "full foreign counterintelligence investigation." This species of bias wastes enormous law enforcement resources on matters that U.S. companies typically handle with civil legal remedies and contributes to the erosion of trust in law enforcement among citizens and scholars of Asian descent, as well as those who work with them. *See, e.g.*, *MIT takes steps to stop foreign espionage, but some faculty say it goes too far*, WGBH (Mar. 1, 2023).[11]

But Mr. Yu and the Court need not answer that "policy" question. It suffices to show that, whether implicitly or consciously, law enforcement referred Mr. Yu for prosecution "at least *in part* 'because of,' and not merely 'in spite of'" his ethnicity and/or national origin. *Wayte v. United States*, 470 U.S. 598, 610 (1985) (quoting *Personnel Admin. of Mass. v. Feeney*, 422 U.S. 256, 279 (1979)) (emphasis added).

Here, there is no doubt that Mr. Yu was referred for prosecution *at least in part* because of his ethnicity and national origin. The Court can even conclude with confidence that the same tips about "John Smith from Topeka" would not have prompted the law enforcement actions directed at Mr. Yu, just as surely as, empirically, similar behavior by Thomas Winslow and Paul

---

[11] Available at https://www.wgbh.org/news/education/2023/03/01/mit-takes-steps-to-stop-foreign-espionage-but-some-faculty-say-it-goes-too-far

Blount apparently never even triggered investigation, much less referral for prosecution. Such selective enforcement betrays the fundamental commitment to fairness, equality, and non-discrimination on which our country and its court system is based. "Racially selective action by law enforcement inflicts harm whether it is perpetrated by law enforcement in the streets or by a prosecutor in an office." *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1055 n.9 (N.D. Cal. 2016). "Both inflict substantial injury on the victim and society: in addition to violating the victim's rights to equality and liberty, such discriminatory conduct impugns the integrity of the criminal justice system and compromises public confidence therein." *Id*.

      For the foregoing reasons, as well as those set forth in prior filings, the Court should dismiss the surviving count of conviction or alternatively, at a minimum, order additional discovery and an evidentiary hearing.

                                        Respectfully submitted,

                                        **HAOYANG YU**

                                        by his attorneys,

                                        */s/ William W. Fick*
                                        William W. Fick (BBO #650562)
                                        Daniel N. Marx (BBO #674523)
                                        FICK & MARX LLP
                                        24 Federal Street, 4th Floor
                                        Boston, MA 02110
                                        (857) 321-8360
                                        *wfick@fickmarx.com*
                                        *dmarx@fickmarx.com*

Dated: April 26, 2023

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 26, 2023.

                                              */s/ William W. Fick*